Case No. 24-189

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AARON NGUYEN, ET AL.
Plaintiffs-Appellants

vs.

CITY OF GARDEN GROVE, et al.,
Defendants-Appellees.

---

Appeal from the Judgement of the United States District Court
for the Central District of California
Case No. 8:21-cv-JVS-ADS

---

## APPELLANTS' OPENING BRIEF

---

BARRETT S. LITT, SBN 105322
DAVID S. McLANE, SBN 124952
LINDSAY BATTLES, SBN 262779
BEN SHAW, SBN 319194
RODRIGO PADILLA, SBN 339523
McLANE, BEDNARSKI & LITT LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-mail: lbattles@mbllegal.com*

Attorneys for Plaintiffs-Appellants

# TABLE OF CONTENTS

Jurisdictional Statement ........................................................... 10

Introduction .......................................................................... 10

Statement of Issues ................................................................ 12

Statement of the Case ............................................................. 13

    I.    Introduction ................................................................ 13

    II.   Overview of the Facts ................................................... 21

        A.    Background ........................................................ 21

        B.    First Recorded Interrogation ...................................... 22

            1.    Nina Described Playing Pool at 2000 With Members of the Victim Group ............................ 25

            2.    When Shown a Photo at 8:53, Nina Unambiguously Denied Being at the Phi Hong on 3/20/11 ........................................ 27

        C.    Intermission ....................................................... 29

            1.    Aaron & Alexander Tran Corroborated Nina .... 29

            2.    Detectives' Inadvertently Recorded Hallway Meeting ................................................ 30

        D.    Martin's Off-Camera Confrontation ........................... 31

        E.    Second Recorded Interrogation .................................. 32

        F.    Prosecution, Conviction & Reversal ........................... 39

        G.    Lord's Report ..................................................... 41

            1.    Mischaracterization of First Interrogation ........ 41

            2.    Coercive Tactics .................................... 42

            3.    Diagram - Mischaracterizing Nina's Statements in the Second Recorded Interrogation ............... 44

            4.    Victims .............................................. 44

Summary of Argument .............................................................. 45

Standard of Review ...................................................................... 46

Argument ....................................................................................... 46

    I.    The District Court Misapplied the Summary Judgment
        Standard By Drawing Factual Inferences in Favor of the
        Non-Moving Party ................................................................. 46

        A.    Direct Evidence Fabrication Claim (1): Genuine
              Disputes of Fact Exist as to Whether Lord's Report
              Materially Misrepresented Nina's First
              Interrogation ............................................................. 47

              1.    The District Court Construed Inferences in Favor
                      of Defendants to Determine Nina Admitted to
                      Being at the Phi Hong After Being Shown a
                      Photo During the First Recorded Session. ......... 48

              2.    Undisputed Facts Establish that Lord
                      Mischaracterized Nina's Reaction to the
                      Phi Hong Photo & Concealed Her Subsequent
                      Denials .............................................................. 52

              3.    By Falsifying the Timing of Nina's First
                      Admission, Lord Distorted Information Essential
                      to Assess the Reliability of Nina's Eventual
                      Admissions. ....................................................... 55

              4.    Construing Inferences in Favor of Plaintiffs,
                      References to Confusion/Dishonesty in Lord's
                      Report Do Nothing to Mitigate the Seriousness
                      of Lord's Misrepresentation ............................... 58

              5.    Material Omissions Support False Evidence
                      Claims ............................................................... 60

        B.    Direct Evidence Fabrication Claim (2): A Genuine
               Dispute of Fact Exists as to Whether Lord Falsified
               Evidence by Directing Nina to Falsely Label the
               Diagram ..................................................................... 61

C. Circumstantial Evidence Fabrication Claim 1: A Genuine Dispute of Fact Exists As to Whether Detectives Used Interrogation Techniques They Knew or Should Have Known Would Yield False/Unreliable Evidence ............................................. 64

    1. Detectives Used Impermissibly Coercive Techniques to Extract Nina's False Admissions ..................................................... 64

        a. Juvenile Interrogations are Judged by a Stricter Standard ......................................... 65

        b. Deception Is Impermissible Where It Will Likely Procure a False Admission ....... 67

        c. Martin's Intimidating Off-Camera Confrontation ............................................... 71

        d. Coercive Promises and Threats .................. 73

    2. Detectives' Conduct Shocks the Conscience ....... 75

D. Circumstantial Evidence Fabrication Claim (2): Detectives Coerced Nina's Admissions Yet Should have Known Aaron Was Innocent ............................... 80

E. Brady ............................................................................ 81

II. The District Court's Rulings on Familial Deprivation, Supervisory Liability and *Monell* Must Be Reversed .......... 83

Conclusion ................................................................................. 84

STATEMENT OF RELATED CASES .................................................... 85

CERTIFICATE OF COMPLIANCE ...................................................... 86

## TABLE OF AUTHORITIES

**U.S. Supreme Court Cases** **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)................................................................57

*Cnty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998)................................................................75

*Gallegos v. Colorado*,
  370 U.S. 49 (1962)............................................................65, 66

*In Re Gault*,
  387 U.S. 1 (1967)..................................................................65

*Monell v. Department of Social Services of New York*,
  436 U.S. 658 (1978)................................................................83

*Masson v. New Yorker Magazine, Inc.*,
  501 U.S. 496 (1991)................................................................54

**Federal Cases**

*Aleman v. Village of Hanover Park*,
  662 F.3d 897 (7th Cir. 2011)......................................................68

*Atkins v. Cnty. of Riverside*,
  151 Fed.Appx. 501 (9th Cir. 2005)..............................................82

*Benavidez v. County of San Diego*,
  993 F.3d 1134 (9th Cir. 2021)....................................................48

*Brewster v. Shasta Cty.*,
  27 F. App'x 908 (9th Cir. 2001)..................................................67

*Caldwell v. City & County of San Francisco*,
  889 F.3d 1105 (9th Cir. 2018)................................................52, 55

*Cooper v. Dupnik,*
  963 F.2d 1220 (9th Cir. 1992) ............................................................ 73

*Costanich v. Dept. of Health and Human Serv.,*
  627 F.3d 1101 .................................................................... 47, 53

*Crowe v. Cty. of San Diego,*
  608 F.3d 406 (9th Cir. 2010) ................................... 63, 65, 68, 71

*Cunningham v. City of Wenatchee,*
  345 F.3d 802 (9th Cir. 2003) ............................................... 71, 77

*Devereaux v. Abby,*
  263 F.3d 1070 (9th Cir.2001) ............................................... 46, 68

*Doody v. Schriro,*
  548 F.3d 847 (9th Cir. 2008) ............................................... 65, 78

*Freeman v. State of Ga.,*
  599 F.2d 65 (5th Cir. 1979) ...................................................... 82

*Fresno Motors, LLC v. Mercedes Benz USA*, LLC,
  771 F.3d 1119 (9th Cir. 2014) ................................................... 59

*Gantt v. City of Los Angeles,*
  717 F.3d 702 (9th Cir. 2013) ...................................... 19, 64, 75

*Gausvik v. Perez,*
  345 F.3d 813 (9th Cir. 2003) ............................................... 53, 77

*Gilbert v. Merchant,*
  488 F.3d 780 (7th Cir. 2007) ..................................................... 66

*Green v. City & County of San Francisco,*
  751 F.3d 1039 (9th Cir. 2014) ................................................... 83

*Gregory v. City of Louisville,*
  444 F.3d 725 (6th Cir. 2006) ..................................................... 56

*Hall v. City of Los Angeles,*
  697 F.3d 1069 (9th Cir. 2012) ................................................. 681

*Harris v. Bornhorst,*
  2004 WL 7340519 (N.D. Ohio) ................................................. 67, 73, 78

*Henry v. Kernan,*
  177 F.3d 1152 (9th Cir. 1999) .............................................................. 78

*Hurt v. Wise,*
  880 F.3d 831 (7th Cir. 2018) ................................................................ 71

*Hyung Seok Koh v. Graf,*
  307 F.Supp.3d 827 (N.D. Ill. 2018) ..................................................... 68

*Kando v. City of Long Beach,*
  2023 WL 3092304 (9th Cir. Apr. 26, 2023) ......................................... 47

*Lewis v. Henderson,*
  520 F.2d 896 (2nd Cir. 1975) ............................................................... 65

*Liston v. County of Riverside,*
  120 F.3d 965 (9th Cir. 1997) ......................................................... 60, 82

*Lobato v. Las Vegas Metro. Police Dep't,*
  2023 WL 6620306 (9th Cir. Oct. 11, 2023) ......................................... 60

*Manning v. Miller,*
  355 F.3d 1028 (7th Cir. 2004) .............................................................. 81

*McSherry v. City of Long Beach,*
  584 F.3d 1129 (9th Cir. 2009) .............................................................. 77

*Mellen v. Winn,*
  900 F.3d 1085 (9th Cir. 2018) ....................................................... 47, 77

*Morse v. Fusto,*
  804 F.3d 538 (2d Cir. 2015) ................................................................. 60

*Newsome v. McCabe,*
  256 F.3d 747 (7th Cir. 2001) ................................................................ 81

*O'Doan v. Sanford,*
  991 F.3d 1027 (9th Cir. 2021) ....................................................... 60, 61

*Olsen v. Idaho State Bd. Of,*
    363 F.3d 916 (9th Cir. 2004) ................................................................54

*Richards v. County of San Bernardino,*
    39 F.4th 562 (9th Cir. 2022) ......................................................46, 70

*Rodriguez v. McDonald,*
    872 F.3d 908 (9th Cir. 2017) ..............................................................74

*Spencer v. Peters,*
    857 F.3d 789 (9th Cir. 2017) .........................................19, 46, 47, 64, 65

*Stoot v. City of Everett,*
    582 F.3d 910 (9th Cir. 2009) ......................................................63, 64

*Tatum v. Moody,*
    768 F.3d 806 (9th Cir. 2014) ..............................................................75

*Tekoh v. Cnty. of Los Angeles,*
    75 F.4th 1264 (9th Cir. 2023) .............................................................70

*Tennison v. City & Cnty. of San Francisco,*
    570 F.3d 1078 (9th Cir. 2009) ....................................................82, 83

*Thomas v. Newton Int'l Enters.,*
    42 F.3d 1266 (9th Cir. 1994) ..............................................................71

*Tobias v. Arteaga,*
    996 F.3d 571 (9th Cir. 2021) ......................................................18, 74

*United States v. Haswood,*
    350 F.3d 1024 (9th Cir. 2003) ...........................................................65

*United States v. Pelullo,*
    399 F.3d 197 (3d Cir. 2005) ................................................................82

*United States v. Skilling,*
    554 F.3d 529 (5th Cir. 2009) ......................................................81, 82

*United States v. Stanert,*
    762 F.2d 775 (9th Cir. 1985) ..............................................................60

*Wilkins v. De Reyes*,
　2006 WL 8443775 (D.N.M. Aug. 16, 2006) ..........................................74

*Wilson v. City of Los Angeles*,
　2020 WL 8211451 (C.D. Cal. Dec. 23, 2020) ......................................60

*Woods v. Clusen*,
　794 F.2d 293 (7th Cir. 1986) ......................................................67, 74

## State Cases

*In the Interest of Jerrell C.J.*,
　283 Wis.2d 145 (Wis. 2005) ................................................................72

*People v. Anderson*,
　47 Cal.4th 92 (2009) ............................................................................10

## Federal Statutes

28 U.S.C. § 1291 ...................................................................................10
28 U.S.C. § 1331 ...................................................................................10
28 U.S.C. § 1343(a)(3) ...........................................................................10
42 U.S.C. § 1983 ...................................................................................10

## Jurisdictional Statement

The district court had subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343(a)(3) for Plaintiffs' 42 U.S.C. § 1983 claims. This Court has jurisdiction pursuant to 28 U.S.C. § 1291. Plaintiffs timely appealed the final judgment, entered on January 3, 2024.

## Introduction

Aaron Nguyen ("Aaron") was wrongfully convicted of homicide for a gang murder of which he was entirely innocent. He was never a gang member, was miles away from the shooting, and unwaveringly maintained his innocence through the investigation, trial, and years of incarceration before his conviction was reversed on appeal for insufficient evidence.[1] Aaron's prosecution, initiated by Defendants' fabricated police report, rested entirely on short-lived, false and coerced statements extracted from his 17-year-old girlfriend, Nina Nguyen ("Nina"), through a terrifying, hours-long coercive interrogation conducted by detectives who deliberately mischaracterized Nina's statements and ignored exculpatory evidence. Despite Nina's immediate recantation,

---

[1] Reversal for insufficient evidence as a matter of law is the equivalent of an acquittal. See *People v. Anderson*, 47 Cal.4th 92, 104 (2009).

maintained through trial, Aaron was convicted, and sentenced to 40-years-to-life. This lawsuit, brought by Aaron and his parents, seeks to hold the detectives accountable for constitutional violations causing Aaron's wrongful conviction and incarceration.

The crux of Aaron's claims is that detectives impermissibly coerced Nina's admissions and fabricated a report to conceal their tactics. The district court, while characterizing these techniques as "improper" and "inappropriate," concluded they were insufficiently coercive to shock the conscience.. This flawed analysis hinged on resolving disputed facts in favor of the non-moving party while examining each of the tactics in isolation, without considering the totality of their effect. The court also disregarded circumstances reflecting detectives' reckless disregard for the truth, including their deliberate choice to employ impermissibly deceptive and coercive techniques while ignoring exculpatory cell phone and video surveillance evidence, instead employing.

The district court acknowledged that the police report detailing the interrogation contained mischaracterizations and omissions, but wrongly characterized them as insufficient to support a deliberate fabrication claim. In doing so, the court drew factual inferences in defendants' favor,

including an erroneous assumption about if/when Nina confessed during the first session. The district court's misapplication of the summary judgment standard requires reversal on each of Plaintiffs' claims.

## Statement of Issues

1. Viewing the evidence in Appellants' favor, is there a factual dispute whether:

    a. Defendant Lord fabricated a police report through mischaracterizations and omissions under a direct evidence theory?

    b. Defendant Lord fabricated evidence by directing Nina to (mis)label her diagram "Westminster" when she drew a different location?

    c. Detectives' coercive interview technique support a circumstantial evidence fabrication claim?

    d. Detectives proceeded in their investigation even though they knew or should have known Aaron was innocent?

2. Did the district court apply the wrong legal standard to Plaintiffs' deliberate fabrication claim?

## **Statement of the Case**

### I.    Introduction

On March 20, 2011, a gang shooting occurred near Phi Hong Billiards at Harbor Blvd. and Westminster Ave., in Garden Grove, California. Around 2:00 a.m., cars from the aggressor group converged in the Phi Hong parking lot and waited for their rivals to finish playing pool inside. Around 2:16, the victims fled the parking lot in an SUV, chased by a caravan of cars down Westminster Ave. The lead car pulled up and fired into the SUV's driver's side, killing one person and wounding another.

Though Aaron was not a gang member, police suspected he had participated in the chase.  Video surveillance confirmed he was not among the caravan leaving the Phi Hong and cell phone evidence placed him 3.6 miles away under 20 minutes before the shooting. Aaron was prosecuted based on statements his 17-year-old girlfriend, Nina Nguyen, made during an April 20, 2011 interrogation. Four homicide detectives, including Defendants Lord and Sgt. Martin, took passes questioning Nina, off-and-on, between  8:08 a.m. and 3:00 p.m. (seven hours).

While the timing of Nina's first "admission" is contested,

undisputed facts establish that Nina repeatedly denied being present at the Phi Hong during the first session (8:08-9:11 a.m.).[2] For over an hour, Nina withstood persistent aggressive questioning, repeated accusations of lying, and relentless attempts to deceive her with false evidence (including elaborate ruses involving visual props). At 8:53 a.m., Defendant Lord showed Nina a photo of the Phi Hong Billiard exterior and asked – directly – if she was there on the shooting night. She immediately, repeatedly stated that she was *not* at the Phi Hong. (10-ER-1880-1881[UMF-164-165]) It is undisputed that she maintained her denials—ten consecutive times— from the moment she was shown a photo through the end of the first session. (10-ER-1897-1899[UMF-196]) The police report falsely conveys the opposite: stating that, when shown a photo, Nina admitted to being at the Phi Hong. It omits all ten denials.

After the first session, detectives held an (inadvertently recorded) meeting where they acknowledged that both Aaron and Nina denied presence and provided consistent alibis. Detectives could have paused to examine objective cell phone and video evidence (both exculpatory).

---

[2] Plaintiffs contend that Nina's first admission was not until 1:02 p.m., defendants construe a statement she made at 8:41 a.m. as an admission.

Instead, they deliberately doubled down on coercive tactics. Sergeant Martin pulled Nina into an office, stood with his foot on her chair, pointed in her face, screamed she was a "fucking liar," a "goddamn liar," and threatened she would be in bigger trouble, until she was crying inconsolably. Lord's report concealed this terrifying diatribe.

Lord then initiated a second interrogation session (12:39-3:25), while Nina was still sobbing. At 1:02 p.m., 5 hours after her first interrogation began, detectives coercively secured a quickly retracted statement that Nina/Aaron went to the Phi Hong. Detectives asked her to draw a diagram of a car "chase" she described. Nina complied, drawing a diagram fundamentally inconsistent with the shooting. Lord's report conceals that he directed her to falsely label the diagram "Westminster" despite that she told officers, while drawing, that she was drawing a different location, where Nina/Aaron became separated from the group and waited at "the restaurant," (which detectives knew was 3.6 miles from the Phi Hong). By 1:40, she recanted, insisting she only admitted to being at Phi Hong because detectives pressured her. Aaron was arrested for murder at 2:50 p.m.

As Plaintiffs' experts establish, any reasonable detective would

have recognized they extracted Nina's admissions with techniques known to generate unreliable evidence. This explains why their report was replete with mischaracterizations and omissions, concealed the timeline of Nina's statements, and the coercive techniques used.

There is no dispute that Lord mischaracterized the first interview session. The report omits that Nina described being at a different poolhall ("2000" billiards), on a different day, and that, when shown a photo of the Phi Hong, she repeatedly denied being there. In describing the second session, Lord reports that *Nina* labeled the diagram "Westminster," omitting that he directed her to write that.

The district court characterized the discrepancies in Lord's report as insufficiently serious to support liability based, in part, on the mistaken impression that, while Nina denied presence at the Phi Hong immediately after being shown a photo, she admitted to being there later during the first interrogation (i.e. after 8:53). She did not. While the timing of Nina's first admission is disputed, it is uncontested that, during the first session, after 8:53, Nina repeatedly and consistently denied being at the Phi Hong. The district court accordingly supplied an unsupported factual inference contrary to both parties' positions. The

court also identified statements in Lord's report referencing Nina's confusion and Lord's view she was "dishonest." This did not alert the reader to Nina's repeated, consecutive denials, nor do they cure the overall falsity of Lord's report. The report did not capture the gist of Nina's statements; any inference to the contrary rests on factual inferences impermissibly drawn in the moving party's favor.

Lord's misrepresentations were significant. They concealed virtually all information necessary to assess the reliability of Nina's later admissions. By fabricating the timing of Nina's first admission, the report falsely conveys Nina admitted to being at the Phi Hong during the first session and maintained this admission throughout. But Nina, in fact, held her ground until 1:02 p.m., five hours into the ordeal, and made no admission until *after* Martin screamed profanities within inches of her face, leaving her sobbing uncontrollably – all omitted from the report.

The report likewise conceals that detectives secured Nina's admission with shameless lies. At summary judgement, it was undisputed that detectives lied to Nina, falsely representing seven times that they had video surveillance (11-ER-2055-2056[UMF-464]) and ten times that they had GPS evidence. (11-ER-2053-2055[UMF-463]) They

showed Nina photos of cars and cell phone maps to persuade her that they had evidence placing them at the Phi Hong (10-ER-1884[UMF-172]) They falsely represented to Nina that Aaron had confessed to being at the Phi Hong. (10-ER-1853[UMF-106], 1985[UMF-333]) Detectives accused her of being dishonest at least twenty times (11-ER-2048-2049[UMF-459]) and repeatedly told Nina she could just go home if she would tell them "the truth," communicating that she was not free to leave until she told them what they wanted to hear. (11-ER-2064-2066[UMF-484-486]) This concealed coercion is especially egregious because Nina was a juvenile, for whom there is a significantly greater risk of false confession, particularly in the face of false evidence ploys, threats, promises and incessant accusations of lying. At deposition, Nina testified she was coerced into admitting she was at the Phi Hong. (11-ER-2044-2068[UMF-452-487])

The district court acknowledged the interview techniques may have been "improper," yet concluded they did not rise to the level of fabricated evidence. The court did so by examining the coercive tactics separately without considering the totality of their effect on Nina. *See Tobias v. Arteaga*, 996 F.3d 571, 581-582 (9th Cir. 2021) ("[a] coercive interrogation

18

exists when the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will"). Detectives' extreme intimidation and relentless suggestive questioning cannot be disentangled from elaborate false evidence ploys, reinforced with visual props. After 4-5 hours, Nina was panic-stricken and confused by the relentless deception. Immediately before making the false admission she asked, "Can I just admit everything?" then capitulated: "Okay…I was there *but I don't remember*, *I don't remember*, I was there but *I don't remember*."

The district court grossly misstated the standard for deliberate fabrication claims. It employed a free-standing "shocks the conscience standard. But, in the deliberate fabrication context, conscience-shocking means "[d]eliberate indifference," defined as "the conscious or reckless disregard of the consequences of one's acts or omissions." *Spencer v. Peters*, 857 F.3d 789, 802 (9th Cir. 2017); *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013). *Notably, the district court never referenced "reckless disregard" in its fabrication analysis*. This failure alone requires reversal.

Audiotapes show that Detectives unquestionably had an

opportunity for deliberation,. Around 10:55 a.m., Lord conferred with his supervisor (Martin), his interview-partner (Danielson), and the district attorney. Lord explained that Aaron and Nina denied being at the Phi Hong and gave consistent alibis of being at a Vietnamese restaurant parking lot. They determined they needed to "flip" someone.

Detectives had the opportunity to pause and consult objective cell phone and video surveillance footage, both exculpatory. Instead, Martin chose to browbeat, intimidate and coerce Nina. With Nina heavily sobbing, Lord initiated the second interrogation, where he extracted her brief, incoherent admission. Detectives' choice to pursue aggressive interrogation techniques, despite obvious red-flags in Nina's statements, and in the face of consistent alibis corroborated by objective evidence, reflects reckless disregard for the truth. Nina's request to "just admit everything" indicated she would say anything to escape an unbearable situation. So do irreconcilable discrepancies between Nina's short-lived admissions and the physical evidence. The district court's summary judgment accounted for none of this.

Aaron's prosecution relied on three constitutionally-defective pieces of evidence: Lord's fabricated police report, the fabricated diagram, and

Nina's coerced statements. No eyewitnesses placed Aaron at the scene. The *prosecution's* veteran gang expert testified Aaron was not in a gang. Nina testified she was pressured into telling police they had been at the "pool hall" and ultimately had no memory of being at the Phi Hong, but the prosecution asked the jury to credit her manipulated diagram over exonerating evidence.

## II.   Overview of the Facts

### A.   Background

A gang shooting occurred at 2:17 a.m. on March 20, 2011. Around 2:00 a.m., the aggressor gangs (TRG/Hellside) converged in the Phi Hong parking lot where the victim groups (POV, VT) were playing pool inside. The victim group fled in a Lexus SUV, westbound on Westminster Ave. Andrew Tran ("Puffy") pursued them onto Westminster in a Lexus SUV at the head of a caravan of cars. Half a block away, at Westminster and West Street, Puffy approached the driver's side of the victim's SUV from the left lane. His front passenger (Ben) fired into the SUV, killing one person and hitting another. The same morning, detectives interviewed the survivors. (10-ER-1814-1821[UMF-47-56])

21

On April 20, 2011, detectives executed searches at fourteen locations. Aaron was a target, along with Alexander ("Alex") Tran, a passenger in his car on March 20. Unlike the other thirteen target locations, there was no warrant for Aaron's home because GGPD lacked sufficient evidence to place him at the scene. (10-ER-1821[UMF-57]; 1826[UMF-62])

GGPD knew Aaron was 26 years old with no prior arrests. (10-ER-1823-1826[UMF-59-61]) Before Aaron/Nina's interviews, GGPD reviewed Aaron's cellphone location data: the ping closest in time to the shooting was at 1:58 a.m., 3.6 miles away from the Phi Hong. Detectives also had surveillance video capturing the entire caravan of cars following Puffy. Aaron's silver Accord was *not* among the group. (10-ER-1828-1836, 1837-1838[UMF-63-73, 75-76]; 1850[UMF-98])

Lord's team arrived at Aaron's home at 7:00 a.m., pulled Aaron and Nina out of bed, and brought them to the station.

## B.    First Recorded Interrogation

Nina's recorded interrogations occurred in a six-by-eight foot room. At the outset, Lord advised Nina that he had already traced Aaron's phone location. He then showed Nina a "red book" purporting to contain

cell phone evidence, claiming "this is all the proof. I'll show you certain things, dear. But this is the proof. [The proof that Aaron wants] is all in this red book..." He continued: "we know where he was. We know who he called. We know who called him…I mean I already know that you guys were over there. And what I'm asking you, is to just be honest about it. I mean, at this point you're not in any trouble." (10-ER-1839-1846[UMF-78-90])

Between 8:16 – 8:42, Nina described her memory of March 19-20, when she and Aaron drank with friends into the early morning. The group in their car included Aaron (driving), Nina, Alex Tran, "Julie" and "Tony." They went to a party at Puffy's house, left with other cars, and ended up at a park. Nina heard gang members discussing chasing down rivals, but confirmed that Aaron did not get out of the car and was not a gang member.

They left the park following CJ (who later participated in the Phi Hong incident), but lost CJ near Miles Square Park ("MSP"). They waited in the parking lot of a Vietnamese restaurant. Nina believed they next went to Tony's house, and may have stopped for donuts. (10-ER-1849-

1852[UMF-96-97, 101-103]; 1855-1862[UMF-111-112, 114-115, 117-119, 122-128, 132-133]; 1864[UMF-136])

Nina's description of the shooting night did not include going to any poolhall. Lord, however, repeatedly tried to insert one. Four minutes into the session (8:11:50 – 8:12:03 a.m.), Lord said, "I know you guys were there… People already told us you were at the poolhall…Where were you guys at *before* you went to the poolhall." (8:14:47). Nina responded: "Sir, I have a really bad memory, do you know what pool hall? **2000**, right?" (8:14:50 – 8:14:54 a.m.). Lord responded: "at Harbor and Westminster," to which Nina replied (8:14:58) "Two Thous., right?" (2000 was a different poolhall, located miles away).[3] When asked about a poolhall, Nina's *two* immediate references to 2000 clearly indicated her memory of a poolhall concerned 2000, not Phi Hong. (10-ER-1844[UMF-85]; 1846-1851[UMF-91-95, 99-100]; 1858-1859[UMF-120-121])

At 8:20, Lord again told Nina he "know[s] they went to the poolhall" after the restaurant and the police had video surveillance proving it. (10-ER-1851[UMF-100]  False.  (10-ER-1833-1835[UMF-70-71])  Detectives

---

[3] Refer to the video; the transcript *omits* Nina's references to 2000 at 8:14 a.m.

lied again, saying Aaron admitted they were there. ("Well, Aaron was there… He's already told us that. That was already discussed."). Aaron made no such statement. (10-ER-1852-1853[UMF-104-106])  By 8:39 a.m., Nina had explained four times that her car lost the group and was waiting in a *restaurant* parking lot. (10-ER-1849[UMF-96]; 1856[UMF-114]; 1857[UMF-117]; 1860-1861[UMF-128])

At 8:41 a.m., detectives insisted that Nina must have been at "the billiard hall at Harbor and Westminster" because they had surveillance video and "cell phone pings." They asked Nina: "were you at the billiard hall at Brook at Harbor and Westminster?" Nina answers, "yes we were," to which Lord responds: "Why is that so hard to tell us?" Nina replied "Cause I don't remember exactly when we were there." (13-ER-2636; 13-ER-2595, [Ex. 1(a) (Video #1 of Nina Nguyen Interrogation [8:40:41 a.m. – 8:41:08 a.m.]) The words "Phi Hong" had not entered the conversation, and Nina's statements indicated that she had no idea what poolhall was located at the intersection.

### 1. Nina Described Playing Pool at 2000 With Members of the Victim Group

At 8:42, Lord stated for the *fifth* time he knew they were at a "poolhall": "So tell me what happened when you went over to the poolhall.

25

Cause I know you guys went over there. I know you did." (10-ER-1866[UMF-140]) Between 8:42-8:53, Nina described a memory of a poolhall, with details indicating she was not referring to the shooting incident. (10-ER-1866-1869[UMF-141-146])

At 8:46, she clarified she was talking about a day at 2000 (different poolhall), with "Thai." (10-ER-1871[UMF-149]) She explained her memory was of *playing pool inside 2000 poolhall with* Thai—one of the shooting victims—and "his cousins," a scenario fundamentally inconsistent with what transpired on the shooting night.[4] (10-ER-1871-1875, 1888-1889[UMF-150-157, 181]) At 8:51, detectives accused her of lying despite obvious indications she was talking about a different day. Nina protested her honesty and requested to take a lie detector test (10-ER-1867[UMF-143])

At 8:52, she again clarified that she was describing 2000 (billiards) in Koreatown Plaza (miles away). (10-ER-1875-1880[UMF-158-163]); 13-

---

[4] As detectives knew, on 3/20/11, no one from the aggressor group was playing pool inside with the victims (they were waiting in the parking lot). Nina's description of playing pool with Thai and his cousins was exculpatory, indicating both a different incident, and a social relationship with the victims. Thai's cousin, Jimmy Nguyen, testified at trial that he shot pool with Aaron at the 2000.

ER-2595 [Ex. 1(a) (Video #1 of Nina Nguyen Interrogation, 8:52:00-8:52:24]) By this point, although detectives had repeatedly, suggestively interjected "Westminster," the only poolhall mentioned by name was 2000, located miles from the crime scene. (10-ER-1880–1881[UMF-164–166])

### 2. When Shown a Photo at 8:53, Nina Unambiguously Denied Being at the Phi Hong on 3/20/11

Whatever confusion about 2,000 existed was resolved at **8:53** a.m., when Lord showed Nina a photo of the Phi Hong exterior sign (attached to his report) and asked – directly – whether Phi Hong was the poolhall she was referring to. This is the first time the words Phi Hong entered the conversation (and the first time Nina is oriented to the poolhall in question). Nina stated twice – clearly – that she was *not* at the Phi Hong. (10-ER-1880-1881[UMF-164-166]) After viewing the photo, Nina told detectives **ten times** during the first interrogation that she had no memory of being at the Phi Hong (10-ER-1897-1899[UMF-196]), while re-confirming her previous timeline for the shooting night (i.e. lost CJ leaving MSP and waited at a Vietnamese restaurant). (10-ER-1882–

27

1883[UMF-168-170], 1886[UMF-176], 1889-1891[UMF-179-180, 182-185], 1895-1896[UMF-192-193, 195])

When Nina repeatedly denied being at the Phi Hong, detectives told more lies about incontrovertible cell phone evidence placing her there. At 8:55, they showed her cell phone location maps purporting to prove she was at the Phi Hong. Unphased, Nina looked at the maps and again denied being at Phi Hong. Two minutes later, at 8:57, they told her (again) they had cell records definitively placing Aaron at the Phi Hong. Detectives falsely told Nina at least five times during the first session they had cell phone records placing her and Aaron at the "the poolhall" or the Phi Hong. They twice falsely said they had video of his car at the Phi Hong. (10-ER-1883-1885[UMF-171-175], 1892[UMF-186])

When Nina continued to deny, they persistently accused her of lying –making up stories, telling half-truths, and concealing information. (10-ER-1887[UMF-177-178], 1892-1895[UMF-187-191]) At 9:07, raising his voice, Detective Danielson admonished her to "stop it, stop this game, stop this 'I don't know, I can't remember, I've got a bad memory.' Just tell us what happened for God sakes. You can tell us the truth and I'll be done asking you questions in like five minutes." (10-ER-1894[UMF-190]) Det.

28

Danielson openly lamented they had gotten nowhere, ("…we've wasted at least an hour and we don't know any more now than when we started this interview."). (13-ER-2662)

## C.   Intermission

### 1.   *Aaron & Alexander Tran Corroborated Nina*

The first videotape of Nina's interrogation ended at 9:11 a.m. From 9:27 – 10:23, Lord and Danielson questioned Aaron, who consistently denied being at Phi Hong. Like Nina, Aaron said they had been at Puffy's party, left looking for another party, and went to a park. They lost the group and parked in front of the Thanh My Vietnamese restaurant; he asked detectives to look for the restaurant's video surveillance to confirm his alibi. He said he was not in a gang and would never back up gang members. (10-ER-1899, 1903–1917[UMF-197, 203–218]) By this time, Lord knew that cell phone evidence showed Aaron near Bolsa/Bushard at 1:58 a.m., confirming Aaron's alibi. (10-ER-1824-1825[UMF-60]) Aaron did not know what his cell phone data showed and could not have conformed his alibi to it.

Between 8:06 a.m. and 9:10 a.m., detectives interviewed Alex Tran, another passenger in Aaron's car. Alex likewise denied being at the crime

29

scene. (13-ER-2825) During a second interview that day, Alex explained their group got lost and waited in a restaurant parking lot. He used a restroom inside, and asked officers to visit the restaurant to confirm his alibi. (10-ER-1899-1903[UMF-198-202])

### 2. *Detectives' Inadvertently Recorded Hallway Meeting*

During the break between Nina's two videotaped sessions, detectives strategized. Around 10:53 a.m., Lord met his supervisor, Sgt. Martin, DDA Dan Feldman, Det. Danielson and Det. Vaicaro. Their conversation was accidentally recorded. Lord said Aaron admitted to being at the park, but said "he's following CJ, and then he gets lost." Lord explained that they pulled over at some restaurant, sat there for an hour and waited for a phone call.

When DA Feldman asked if anyone questioned Nina, Lord affirmed, "she says the same thing." *Contrary to his own report*, Lord told his supervisor and the district attorney that Nina *denied* being at the Phi Hong and had given the same alibi as Aaron. (10-ER-1917-1927[UMF-219-232]) DDA Feldman next advised they could potentially charge Aaron if they have cell phone evidence (they did not), and statements of

30

other witnesses, "realizing that they might have to flip someone." The term "flip" meant to get one defendant to "roll over" on another. (10-ER-1927-1931[UMF-233-237]) Thus, rather than investigating the group's consistent alibi or consulting objective evidence, the detectives deliberately chose coercive tactics to "flip" Nina.

### D. Martin's Off-Camera Confrontation

To achieve this objective, Martin pulled Nina into his office alone. Nina testified that Martin "put his leg on my chair...And he screamed and put [his finger] in my face [gesturing with hand inches from face], screaming at the top of his lungs—that if she didn't "stop fucking lying" she would be in "deep trouble," and calling her a "goddamned liar" and "fucking liar". (10-ER-1935-1953[UMF-248-271])

Lord found Nina crying after the confrontation. (10-ER-1933-1945[UMF-243]) Minutes into the second videotaped interrogation, still crying, Nina told Lord she was crying because "he was in my face. He was pointing at me..." (10-ER-1931-1935[UMF-239-247]) An hour later, she said again, to Aaron, on video observed by officers, that Martin was "yelling at me, he was in my face. He was pointing at my face. He was like, you do not ever fucking lie to them," emphasizing "but I wasn't lying.

31

I wasn't." (10-ER-1940[UMF-252]) Nina later testified she was overcome with fear and terrified she would go to jail. (10-ER-1946, 1951-1952[UMF-259, 268-269])

### E.  Second Recorded Interrogation

Nina's second videotaped session began at 12:39 p.m. Video shows Nina crying inconsolably and pleading with officers to believe her. "I am not lying to you sir." For the first 20 minutes, Nina maintained the same timeline, which did not include the Phi Hong. (10-ER-1960, 1962-1972[UMF-287, 290-306])

Her denials triggered a critical exchange. At 12:57, Lord insisted she went to the Phi Hong, falsely claiming she had already confessed: "And now you are telling me you didn't go to the pool hall. Even though you told my sergeant you did. And he said, you didn't tell me the truth before and now you wanted, you understand how serious the situation is. And you wanted to talk to me again…"

Nina refuted him, explaining that she was crying because of Martin's conduct (i.e. not because she was guilty). In response, Lord aggressively – and repeatedly – accused her of lying, telling her she was "ridiculous" and a "liar." Lord again accused, "You are a liar," as Nina

pleaded, "why would I lie straight to your face when you ask me *over and over again*," to which Lord responds: "You're a liar. You and Aaron are liars." Between 12:57 – 12:58 he called her a liar five times.

By 12:59 p.m., Nina, still crying, pleaded: "I promise you, just please believe me. I promise you. Okay, if we were there, then I was there. But I don't remember turning into the place and going to the park and parking at the McDonalds." In response, Lord threatened "the more you lie…the more you are going to get yourself in trouble. You are digging a hole for yourself." **At this point, Nina asked, "*can I just admit everything?***" (10-ER-1972-1980[UMF-307-322])

This is the turning point. At 1:01, Nina tells Lord "Okay…I was there *but I don't remember*, *I don't remember*, I was there but *I don't remember*." (10-ER-1981-1982[UMF-324-325]) Lord ran with it, asking, "what happened?" after the Phi Hong. Nina responded that Tony got out of the car to talk to CJ. Nina made this first admission at 1:02 p.m.[5] (10-ER-1983-1987[UMF-329-336]) By 1:02, she had denied being at the Phi

---

[5] In deposition, Nina explained that she agreed to being present: "It is because he totally disregarded my answer and kept asking questions"; "I didn't know what else to say."

Hong **twelve** times, all of which were omitted from Lord's report. (10-ER-1980-1981[UMF-323]; 11-ER-2107-2110[UMF-505]) By 1:02, detectives had falsely claimed, at least eight times, that they had irrefutable video and GPS data placing Aaron/Nina at the scene. (10-ER-1985-1987[UMF-333])

Over the next 40 minutes, Nina agreed she was at the Phi Hong parking lot, yet made statements unmistakably contradicting the evidence, presenting obvious red flags that her admissions were unreliable. During this segment, she did, however, describe what she perceived to be a car chase, in which she believed they were supposed to "trap" another car. (Lord's report omitted Nina's unequivocal denials that Aaron helped trap another car). (10-ER-1983-1994[UMF-329-255]; 11-ER-1996-1999[UMF-256-363], 2005–2007[UMF-375-378]; 2093-2096[UMF-500], 2128[UMF-524])

The session culminated at 1:19, when Lord directed Nina to draw a diagram depicting the perceived chase. Lord directed her to write "Westminster" on the diagram, which she did. She also drew an arrow and circle, indicating with the arrow/circle where they pulled over: "the **restaurant**." Her reference to "the restaurant" indicated that the

diagram depicted events near Miles Square Park ("MSP"), where they lost CJ and turned into the Vietnamese restaurant, and not events on Westminster. Lord knew (from Aaron) the restaurant was Thanh My, at Bolsa/Bushard, 3.6 miles from the Phi Hong, a location consistent with Aaron's phone GPS data. (11-ER-1999-2005[UMF-364-373], 2101-2107[UMF-503–504], 2125–2126[UMF-520]) By directing her to write Westminster, Lord transformed her diagram of events near Thanh My/MSP into a false inculpatory admission of being at the shooting.

Nina's diagram is inconsistent with physical evidence from the shooting. Detectives knew Puffy approached the victim's silver Lexus SUV from the far-left lane and the shooter fired from Puffy's front passenger seat into the SUV's driver's side. Nina's diagram placed Puffy to the right of the victim's car—Lord's report excluded that her drawing was incorrect on this key point. She also drew a box representing the "white Honda" she believed they chased. The victim's car was a silver SUV, not a white Honda; the white Honda belonged to Danny Tran, who was with CJ's group at the park, and who CJ's group could not have been

trying to attack.[6] Lord omitted from his report that she misidentified the victim's car (in verbal description and photos). (10-ER-1993[UMF-351]; 11-ER-1998[UMF-361], 2005[UMF-374–375], 2008[UMF-381], 2015[UMF-398], 2125-2128[UMF-519-524])

Omitted from the report, at 1:23, Lord showed Nina surveillance footage and falsely represented that it showed Aaron's car, causing her to inaccurately identify Aaron's car. Lord told her twice: "looks a lot like Aaron's car doesn't it?" (11-ER-2007-2009[UMF-379-383]) The car in question was not Aaron's, and was in fact a different make and model: a silver Toyota Camry, not a silver Honda Accord. At 1:38, Detective Farley also showed her a photo and *falsely suggested* it looked like Aaron's "Silver Accord." (11-ER-2015-2016[UMF-399-400]) (detectives knew a silver Camry was driven by someone else known to be at the Phi Hong.)

Within ~20 minutes of drawing the diagram, Nina unambiguously recanted, insisting she had no memory of being at the Phi Hong and only

---

[6] That Nina was not talking about the victim car became even clearer when officers showed her a picture of the victims' SUV and she denied seeing the car in the photo being blocked in (her description of blocking should also have alerted officers she was not describing the Westminster-chase because the surveillance footage showed the victims' vehicle was not blocked in).

relented because detectives pressured her. At 1:40 p.m., detectives put Aaron and Nina together to observe whether they would confess. The plan backfired. Between 1:40 p.m. and 1:53, Nina and Aaron consistently denied being at the Phi Hong (as reflected in Lord's report). At 1:41, Lord showed Aaron Nina's drawing, and Nina immediately interjected, "that wasn't by the pool hall. That was by Miles Square Park." Contrary to Lord's report, she did not just recant the location in Aaron's presence (in drawing it, she placed it at the "restaurant" where they pulled over after losing the group leaving MSP). Nina also told Lord – on camera – that she only agreed to being at the Phi Hong because detectives *pressured* her with lies ("he "kept lying to her" that she was there). (11-ER-2018-2021[UMF-404-410])

Martin returned and barraged Nina with accusations of dishonesty between 2:24 – 2:46 p.m. Martin showed Nina the word "Westminster" on the drawing: "You [told] the officer this is where you were, this is Westminster. *You wrote it….you can't go sideways on me.*" (emphasis supplied.) (This was false because Lord told her to write Westminster.) Nina then asked to explain the drawing, stating the drawing referred to the MSP area. "Because it seems like that what all you guys wanted to

37

hear. And I tell you guys...over and over...I was never there. I don't remember being there." (11-ER-2025-2029[UMF-416-422])

Nina explained she was pressured by police to say things about where she was: "I told you from the beginning that I don't remember being at the Phi Hong. And you guys kept telling me that everyone's been telling you [we were there]." Martin responded with lies about irrefutable evidence establishing that Aaron and Nina were at the pool hall: (Martin: "we know that his phone pings at Harbor and Westminster. We can put him, the phone, his car. You saw pictures of his car, right? ... That's all Westminster. We know actually where that is. So, we don't need a lot... We don't need people to tell us that you and your boyfriend were there. Because, we have technology, we have video... And a phone, yes... Absolutely proof.") Nina responded that the police may "have proof but I don't remember being there." (11-ER-2029-2035[UMF-423-433])

Finally, Martin threatened that, while Aaron's fate was sealed, Nina had a chance to "still have a life" and would one day be a mother. At 2:33 p.m. Nina was crying as Martin explained people who showed up to the Phi Hong could be charged with conspiracy, emphasizing Nina was "in one of those cars, young lady." (11-ER-2035-2036[UMF-434-436])

Even in the face of this threat, Nina denied they went to Phi Hong. Martin repeated—falsely—asserted that GGPD had proof from GPS and video, imploring Nina: "All you have to say is, yeah, we were here." (11-ER-2036-2041[UMF-437-447]) The tape ends at 3:25. By the end of two sessions, Nina told detectives sixteen times she had no memory of being at the Phi Hong, but Lord excluded them all in his report. (11-ER-2017-2110[UMF-505])

### F.     Prosecution, Conviction & Reversal

At trial, no eyewitness testified to seeing Aaron at the scene; two prosecution eyewitnesses testified they did *not* see his car (Cynthia Sipaseuth and Skylar Avila). Jimmy Nguyen, one of eight victims in the SUV, testified for the prosecution and did not identify Aaron at the scene. According to Jimmy, his cousin Thai was Aaron's friend; they had hung out multiple times, and knew Aaron was not a gangster. If Aaron had been affiliated with rivals, they would not socialize. (10-ER-1767, 1775-1795[UMF-6, 12-26])

Aaron's cell phone placed him 3.6 miles away (a 10–15-minute drive) at around 1:58 a.m. (19 minutes before the shooting). As the appellate decision noted, "Nguyen's cell phone records confirmed that

when the TRG [aggressor] members were converging on the pool hall around 2:00 a.m., he was several miles away, near a restaurant he, Nina [his girlfriend] claimed to have stayed at because he lost [the group]." This corroborated Aaron's alibi, adding to the mountain of evidence showing he was not there. (10-ER-1768[UMF-7], 1774-1775[UMF-11]; 1795[UMF-27])

During closing, the prosecutor conceded no cell evidence placed Aaron at the scene, and flatly acknowledged *no one* saw Aaron's car in the parking lot. (10-ER-1812-1814[UMF-45-46]) Aaron's conviction hinged entirely on Nina's testimony, which she gave under a grant of immunity. At trial, Nina admitted she had made inculpatory statements to detectives about being at the Phi Hong, but testified that she had no memory of being there, and denied that she and Aaron were present. She unequivocally testified that Aaron never participated in any plan to trap a car. (10-ER-1799-1805[UMF-32-41])

The prosecution relied entirely on the manufactured diagram – which contradicted critical physical evidence of the crime – to refute substantial exonerating evidence, and secure a conviction. (10-ER-1805-1812[UMF-42-44) At closing, the prosecutor conceded Nina's testimony

was highly inconsistent, but emphasized the jury could not ignore the map: "You just can't ignore that young woman when she says, 'Here's the map and the way in which we executed this plan.' You just can't write that off." (10-ER-1760-1797[UMF-1-28]; 1799–1814[UMF-32-46])

Aaron was convicted and sentenced to 40-years-to-life. He spent 9 years in custody before his conviction was reversed for insufficient evidence (equivalent to acquittal) on appeal. (5-ER-955[AMF-573])

## G.    Lord's Report

No prosecution would have ensued in the absence of the false police report (and diagram). The report contained flagrant misrepresentations of material fact that both distorted Nina's statements and concealed the coercive tactics that produced them. Defendants used the false report and diagram to secure Aaron's charges and invalid conviction.

### 1.    *Mischaracterization of First Interrogation*

The police report affirmatively misrepresented Nina's statements during the first session, stating that: (1) Nina admitted to being at the Phi Hong during her first videotaped interrogation; and (2) when shown a photo of the establishment, Nina confirmed she was at the Phi Hong. The opposite is true: when Lord showed her a photo at 8:53 a.m., she

twice unambiguously denied being there (and after seeing the photo, denied being present ten consecutive times). Lord also distorted Nina's statements by reporting that Nina admitted to being at the "poolhall," when she told him she only remembered being at the 2000 billiards (on a different day). Nina mentioned the 2000 (billiards) eight times; the 2000 is unmentioned in Lord's report. (10-ER-1880[UMF-164], 1897-1899[UMF-196]; 11-ER-2068-2079[UMF-490-493])

By misrepresenting Nina's statements, Lord concealed the timeline necessary to assess the reliability of her eventual admissions: that (1) Nina's first admission of being at the Phi Hong was not until 1:02 p.m., six hours after detectives pulled her from bed and five hours after the first recorded interrogation began; (2) Nina's twelve denials before 1:02 p.m. (she denied being present sixteen separate times); and (3) by 1:42 p.m., Nina unequivocally and repeatedly recanted her short-lived admissions and maintained her recantation through 3:25 p.m. when the second tape ends. (10-ER-1890[UMF-323]; 11-ER-2107-2110[UMF-505])

## 2. *Coercive Tactics*

Lord's report omits that Nina remained at the police station from 8:08 a.m. until at least 3:25 p.m. Had the report disclosed that Nina was

questioned for over seven hours, it would have raised serious questions about what transpired during this period and *why* she was subjected to such prolonged questioning when Lord falsely reported that she had confessed during the first session.

The report concealed that four detectives applied highly coercive interrogation techniques, repeatedly lying to Nina about purported video/GPS evidence placing her at the crime scene, relentlessly accusing her of lying, promising she could just go home if she told "the truth," and threatening worse trouble if she didn't tell "the truth."

Lord's report both omitted Martin screaming in Nina's face as he pointed and cursed, (11-ER-2082-2087[UMF-495-496]) and falsely reported that Nina said she had not been completely honest and that Nina immediately told Lord she wanted to talk again. (10-ER-1931[UMF-238]) He omitted Nina's description to Aaron of Martin "in her face," "pointing at [her]," and yelling "you do not ever fucking lie to them." This was falsity by omission and critical *Brady* information, indispensable for assessing both the voluntariness and reliability of Nina's statements. Because there was no written or video evidence of Martin's off-camera confrontation, the prosecutor necessarily relied on Lord's description,

43

which egregiously mischaracterized the circumstances. (11-ER-2160-2163[UMF-541])

### 3. *Diagram - Mischaracterizing Nina's Statements in the Second Recorded Interrogation*

Lord's report created a materially misleading impression of the diagram by omitting that: (1) Lord directed Nina to write "Westminster," thereby mischaracterizing it as an admission of presence at the scene (11-ER-2101-2104[UMF-503]);[7] and (2) Nina told Lord that the diagram showed where they pulled off to "the restaurant" 3.6 miles from the crime scene. (11-ER-2104-2107[UMF-504]) Lord's report falsely conveyed that Nina/Aaron admitted participating in trapping a car despite twice, clearly denying they played any role in trapping a car. (10-ER-1832-1834[UMF-68-70]) Lord's mischaracterizations deprived the prosecutor of information necessary to understand that *he* transformed the diagram into a false admission of guilt. (11-ER-2096-2101[UMF-501-502])

### 4. *Victims*

Lord's report omitted exculpatory information reflecting a social relationship between Aaron/Nina and the victims: (1) Nina described

---

[7] 13-ER-2798 ("I explained to her that was impossible because she had written on the map Westminster Ave…")

playing pool with Aaron and three members of the *victim* group (Thai and his cousins, Jimmy/John) at 2000, on a different day (2) Aaron described learning about the shooting from Jenny Do, Thai's girlfriend. This was classic *Brady* material because it was indispensable in understanding Nina's description of being at a different poolhall (on a different day), it showed a social relationship and negated any motive, and it supported the plausibility that Aaron was left out of the loop regarding the gang attack. (10-ER-1871-1873[UMF-149-154];1888-1889[UMF-181]). Lord's report describes a conversation between Aaron and Thais' cousins, but falsely placed the conversation on the shooting night, at Tony's house, concealing Nina's description of playing pool at 2000, on a different day. 13-EWR-2789.

## **Summary of Argument**

The district court improperly drew multiple factual inferences in favor of the non-moving party, inappropriately dismissing Plaintiffs' direct fabrication claims arising from detectives' falsified police report and fabricated diagram, and circumstantial fabrication claims regarding coercive interrogation tactics against a juvenile witness to produce evidence that detectives knew or should have known to be false,

45

particularly in light of the obviously exculpatory evidence in their possession.

## Standard of Review

Summary judgment is a question of law, review is *de novo*, applying the same summary judgment standard as the district court. *Richards v. County of San Bernardino*, 39 F.4th 562, 569 (9th Cir. 2022).

## Argument

### I. The District Court Misapplied the Summary Judgment Standard By Drawing Factual Inferences in Favor of the Non-Moving Party

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the Government." *Devereaux v. Abby*, 263 F.3d 1070, 1075 (9th Cir.2001); *Spencer,* 857 F.3d 7 at 802 ("[N]o sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence").

Deliberate fabrication can be established through direct or circumstantial evidence. *Spencer*, 857 F.3d at 799-800. There are two methods of circumstantially proving deliberate fabrication: (1) investigative techniques so coercive and abusive that police know or

should know they will yield false information; and, (2) continuing an investigation where detectives know or should know the plaintiff was innocent. *Spencer*, 857 at 799-800.

## A. Direct Evidence Fabrication Claim (1): Genuine Disputes of Fact Exist as to Whether Lord's Report Materially Misrepresented Nina's First Interrogation

Deliberate mischaracterization of a witness interview constitutes direct evidence of deliberate fabrication. *Spencer*, 857 F.3d at 793; *Costanich v. Dept. of Health and Human Serv.*, 627 F.3d 1101, 1111 (9th Cir. 2010) ("[A]n interviewer who deliberately mischaracterizes witness statements in her investigative report…commits a constitutional violation."); *Mellen v. Winn*, 900 F.3d 1085, 1102–03 (9th Cir. 2018) (discrepancies between officer's written statement and the video recorded witness statement suggested detective modified the written statement to conform to the physical evidence and to feed the witness information). Lord's report contained brazen mischaracterizations that place this case squarely within *Costanich*'s definition of direct fabrication.

As explained in *Kando v. City of Long Beach*, No. 21-56199, 2023 WL 3092304, at *2 (9th Cir. Apr. 26, 2023) (unpublished), a deliberate fabrication claim:

"requires "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1147 (9th Cir. 2021) (citation omitted).

Lord's fabricated report mischaracterized Nina's first interview by (1) falsely reporting that, when shown a photo, she admitted to being at the Phi Hong; (2) omitting her ten consecutive denials after being shown a photo; (3) concealing her explanation of being at the 2000 on a different day; and (4) omitting coercive tactics used to extract her short-lived admissions.

### 1. The District Court Construed Inferences in Favor of Defendants to Determine Nina Admitted to Being at the Phi Hong After Being Shown a Photo During the First Recorded Session.

As a threshold matter, the parties dispute the *timing* of Nina's first "admission." There is more than a reasonable inference that Nina *never* admitted to being at the Phi Hong during the first recorded interrogation. Regardless, it is undisputed that she consistently denied being there after being shown a photo at 8:53 a.m. Instead, from 8:53 forward—the first time the words "Phi Hong" entered the conversation, and the first time she was oriented as to its location—she consistently denied being

there, articulating her denial ten separate times, each omitted from the police report.

Minutes into the interrogation, at 8:14 a.m., detectives asked if she was at a poolhall at Harbor and Westminster. In response, Nina twice asked if they were talking about 2000, indicating she was not familiar with the intersection and didn't know what poolhall was located there.

At 8:41, after persistent, suggestive questioning, Lord asked if she went to the poolhall at "Harbor and Westminster." Nina answered "[y]es, we were," but clarified "Cause I don't remember exactly when we were there." (13-ER-2595 [Ex. 1(a) (Video #1 of Nina Nguyen Interrogation), 8:40:55-8:41:06)]) Based on her earlier statements, there is an entirely reasonable inference that she was unfamiliar with the intersection and didn't know what establishments were there. Regardless, even if "yes" were construed as an admission, she indicated she couldn't remember *when* she was there, negating any inference she admitted to being present on the shooting night.

Whatever confusion exists as to the "yes" at 8:41, as the interview proceeds, it becomes clear that Nina did not admit to being at the Phi Hong the night of the shooting. At 8:52, she states unambiguously that

49

her memory of being at a poolhall was 2000 in Koreatown Plaza (miles from the Phi Hong). (10-ER-1875-1880[UMF-158-163]) (While there had been discussion of a "poolhall," detectives had yet to mention "Phi Hong.")

At 8:53, Lord showed Nina a photo with the Phi Hong sign, and she twice unequivocally denied being there. Between 8:53 and 9:11, when the first interrogation ended, Nina denied being at the Phi Hong ten consecutive times.:

- 8:53:00- 8:53:25  p. 45 ("Are you serious…I don't remember being there…);

- 8:53:00- 8:53:25  p. 45 ("Are you sure I was in the car? I don't remember being there.");

- 8:55 a.m., p. 47 (denying that they went to Phi Hong after 2,000 and stating that she does not remember going to Phi Hong);

- 8:55:51-8:55:36, p. 48 ("Can I please tell you why I know I wasn't in that car.");

- 8:59, p. 51 (Nina says she remembers being at the 2,000, not the Phi Hong);

- 8:59, p. 51 (Nina says she "had no clue" they were at the Phi

Hong);

- 9:03:21 – 9:04:04, p. 55 (when Lord asks who went into the Phi Hong, Nina says she "never knew we were there.");

- 9:04, p. 55 (explaining that when she referenced Puffy's car being in the parking lot, she was talking about the day at the 2,000 [not Phi Hong]);

- 9:04, p. 55-56 (explaining she doesn't remember being at the Phi Hong, she only remembers being at the 2,000);

- 9:08, p. 59 ("I don't remember being at Phi Hong.").

(10-ER-1897-1899[UMF-196])

These consecutive denials upon viewing the photo are more than sufficient to support the inference that her earlier (8:41) "yes" was not intended as an admission.

The inference that Nina made no admissions during the first session is reinforced by Lord/Danielson's recorded hallway conversation, when Lord admitted that both Nina and Aaron denied being at the Phi Hong, providing consistent alibis of having been separated from the group and waiting the Vietnamese restaurant. This inference is further reinforced by Nina's statements at the outset of the second session. At

51

12:57, after Lord accuses her of lying, Nina pleads again: "why would I lie straight to your face when you ask me over and over again."

### 2. Undisputed Facts Establish that Lord Mischaracterized Nina's Reaction to the Phi Hong Photo & Concealed Her Subsequent Denials

Undisputed facts establish that, although Lord falsely reported he showed Nina a photo of the Phi Hong and she admitted to being there, the opposite happened. Nina immediately and (twice) unambiguously denied being there. The report conceals not only the first two denials, but all ten **consecutive** denials during the first interrogation (not to mention additional denials at the beginning of the second interrogation). This was not "mere carelessness," it was outright falsification. *See, e.g., Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) (triable issue exists on whether an officer fabricated a report by writing that an arrestee was present for a shooting, when the man contended that he had told the officer he was he was merely nearby; "[t]here is a wide gulf between telling someone you were…nearby when a shooting occurred and telling someone you were 'present' for a shooting and were 'with the suspects dealing drugs'"). Here, Nina did not even

state that she was "nearby," she simply disclosed being in the same type of establishment, on a different day, with a (partially) different group.

Nina's response to the photo at 8:53 a.m. (and her subsequent denials) were significant. Her statements went to the heart of the investigation, which focused entirely on whether Aaron and Nina were present at the Phi Hong. This specific moment in Nina's interrogation was especially crucial because 8:53 is the *first* time the words "Phi Hong" enter the conversation; it represents the first moment in which Nina and detectives were oriented to the same location. (*See* 10-ER-1881[UMF-166]) Changing her statement from "No" (I was not there) (ten times), during the interview, to "Yes," (I was), in the report, could not be more consequential. *See Costanich*, 627 F.3d at 1113; *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003) ("[t]he substitution of 'consistent' for 'positive,' [] reasonably may be characterized as a misstatement. Reporting that a witness said something she did not cannot be so characterized.").

The district court framed Lord's description as a trivial inaccuracy of "timing" based on the incorrect assumption that, later during the first interrogation (i.e. *after* being shown a photo at 8:53), Nina admitted to

being at the Phi Hong. Not so! The court mistakenly concluded Nina admitted to being at the Phi Hong when Nina agreed "yes" she went to the poolhall at Harbor/Westminster (and she specifically said she could not remember when she was there). Critically, this exchange occurred at 8:41, *before* she was shown a photo *See* 1-ER-5, 15 (district court citing to Nina interrogation transcript, p. 33).

This critical assumption was unfounded. Defendants have never contested that, when shown a photo, Nina denied being at the Phi Hong and maintained her denials through the end of the first session. Between 8:53 and 9:11, there is no statement that could be construed as an admission of being at the Phi Hong. Regardless, even if defendants disputed this, "[a]n admission by a defendant is not required to survive summary judgment." *See Olsen v. Idaho State Bd. Of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Where words or conduct may be interpreted in several ways, one supporting the motion and one controverting it, summary judgment must be denied. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521-522 (1991).

The district court also pointed to an exchange between Lord and Nina between 8:54 – 8:55 a.m. in which Lord attempted to redirect the

conversation back to Nina's earlier description of seeing Puffy in the parking lot. Nina acknowledges her earlier statement that she saw Puffy in a parking lot, but explains that she was referring to the parking lot of the 2000, not the Phi Hong, on a different day than the shooting. (10-ER-1881-1883[UMF168-169], 1890-1891[UMF-183-184]; 13-ER-2595 [Ex. 1(a) (Video #1 of Nina Nguyen Interrogation [9:04:04-9:04:43])

Crucially, Lord's report contains no reference to 2000, despite Nina's <u>eight</u> references to it. Her description of being at 2000 was not a minor detail, it was vital to understanding her statements during the first interview – and to Lord's report. Lord reported that Nina admitted to being at "a poolhall," yet misleadingly failed to clarify that she had repeatedly said she was at the 2000, not the Phi Hong, and that she was thinking about a different poolhall (from the Phi Hong) on a different day. This exclusion was "not obviously the product of carelessness," *Caldwell*, 889 F.3d 1105 at 1115, and alone is strong evidence of fabrication, requiring remand.

### 3. *By Falsifying the Timing of Nina's First Admission, Lord Distorted Information Essential to Assess the Reliability of Nina's Eventual Admissions.*

The district court's trivialization of Nina's reaction to the photo

isolates Lord's mischaracterization from its context and diminishes the paramount importance of Nina's reaction. This exemplifies the order's faulty analysis. Nina's true reaction showed she persistently denied involvement – even in the face of overwhelming deception and pressure – for the entire first interrogation session, until 1:02 p.m., and only capitulated *after* Sgt. Martin subjected her to a terrifying confrontation. Lord's failure to report this is both foundational to Plaintiffs' claims and fundamentally inappropriate for resolution at summary judgment. *See Gregory v. City of Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (rejecting argument a report's "'failure to disclose,' if any, amounts only to negligence" because "culpability is an issue of fact for a jury.").

This timeline also shows that detectives acted with reckless disregard for the truth when they doubled down on coercive tactics after consulting among themselves. At the hallway meeting described previously, detectives had the opportunity to discuss the investigation. At this juncture, they could have paused to re-review the video surveillance and investigate Aaron's alibi. Instead, they made the deliberate choice to "flip" someone, and employed coercive interrogation tactics that so terrified Nina that she made the brief, false admission of

being at the Phi Hong.

The flagrant discrepancies in Lord's report also support the inference that Lord knew his team had used impermissibly coercive techniques, undermining the reliability of Nina's admissions – his guilty knowledge is evidenced by omissions and mischaracterizations designed to conceal the fact that a team of four detectives (Lord, Martin, Danielson and Farley) subjected Nina to seven hours of interrogation. Just as Lord falsified the timing of her first admission, he concealed the duration of her interrogation. Disclosing its length would have raised questions about the reason for such a prolonged interrogation and whether Nina actually confessed during the first session, as reported.

The significance of Lord's mischaracterization requires an assessment of the complete context in which his false statements were made, and is therefore a question that should be reserved for the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.")

### 4. Construing Inferences in Favor of Plaintiffs, References to Confusion/Dishonesty in Lord's Report Do Nothing to Mitigate the Seriousness of Lord's Misrepresentation

In granting summary judgment, the district court emphasized that Lord's report reflected confusion in Nina's statements and Lord's opinion that Nina was not fully forthcoming: "I still did not think she was telling the truth…" or Nina "told me she could not exactly remember that." 1-ER-14. The order cites specifically to statements on pages of 6 and 7 or Lord's report describing the first interview session. (*See* 13-ER-2788-2789)

None of these statements sufficiently alerted the reader that, when shown a photo, Nina expressly denied – ten times – that she was at the Phi Hong, emphasizing that her only memory of being at a poolhall was regarding the 2000 Billiards *on a different day*. For example, where Lord says he "still did not think she was telling the truth…" no reasonable reader would infer that he was saying that she had denied being at the Phi Hong because *in the directly preceding*

> She then told me she was down at the Phi Hong. She said Aaron NGUYEN parked his car right next to "Puffy's" car in the parking lot, and they began to drink. She said suddenly after a few minutes, "Puffy" said he needed to take care of some business and go do something. He then drove off. Nina NGUYEN told me they continued to drink in the car, and they just kind of hung out and eventually went home. I showed Nina a picture of the Phi Hong Billiards and she admitted she was there with Aaron.
>
> I explained to Nina NGUYEN I still did not think she was telling me the truth, and she needed to be honest. Nina NGUYEN told me she did not know anything else about the incident. I asked her if she saw the shooting or heard it, and she said she did not. I explained to Nina NGUYEN I already had evidence showing Aaron NGUYEN was at the parking lot, and there were people who had seen him there, along with her. Nina NGUYEN told me she could not exactly remember that.

*sentence* Lord said "I showed Nina a picture of the Phi Hong Billiards and she admitted she was there with Aaron." Thus, whatever Nina was supposedly lying about, it wasn't her presence at the Phi Hong, because, in the preceding sentence, Lord (falsely) wrote she admitted to being there when shown a photo. On page 6 of his report, Lord characterized Nina's alibi as "confused" "jumbled," or not entirely truthful. These characterizations did not apprise the prosecution/defense of Nina's repeated denials; they falsely discredited her alibi—validating Lord's fabrications.

Lord's opinion regarding truthfulness is not a fact justifying summary judgment. Even if there were an inference that Lord's commentary on confusion/dishonesty conveyed inconsistency in Nina's statements, that inference cannot justify summary judgment. A jury could readily find that Lord's report presented a fundamentally misleading view of what happened during Nina's interrogation. *Fresno Motors, LLC v. Mercedes Benz USA*, LLC 771 F.3d 1119, 1125 (9th Cir. 2014) (summary judgment improper "where divergent ultimate inferences may reasonably be drawn from the undisputed facts).

### 5. *Material Omissions Support False Evidence Claims*

Omissions, if material, support deliberate fabrication claims. *See Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *1 (9th Cir. Oct. 11, 2023) (unpublished) (distinguishing *O'Doan* because "the totality of the mischaracterizations, discrepancies, and omissions between" plaintiff's account and defendants' reports, viewed in light most favorable to non-moving party, provides direct evidence of fabrication); *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (fabrication includes both "material false statements and material omissions," because both deceive the factfinder); *United States v. Stanert,* 762 F.2d 775 (9th Cir. 1985)*, amended, reh'g denied,* 769 F.2d 1410 (9th Cir. 1985) (defendant may challenge a facially valid "warrant affidavit .. when it contains deliberate or reckless omissions of facts that tend to mislead"); *Morse v. Fusto*, 804 F.3d 538, 548 (2d Cir. 2015) ("[I]nformation may be 'false' if [as here] material omissions render an otherwise true statement false"); *Wilson v. City of Los Angeles*, No. CV 18-5775-KS, 2020 WL 8211451, at *29 (C.D. Cal. Dec. 23, 2020) ("Fabrication can be established either through "material false statements or material omissions.").

The district court analogized this case to *O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir. 2021), but *O'Doan* simply holds that "mere omission" is insufficient to support a false evidence claim. What transpired in this case is anything but "mere omission." Taking all inferences in Plaintiff's favor, Lord entirely transformed the import of Nina's statements in the first recorded session by misrepresenting Nina's reaction to the photo, her numerous denials, and her explanation of being at 2000 on a different day.

## B.    Direct Evidence Fabrication Claim (2): A Genuine Dispute of Fact Exists as to Whether Lord Falsified Evidence by Directing Nina to Falsely Label the Diagram

It is undisputed that Lord directed Nina to write "Westminster" on her diagram. (1-ER-13)[8] His report not only failed to disclose that he instructed Nina to do so, it claimed Nina tried to backtrack about the location only after Aaron came in the room—creating the false impression that she wrote "Westminster" because that is what she intended the diagram to depict, and that Aaron's presence was what caused her to backtrack, when in reality she never intended the diagram to reflect the

---

[8] Nina testified that she only wrote Westminster because Det. Lord told her to. (11-ER-1999-2001[UMF-365-370]; 2101-2107[UMF-503-504]).

location of the shooting in the first place. Indeed, Nina explained – while actually drawing a circle on the diagram – that her drawing pertained to the area near "the restaurant." (11-ER-2001[UMF-370]) Nina's reference to the "restaurant" established a physical location 3.6 miles from the shooting—yet she was effectively instructed to label her depiction "Crime Scene."

Nina had repeatedly explained to detectives that they were following CJ leaving MSP, lost him nearby, and pulled over to the Vietnamese restaurant where they waited to reunite with the group. Detectives learned from Aaron that it was the Thanh My Vietnamese restaurant, located near Bolsa/Bushard, 3.6 miles away from the crime scene. As detectives knew, consistent with their alibis, cell phone evidence established that Aaron/Nina were in the vicinity of the Thanh My at 1:58 a.m., about 20 minutes *before* the shooting.

As Plaintiffs' police practices expert explained, detectives knew or should have known that Nina's diagram was an unreliable piece of evidence, generated through interview techniques they knew or should have known would yield unreliable evidence. (11-ER-2125[UMF-519]) Lord's failure to disclose how the words "Westminster" came to appear on

the diagram was even more reckless given video surveillance footage establishing Aaron's car was not among the Westminster caravan and cell phone evidence corroborating Aaron/Nina's alibis.

Lord's description of Nina's statements as "jumbled," "confused," or "vague," in no way mitigated the false impression created by Lord's report that Nina, herself, had labeled the diagram "Westminster." By directing Nina to (mis)label the report with the word "Westminster," Lord transformed her drawing of a street near MSP/restaurant into a falsified admission of guilt. *See Crowe v. Cty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010); *Stoot v. City of Everett*, 582 F.3d 910, 927-28 (9th Cir. 2009) ("A reasonable fact finder could conclude that it was not reasonable for an officer to believe that it was constitutional to coerce a confession and then to hand that information to a prosecutor—without divulging the means by which the confession was acquired—for use in a criminal case.") (citation omitted).

At trial, the prosecutor placed so much weight on the mischaracterized diagram that he told the jury to essentially disregard the eyewitness testimony of three *prosecution* eyewitnesses who did not see Aaron's car at the crime scene. Although Nina testified that Lord told

her to write Westminster, the jury never learned that, while drawing the diagram, Nina placed the location at the "restaurant." The diagram was directly responsible for Aaron's conviction.

### C. Circumstantial Evidence Fabrication Claim 1: A Genuine Dispute of Fact Exists As to Whether Detectives Used Interrogation Techniques They Knew or Should Have Known Would Yield False/Unreliable Evidence

#### 1. Detectives Used Impermissibly Coercive Techniques to Extract Nina's False Admissions

The use of coercive and abusive techniques to fabricate third-party witness statements supports a 14th Amendment fabrication claim. *Tobias*, 996 F.3d at 584; *see also, Gantt*, 717 F.3d 702 (coercion produced third-party statement after "hours-long" interrogation with threats of murder charges if witness did not identify suspect). "[P]sychological coercion is sufficient;" physical violence is not required. *Stoot v. City of Everett*, 582 F.3d 910, 929 (9th Cir. 2009).

Liability hinges on whether interrogation techniques are known to yield false or unreliable evidence. *Spencer,* 857 at 801-802; *Tobias*, 996 at 581-582. The question is not whether any single technique is impermissibly coercive, but whether "the totality of the circumstances" shows that the officer's tactics overcame the interviewee's free will.

Tobias, 996 F.3d at 581 (§ 1983 due process claim). The totality analysis includes both the coerciveness of interview techniques and any characteristics rendering an individual suspect/witness more vulnerable, including youth and inexperience with law enforcement. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

### a. Juvenile Interrogations are Judged by a Stricter Standard

"It has [] long been established that the constitutionality of interrogation techniques is judged by a higher standard when police interrogate a minor." *Tobias,* 996 F.3d at 584 (9th Cir. 2021); *Crowe*, 608 F.3d at 431 (*quoting In re Gault,* 387 U.S. 1 (1967) ("[T]he greatest care must be taken to assure that the [juvenile] admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."); *see also Gallegos v. Colorado*, 370 U.S. 49, 52–54 (1962) (a juvenile "cannot be compared with an adult" when assessing the voluntariness of a confession). [9]

---

[9] *See also, Doody v. Schriro*, 548 F.3d 847, 866 (9th Cir. 2008) (17-year-old's vulnerability "enhanced by the fact that he had never been arrested before"); *Lewis v. Henderson*, 520 F.2d 896, 901 (2nd Cir. 1975)

In questioning Nina, the need for caution was obvious. She was 17 by four days, had never been arrested,[10] and was interrogated without a parent[11] in a 6'x8' room, for over six hours. Their techniques went far beyond "reminders to be honest." They involved a cocktail of prolonged, repeated, and suggestive deception, and forceful intimidation, including repeatedly lying to her about purportedly incontrovertible video and GPS evidence, incessant accusations of lying, screaming profanities while pointing in her face, implying that she could be charged with conspiracy, and suggesting she could "just go home" if she would only "tell the truth." (10-ER-1839[UMF-78-79]; 11-ER-2043[UMF-451], 2057-2064[UMF-468-483])

---

(twenty-two-year-old had "little prior experience with police methods, … rendering him particularly susceptible to police pressure.").

[10] The absence of *Miranda* warnings compounded the coercion. Officer statements would have left no reasonable 17-year-old in Nina's situation feeling free to leave. (10-ER-1842[UMF-82], 1853-1855[UMF-107-110]; 11-ER-2045-2046[UMF-454-455])

[11] *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (The absence of a parent "bears on voluntariness…") (citing *Colorado v. Gallegos*, 370 U.S. 49, 52–54 (1962)).

### b. Deception Is Impermissible Where It Will Likely Procure a False Admission

Under *Devereaux*, disbelief in an initial denial, followed by continued "aggressive questioning," does not, "without more" support a fabrication claim. Here, detectives' trickery easily supplies the something "more" missing from *Devereaux*. Federal courts have long recognized that deception is a form of coercion that may yield false admissions, particularly when employed against youth and vulnerable witnesses. *See e.g., Harris v. Bornhorst*, 2004 WL 7340519 (N.D. Ohio) (§ 1983 case, police "took advantage of [minor suspect's] youth and inexperience by using deception to" convince him of the existence of inculpating evidence meaning "he had no option but to confess"); *Brewster v. Shasta Cty.*, 27 F. App'x 908, 912–13 (9th Cir. 2001) ("suggestive procedures with the intent of obtaining an identification" of a suspect, "irrespective of whether he was in fact guilty," qualifies as a coercive investigative technique); *Woods v. Clusen*, 794 F.2d 293, 295-296 (finding a confession involuntary when detectives falsely claimed to have found suspect's fingerprints).[12]

---

[12] No authority precludes referencing voluntariness cases addressing coercive interrogation techniques. *Hall v. City of Los Angeles* merely held that coerced confession claims are not cognizable under a

Deception is impermissibly coercive when it is likely to procure an unreliable admission. *See Aleman v. Village of Hanover Park*, 662 F.3d 897, 906-907 (7th Cir. 2011) ("[A] trick that is as likely to induce a false as a true confession renders a confession…unreliable" and "worthless as evidence"); *Crowe*, 608 F.3d at 420 (9th Cir. 2010) (impermissible coercion included subterfuge regarding inculpatory evidence); *Hyung Seok Koh v. Graf,* 307 F.Supp.3d 827, 851–59 (N.D. Ill. 2018) (coercion included deception regarding inculpatory evidence, rejection of denials, accusations of lying, and confusing questions, etc.).

Throughout the two recorded sessions, detectives endlessly lied to Nina, falsely claiming at least twelve times, that incontrovertible cell phone and video evidence placed her at the scene. As Dr. Kassin (a leading expert unmentioned by the district court) observes "[i]n ways that were particularly egregious, detectives confronted Nina Nguyen with a litany of lies, the likely effect of which was to make her feel trapped, confuse her, disorient her, and cause her to question her own memory.

---

*Devereaux* fabrication of evidence theory where the fabricated evidence is the plaintiff-defendant's own confession. *Hall*, 697 F.3d 1069-1070 (9th Cir. 2012). Plaintiff does not assert an involuntary confession claim; regardless, *Hall* does not address reliance on voluntariness cases where the claim arises from a third-party's admissions.

And whenever she sought to assert herself, they countered with the same ostensibly incontrovertible and objective evidence…The deceptions were unequivocal and relentless, oral and visual, leading Nina to search for an explanation as to why she did not recall the events as described to her." (11-ER-2053-2063[UMF-462-481])

Detectives' lies were enhanced with physical props. Lord initiated the first interrogation by opening his "red book," claiming it had "all the proof" of their whereabouts. When Nina denied being at the Phi Hong, Lord showed Nina cell phone GPS maps, falsely claiming they established Aaron's presence at the crime scene, and told her to start telling the truth. Detectives even claimed that a still-shot taken from video-surveillance was Aaron's car, when they had no basis for that belief. (10-ER-1845[UMF-87-88], 1883[UMF-171]; 11-ER-2007[UMF-379], 2016[UMF-400]) Detectives' deception made Nina feel overwhelmed and disoriented. Though she could not remember being at the Phi Hong, she believed detectives' false claims of irrefutable proof and she eventually began to doubt her memory. (10-ER-1973[UMF-311]; 11-ER-2052[UMF-461], 2057[UMF-467], 2062[UMF-478], 2064[UMF-483])

69

Well-established psychiatric research demonstrates that subterfuge increases the risk of false confession, particularly with juveniles. Dr. Kassin explains, Lies "put innocent people at risk …: (1) by causing them to feel trapped by the apparent weight of evidence and eliciting compliance by instilling a sense of inevitability and despair; and (2) by causing confusion and disorientation, sometimes leading them to question their own memories and at times internalizing a false belief in their own culpability." "While orally presented false evidence can cause innocent people to confess… *an even greater risk exists when the lie is supplemented by false visual evidence." The effects of post-event misinformation on memory are even greater for youth, especially under duress;* teens do not know that police can and will lie about evidence, increasing the risk of false confessions. (11-ER-2060[UMF-475], 2063-2064[UMF-482-484])[13]

---

[13] Expert testimony on false confessions is admissible in the context of § 1983 cases arising from allegedly coerced statements. *See Tekoh v. Cnty. of Los Angeles*, 75 F.4th 1264, 1266 (9th Cir. 2023) (reversing exclusion of coerced confessions expert—"it is 'hard to imagine anything more difficult to explain to a lay jury' than the fact that the alleged perpetrator could have confessed to a crime he did not commit'"); *see also Richards v. Cnty. of San Bernardino*, 39 F.4th at 571. ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to

### c. Martin's Intimidating Off-Camera Confrontation

Unlike *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003), this is not a case where police merely continued questioning after an initial denial. During the first session, detectives persistently pressured Nina to say she was at the Phi Hong and forcefully cut off her denials with repeated accusations of dishonesty, communicating they would accept nothing short of admission. Nina desperately pleaded for officers to believe her and offered to take a lie detector test. (11-ER-2052[UMF-460])

Relentlessly pressuring witnesses to tell a particular story is itself inherently coercive, especially for vulnerable witnesses. *See Crowe*, 608 F.3d at 432 (conscience-shocking behavior where detectives "isolated and subjected [juvenile suspects] to hours…of interrogation in which they were cajoled, threatened, lied to, and relentlessly pressured"); *Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir. 2018) (§1983 case, noting coercive tactics included fact-feeding, calling suspect a liar each time she denied involvement and threatening murder charges; "the rule forbidding such

---

defeat a summary judgment motion," *quoting Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994)).

conduct has been established for decades"); *In the Interest of Jerrell C.J.*, 283 Wis.2d 145 (Wis. 2005) (confession involuntary where, over seven-and-a-half hours in custody, police disregarded 14-year-old's repeated denials, and urged him to tell a "different truth").

But the conduct in this case goes far beyond pressure to tell a particular story: Following Nina's repeated denials in the first session, detectives hatched a plan to "flip" a suspect with off-camera tactics that were far more intimidating and coercive than the those captured on film.[14] They wanted an arrest, not the truth. After Martin deliberately terrified Nina,[15] leaving her crying unconsolably, Lord resumed his aggressive questioning, disregarding Nina's emotional state and protestations of innocence ("I'm not lying to you, sir"). Exercising no caution, Lord continued to berate her, calling her "ridiculous" and a "liar"

---

[14] Not recording this confrontation supplies circumstantial evidence of deliberate indifference/reckless disregard.

[15] The timing of Martin's confrontation - immediately after the team decided to "flip" someone - supports the inference that Martin understood this tactic as capable of eliciting, and intended it to elicit, a *false* admission. *Brewster*, 27 F. App'x 908 at 912–13 ( "suggestive procedures with the intent of obtaining an identification" of a suspect, "irrespective of whether he was in fact guilty," qualifies as a coercive investigative technique).

(at least four times). (10-ER-1958-1960[UMF-283-285], 1973–1974[UMF-310-311], 1976[UMF-316], 1978[UMF-320])

There was an obvious risk of extracting a false confession, especially given Nina's youth. Any reasonable detective would have understood Nina's panic-stricken state as a warning that she was at risk of falsely confessing to escape an unbearable situation. (5-ER-956[AMF-576]). *See also, Harris v. Bornhorst*, 2004 WL 7340519; *Cooper,* 963 F.2d 1220, 1240-1241 (9th Cir. 1992) (§1983 due process claim; investigators' tactics shocked the conscience when they "badgered [the suspect] for four hours" as he was "hammered, forced, pressured, emotionally worn down, stressed, and infused with a sense of helplessness and fear," reducing him "to a state of agitation and anxiety marked by tears and sobbing").

### d. Coercive Promises and Threats

Detectives repeatedly minimized the consequences of an admission (e.g. "it's not a crime to be there"), while threatening worse trouble if Nina persisted in her denials ("but it is a crime to lie to us" and if you don't talk it "makes you look like …the hard core one"). (10-ER-2618, 2634) They told her underline five times, in response to her denials, that the faster she gave them the information they wanted, the faster she could leave,

communicating she was not free to leave until she provided the narrative they wanted. During his off-camera confrontation, Martin threatened Nina with deeper trouble, and later, on video, threatened her with conspiracy charges, emphasizing that, while Aaron "made his decision," "all you have to do is say 'yeah' we were there,'" and noting Nina was "still young enough to have a life." (10-ER-1853[UMF-107], 1860[UMF-127], 1949[UMF-265]; 11-ER-2064-2066[UMF-484-486])

Such threats are inherently coercive, especially in juvenile interrogation. *Tobias v. Arteaga*, 996 F.3d at 581-582 (promise to release suspect without a charge upon confession was coercive as matter of law); see also *Woods,* 794 F.2d at 295-296 (7th Cir. 1986) (confession involuntary where *Mirandized* 16-year-old was interrogated for two consecutive 20-minute-sessions; during the second session detectives "suggested things would 'be better' or 'go easier' if suspect answered questions); *Rodriguez v. McDonald*, 872 F.3d 908, 921-924 (9th Cir. 2017) (confession involuntary where police suggested leniency by promising to tell the prosecutor that he was "not entirely bad dude" and there was "a little bit of influence from the other guys…" and "you still have a lifetime."); *Wilkins* 2006 WL 8443775, at *16 ("no question … that a jury

could find that threats of harm, as well as promises of help, leniency, and safety, are improperly coercive tactics, particularly when used against a young, uneducated defendant").

### 2. *Detectives' Conduct Shocks the Conscience*

The district court's decision emphasizes that fabrication claims require conscience-shocking behavior. Shocks the conscience means different things in different constitutional contexts. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 852, 118 S. Ct. 1708, 1719 (1998). In the deliberate fabrication context, conscience-shocking behavior means deliberate indifference or reckless disregard for the consequences of their actions. *Spencer*, 857 F.3d at 802; *Gantt*, 717 F.3d at 702, 707-708; *see also*, *Tatum v. Moody*, 768 F.3d 806, 820-821 (9th Cir. 2014) (*Brady* context). ***The district court never referenced "deliberate indifference" or "reckless disregard" in its fabrication analysis*, a failure that requires reversal.**

The facts here establish conscious, reckless disregard for the consequences of detectives' actions. As Plaintiff's police practices expert explains, any reasonable police officer would have appreciated the risk of eliciting false statements presented by Nina's interrogation: "Reasonably

75

trained detectives would have understood in 2011 that repeatedly lying to a juvenile witness to create the impression police had irrefutable evidence of guilt, coupled with repeated accusations of lying, promises of leniency (you can go home in five minutes), and threats of more serious trouble if they don't 'tell the truth' could be sufficient to elicit an involuntary confession – and that extreme caution was warranted particularly after Nina Nguyen was found crying inconsolably prior to her second interrogation. A reasonably trained detective would know or should know that such coercive techniques were likely to yield false or unreliable evidence; persisting in the use of such techniques demonstrates deliberate indifference and/or reckless disregard to the truth and/or to the rights of the accused." (14-ER-3098-3099)

Any reasonable officer would have understood that detectives' relentless deception created a substantial risk of false admissions. Their false evidence ploys disoriented Nina and left her struggling to understand why she couldn't remember the narrative advanced by the detectives. (11-ER-2053[UMF-462]) As Plaintiffs' police expert explains, in law enforcement circles, it is widely understood that lying to a witness

can induce false statements, depending on the circumstances and vulnerability of the witness. (11-ER-2063[UMF-481])

When deception failed, detectives resorted to brute intimidation, and used these tactics in tandem. It is precisely the combination of trickery and browbeating that distinguishes this case from *Cunningham*, 345 F.3d 802 (9th Cir. 2003), *Gausvik,* 345 F.3d at 817, *Devereaux*, and *McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir. 2009). None of these cases involved a combination of tactics applied here, nor the evidence of a conscious choice to double-down on coercive tactics that was unknowingly captured in a hallway meeting where detectives deliberately elected to employ coercive tactics rather than evaluate exculpatory evidence. This choice demonstrates reckless disregard for the truth and makes clear that officers would stop at nothing to obtain Nina's confession to secure Aaron's conviction. *Mellen*, 900 F.3d at 1103 (9th Cir. 2018) (determining evidence suggested detective "would have taken any means necessary to secure [the] conviction" in part where he knowingly exceeded the scope of a search warrant, suppressed the content of her conversation, spoke with a suspect without counsel, and failed to investigate other credible witness accounts.)

Nina's false, short-lived "admissions" contained numerous known discrepancies from the actual events. She repeatedly described a white Honda being "chased," although detectives knew the victims drove a silver Lexus SUV. Nina's diagram erroneously placed Puffy to the right of the white car being "chased," but detectives knew Puffy pulled up on the SUV's left. Nina's diagram sandwiched the "chased" car between Puffy's and CJ's cars, suggesting the victim was surrounded; video surveillance shows the victim's car was *not* surrounded. (10-ER-1818-1819[UMF-53–54], 1868[UMF-145], 1962-1963[UMF-290]; 11-ER-1998[UMF-361-363], 2008[UMF-381], 2126[UMF-521–524]; 5-ER-956[AMF-565]) But detectives refused to heed these red flags. Such discrepancies provide clear indications a witness/suspect's will has been overborne and they have provided unreliable information. *See Henry v. Kernan*, 177 F.3d 1152, 1157 (9th Cir. 1999) ("police tactics and trickery produced a confession which was neither rational nor the product of an essentially free and unconstrained choice"); *Doody v. Schriro*, 548 F.3d 847, 866 (9th Cir. 2008) (discrepancies between admissions and the facts "provides strong evidence that his will was overborne."); *Harris*, 2004 WL

7340519, *16 (noting inability to provide details is "consequential factor" in assessing voluntariness).

As Plaintiffs' police expert explains, Nina's own statements alerted detectives to the risk of eliciting unreliable information. (14-ER-3153) At 1:00 p.m., after being berated, and called "ridiculous" and a "liar" (multiple times in quick succession), Nina asked if she could "just admit everything," trying to agree with detectives ("Okay, I was there.") while emphasizing *but I don't remember*." Despite such glaring warnings, detectives continued pressuring her to admit to being present. During her second interrogation, Nina twice, unambiguously told detectives they coerced her into saying she was at the Phi Hong, when she had no such memory. (11-ER-2107[UMF-505]) (e.g., "I told you from the beginning that I don't remember being at the Phi Hong. And you guys kept telling me that everyone's been telling you [we were there].").

Nina testified in deposition that detectives coerced her into falsely admitting she was at the Phi Hong: "[A]s much as I tried my best to cooperate and tell them the truth, nothing but the truth, they still wouldn't believe me. They just – they just kept calling me a liar." (11-ER-2066-2068[UMF-487]) *see e.g.*, ("They kept asking me the exact same

thing, I answered with the same exact answer, and I felt like I had to just tell them what they wanted to hear in order for me to leave." Q:"What is it that you thought they wanted to hear?" A:"Agreeing that I was on Westminster or at Phi Hong on the day of the shooting when we weren't, and we were at a Vietnamese restaurant.").

### D. Circumstantial Evidence Fabrication Claim (2): Detectives Coerced Nina's Admissions Yet Should have Known Aaron Was Innocent

Detectives had every reason to know they had, in fact, overborne Nina's will and were eliciting false admissions. Both Nina and Aaron's denials were corroborated by cell phone location data showing that, consistent with their statements, they were near the Thanh My restaurant about 20 minutes before the shooting. (They could not have conformed their statements to cell phone data they had never seen). Moreover, the video surveillance footage, already possessed by detectives, showed that Aaron's car was not among the caravan on cars on Westminster – he was not present during the deadly car chase, and therefore, Nina's diagram showing cars on a street, could not have pertained to the Westminster chase. Given the video surveillance evidence, and cell phone evidence corroborating the consistent alibis of

Nina, Aaron and Alexander Tran, detectives should have known Aaron was innocent, even before contacting other eyewitnesses.

###   E.   Brady

Lord's report misleadingly flipped Nina's consistent exculpatory narrative, interrupted by short-lived admissions, into a consistent admission, interrupted by confused and untruthful contradictions. Concealing Nina's denials and the coercive tactics by which her admissions were extracted creates a fundamentally misleading description of the interview and presents a standalone *Brady* violation. *Brady* requires officers to disclose when they have presented false statements, fabricated evidence or have undermined the integrity of evidence through investigatory misconduct. *Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (FBI agents failed to disclose that they induced false witness statements and submitted false reports); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (failure to disclose coaching of witnesses violated *Brady*).

Detectives may not bury exculpatory details buried in 90+ hours of video. *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358 (2010) ("the

government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Atkins v. Cnty. of Riverside*, 151 Fed.Appx. 501, 505 (9th Cir. 2005); *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1090 (9th Cir. 2009) (Exculpatory evidence "…should not have been buried in a file… [but] made known to the prosecutor").

Exclusion of exculpatory information from reports is never excusable where, as here, the omissions create a misleading description of events. *Skilling* concluded that secreting exculpatory information in voluminous files violates Brady where police engage in deceit. *Skilling*, *supra* at 577. The availability of information elsewhere is irrelevant where police deceptively conceal the exculpatory value. *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005); *Freeman v. State of Ga.*, 599 F.2d 65, 72 (5th Cir. 1979); *Liston,* 120 F.3d at 973 ("material omission" a form of false evidence). When prosecutors receive police reports in the context of serious and complex cases, their default assumption is that the the report is truthful, accurate and reasonably complete. (11-ER-2163[UMF-542], 2175–2176[UMF-546-547], 2197-2200[UMF-555])

Critically, even if prosecutors may consult video for recorded interviews, they rely *exclusively* on police reports for descriptions of **unrecorded** interviews. (11-ER-2160-2163[UMF-541]) Detectives failure to report Nina's description of Martin's off-camera confrontation (shouting profanity and pointing in her face) concealed crucial exculpatory details relevant to voluntariness and reliability. *Tennison*, 570 F.3d 1078, n.6 (9th Cir. 2009) (liability for *Brady* violation did not hinge on how exculpatory information was documented but whether it was disclosed).

## II.    The District Court's Rulings on Familial Deprivation, Supervisory Liability and *Monell* Must Be Reversed

The district court's grant of summary judgment on Plaintiffs' familial deprivation claims, supervisory liability theory, and entity-liability claims under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) was premised on its determination that the individual defendants had not violated Plaintiff's rights. (1-ER-24-29) Because the individual defendant rulings were in error, the court's derivative rulings on Monell claims must also be reversed. See *Green v. City & County of San Francisco*, 751 F.3d 1039, 1053 (9th Cir. 2014).

Regarding the familial deprivation claim, the district court also

found there was insufficient evidence to show conscience-shocking conduct. The court's state-of-mind analysis misstates the law: deliberate indifference/reckless disregard are sufficient to establish conscience-shocking behavior in the deliberate fabrication context. There are more than sufficient facts to establish a genuine dispute as to deliberate indifference/reckless disregard. (See §I,C,2).

## Conclusion

For the foregoing reasons, Appellant respectfully requests reversal and remand for trial.

Dated: June 20, 2024      Respectfully submitted,

McLANE, BEDNARSKI & LITT, LLP

By:    /s/ Lindsay Battles
    LINDSAY BATTLES
    Attorneys for Plaintiffs-Appellants

# STATEMENT OF RELATED CASES

## Form 17. Statement of Related Cases Pursuant to Circuit Rule 28-2.6

**9th Cir. Case Number(s)**

24-189

The undersigned attorney or self-represented party states the following:

[ X ]  I am unaware of any related cases currently pending in this court.

**Signature** */s/ Lindsay Battles*          **Date** June 20, 2024

85

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-189

I am the attorney or self-represented party.

**This Opening Brief contains 13,999 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R 32-1.

**Signature** */s/ Lindsay Battles*　　　　**Date** June 20, 2024

*(use "*s/[typed name]*" to sign electronically filed documents)*