U.S. Court of Appeals Case No. 24-189

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————————————————

AARON NGUYEN, et al.,
*Plaintiffs/Appellants*

vs.

CITY OF GARDEN GROVE, et al.,
*Defendants/Appellee.*

———————————————————————

**APPELLEES' ANSWERING BRIEF**

———————————————————————

On Appeal From
The United States District Court
For The Central District of California
The Honorable James V. Selna, Judge
U.S.D.C. Case No. 8:21-cv-JVS-ADS

———————————————————————

CAROLINE A. BYRNE - State Bar No. 196541
cbyrne@woodruff.law
ROBERTA A. KRAUS – State Bar No. 117658
bkraus@woodruff.law
MEREDITH D. STEWART – State Bar No. 217212
mstewart@woodruff.law
WOODRUFF & SMART, APC
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Tel.: (714) 558-7000
Fax: (714) 835-7787

Attorneys for Defendants/Appellees City of Garden Grove, Sergeant Mark
Lord, Detective Michael Reynolds and Sergeant Mike Martin

## TABLE OF CONTENTS

**Page**

1. INTRODUCTION ................................................................... 7

    A. Statement of Jurisdiction ........................................ 8

    B. Statement of Issues/Summary of Argument ........................ 9

    C. Statement of the Case ........................................... 15

    D. Summary of Facts ............................................... 16

        1) The shooting and conviction ................................. 16
        2) The investigation .......................................... 16
        3) Nina's first interview ..................................... 18
        4) Nina's conversation with Martin ............................ 21
        5) Nina's second interview .................................... 21
        6) Lord's report ............................................. 25
        7) Investigative materials .................................... 26
        8) Decision to Prosecute ...................................... 27
        9) Nina's criminal trial testimony ............................ 28
        10) The City's Policies ....................................... 29

    E. Standard of Review ............................................. 31

2. THE DISTRICT COURT CORRECTLY FOUND IN THE OFFICERS' FAVOR AND AGAINST PLAINTIFFS ON THE FOURTEENTH AMENDMENT DUE PROCESS AND SUPERVISORY LIABILITY CLAIMS ........................................ 31

    A. There Is No Direct Evidence Lord Deliberately Falsified Evidence In His Report ........................................... 33

    B. There Is No Circumstantial Evidence The Officers Deliberately Fabricated Evidence ................................ 41

    C. Lord's Report Is Not A *Brady* Violation ...................... 56

    D. The Officers Did Not Violate Ngoc's And Hoang's Right To Their Son's Society And Companionship ........................ 57

    E. Because Plaintiffs' Constitutional Rights Were Not Violated, The Supervisor Liability Claim Fails ........................... 58

3. QUALIFIED IMMUNITY APPLIES ................................... 58

4. THE DISTRICT COURT CORRECTLY FOUND THE CITY IS

4880-4110-4847, v. 1

# **TABLE OF CONTENTS**

**Page**

ENTITLED TO JUDGMENT ON THE *MONELL* CLAIM ........ 62

    A.    There Was No Underlying Constitutional Violation .......... 62

    B.    The City Established It Did Not Have An Unconstitutional Custom, Policy Or Practice And It Had A Constitutionally Sound Training Program ....................................................... 63

5.    PLAINTIFFS RELY ON IMPROPER EVIDENCE ................... 63

6.    CONCLUSION ............................................................................ 66

## TABLE OF AUTHORITIES

**Page**

### FEDERAL CASES

*Ah Quin v. County of Kauai Department of Transportation*, 733 F.3d 267
   (9th Cir.2013)..................................................................................31

*Amaya-Ruiz v. Stewart*, 121 F.3d 486 (9th Cir.1997)..................................43, 49

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir.2015)......................................32

*Brewster v. Shasta Cty.*, 27 F.App'x 908 (9th Cir.2001) ..................................52

*Caldwell v. City and Cnty. of San Francisco*, 889 F.3d 1105
   (9th Cir.2018)................................................................. 9, 33, 42, 49

*City of Canton v. Harris*, 489 U.S. 378 (1989) ..........................................62, 63

*City of Escondido, Cal. v. Emmons*, 586 U.S. 38 (2019) ............................12, 59

*City of Los Angeles v. Heller,* 475 U.S. 796 (1986) ..........................................62

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833 (1998)..........................................11

*Costanich v. Dep't of Soc. & Health Services*, 627 F.3d 1101
   (9th Cir.2010)............................................................... 35, 36, 38, 39

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir.2010) ....................43, 44

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir.2003) .........42, 43, 49

*D.C. v. Wesby*, 583 U.S. 48 (2018)....................................................................12

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir.2001) .................................. passim

*Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir.2011)...............................62

*Fare v. Michael C.*, 442 U.S. 707 (1979) .........................................................47

*Frazier v. Cupp*, 394 U.S. 731 (1969) ..............................................................43

*Gallegos v. Colorado*, 370 U.S. 49 (1962)............................................43, 45, 46

*Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir.2013)...............................48

*Gausvik v. Perez*, 345 F.3d 813 (9th Cir.2003) ......................................... passim

*Gausvik v. Perez*, 392 F.3d 1006 (9th Cir.2004) ..............................................11

4

## TABLE OF AUTHORITIES

**Page**

*Hall v. City of Los Angeles*, 697 F.3d 1059 (9th Cir.2012)................................33

*Henry v. Kernan*, 177 F.3d 1152 (9th Cir.1999) ...............................................50

*Hurt v. Wise*, 880 F.3d 831 (7th Cir.2018) .........................................................51

*Hyung Seok Koh v. Graf,* 307 F.Supp.3d 827 (N.D. Ill.2018) ................... 49, 50

*Jackson v. City of Bremerton*, 268 F.3d 646 (9th Cir.2001) ...................... 12, 58

*Jeffers v. Gomez*, 267 F.3d 895 (9th Cir.2001)...................................................58

*Kando v. City of Long Beach*, No. 21-56199, 2023 WL 3092304

   (9th Cir. Apr. 26, 2023) .............................................................. 37, 40

*Kisela v. Hughes*, 584 U.S. __, 138 S.Ct. 1148 (2018) ............................... 12, 59

*Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023

   WL 6620306, at *1 (9th Cir. Oct. 11, 2023) ...............................................34

*McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir.2009) .......... 13, 61, 65

*Molina v. Astrue*, 674 F.3d 1104 (9th Cir.2012) ................................................31

*Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658

   (1978)................................................................................ 14, 15, 62, 63

*nited States v. Preston*, 751 F.3d 1008 (9th Cir.2014) .......................................49

*O'Doan v. Sanford*, 991 F.3d 1027 (9th Cir.2021).......................... 10, 34, 35, 40

*Palmerin v. City of Riverside*, 794 F.2d 1409 (9th Cir.1986) ............................14

*Parke v. Raley*, 506 U.S. 20 (1992) ....................................................................31

*Saucier v. Katz*, 533 U.S. 194 (2001) .................................................................59

*Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail*, 628 F.App'x 527

   (9th Cir.2016)...............................................................................................11

*Shinseki v. Sanders*, 556 U.S. 396 (2009) .........................................................31

*Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 860, fn. 17 (9th Cir.1995).............31

*Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir.1987)....................................58

5

## TABLE OF AUTHORITIES

**Page**

*Spencer v. Peters*, 857 F.3d 789 (9th Cir.2017) ........................................ passim

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir.2009)................................. passim

*Tatum v. Moody*, 768 F.3d 806 (9th Cir.2014) ....................................................55

*Tekoh v. County of Los Angeles,* 2018 WL 9782523, *10

    (C.D.Cal. Mar. 8, 2018) ................................................................................41

*Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078

    (9th Cir.2009)........................................................................................ 56, 57

*Tennison v. City & Cty. of San Francisco*, No. C 4-574, 2006 U.S. Dist.

    LEXIS 25664, at *74 (N.D. Cal. Feb. 2, 2006) ................................................65

*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir.2021)............................. 11, 12, 13, 59

*Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir.2008) ............................59

*United States v. Miller*, 984 F.2d 1028 (1993) ....................................................49

*United States v. Skilling*, 554 F.3d 529 (5th Cir.2009)................................ 56, 57

*United States v. Wolf*, 813 F.2d 970 (9th Cir.1987) ...........................................49

## FEDERAL STATUTES

28 U.S.C. section 1291 ........................................................................................9

28 U.S.C. section 1331 ........................................................................................8

28 U.S.C. section 1367 ........................................................................................8

28 U.S.C. section 2111 ......................................................................................31

42 U.S.C. section 1983 ............................................................................... passim

## 1. <u>INTRODUCTION</u>

This is a case where the material facts essentially are undisputed. Most of them can be confirmed by video and audio evidence, all of which was turned over to the Orange County District Attorney ("OCDA") for use in the prosecution of multiple individuals, nearly all of whom were gang affiliated. Indeed, when Plaintiffs' recitation of the facts is stripped of speculation, hyperbole and argument, it is clear that the District Court reached a correct decision in this matter.

The gist of Plaintiffs' lawsuit is that the Officers (Sergeant Mark Lord ("Lord"), Detective Michael Reynolds ("Reynolds") and Sergeant Mike Martin ("Martin") (collectively "Officers")) used coercive interview techniques when interviewing third-party witness Nina Nguyen ("Nina")[1] about a gang-related shooting that had occurred near the Phi Hong poolhall ("Phi Hong" or "poolhall") in the City of Garden Grove ("City") in the early morning hours of March 20, 2011. The shooting resulted in the death of one young man and injury to another. During initial interviews of witnesses occurring within days of the shooting, Aaron's name,

---

[1] To avoid confusion, Plaintiffs Aaron Nguyen ("Aaron"), Ngoc Le Thi Phan ("Ngoc"), and Hoang Minh Nguyen ("Hoang") (collectively "Plaintiffs"), when not being referred to collectively, will be referred to by their first names. Additionally, Aaron's girlfriend at the time of the incident and third-party witness Nina Nguyen will be referred to as "Nina."

among many others, was mentioned as possibly being present at the scene. Thus, on April 20, 2011, in an investigation involving over 200 homicide personnel, more than a dozen people were brought to the Garden Grove police station to be interviewed, including Aaron and Nina. Aaron was placed under arrest that day and, following a criminal jury trial at which Nina testified, he was convicted of various crimes relating to the shooting. Aaron's conviction was reversed in May 2020 by the California Court of Appeal for insufficient evidence.

Following reversal of his conviction, Plaintiffs sued the Officers, asserting claims for violation of his due process rights under the Fourteenth Amendment and supervisor liability, as well as a *Monell* claim against the City. The essence of Plaintiffs' action is that the Officers used improper and coercive interview techniques when interviewing Nina, which resulted in her implicating Aaron, and that Lord falsified his police report and/or failed to include exculpatory and material evidence in his report. The district court correctly granted Defendants' motions for summary judgment, and denied Plaintiffs' motion for partial summary judgment. This ruling should be upheld.

### A. <u>Statement of Jurisdiction</u>

Plaintiffs assert federal claims under the federal Constitution and 42 U.S.C. section 1983. The district court had jurisdiction over those claims under 28 U.S.C. sections 1331 and 1367. This Court has jurisdiction over the claims under 28 U.S.C.

section 1291. Defendants agree that Plaintiffs' notice of appeal was timely.

**B.    Statement of Issues/Summary of Argument**

**Issue 1**:        Did the District Court correctly find in favor of the Officers and against Plaintiffs on Plaintiffs' Fourteenth Amendment due process claim, as well as the supervisory liability claim, because (a) neither direct nor circumstantial evidence showed that the Officers deliberately fabricated evidence, (b) the evidence did not show that the Officers suppressed exculpatory and material evidence and they did not violate *Brady*, (c) the Officers' conduct did not "shock the conscience" such that they did not violate Ngoc's and Hoang's right to their son Aaron's society and companionship, and (d) because the Officers did not violate Plaintiffs' constitutional rights, Reynolds and Martin cannot be held liable as supervisors?

The answer to this question is yes. A deliberate fabrication of evidence claim generally can be proved either through production of direct evidence of deliberate fabrication or through production of circumstantial evidence related to a defendant's motive. *Caldwell v. City and Cnty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir.2018). A *Brady* violation cannot in itself support a deliberate fabrication of evidence claim. *Devereaux v. Abbey*, 263 F.3d 1070, 1079 (9th Cir.2001) (en banc).

The evidence here does not show that the Officers fabricated any evidence. Indeed, Plaintiffs' claim is based on Lord *omitting* certain information from his police report: Nina's explanations of being at the Two Thousand poolhall ("2000"),

Lord telling Nina to "write Westminster" on the diagram, Nina's denials of being at the Phi Hong, and the Officers' accusations of dishonesty and use of false evidence while interviewing Nina. But the evidence shows that Lord's report included most of the evidence Plaintiffs claim was omitted. Further, case law holds that an evidence fabrication claim requires more than just continuing an investigation or suppressing exculpatory evidence, and requires something more than mere omission. *O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir.2021). *O'Doan* stated that (1) there is nothing in clearly established law suggesting an officer was required to provide more detail to avoid violating the constitution, (2) it is not against the law to omit a witness's repeated denials from a police report, and (3) a technical inaccuracy in a report does not give rise to a deliberate fabrication of evidence claim. *Id.* at 1045, 1046. Finally, the evidence shows the OCDA and criminal defense attorney were provided with the recordings of Nina's interviews so that any omission of certain of Nina's statements from the police report did not result in a deliberate fabrication of evidence.

The evidence also does not support a "circumstantial" evidence claim. To prove that claim Plaintiffs needed to point to some evidence to show that the Officers used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information. *See O'Doan*, 991 F.3d at 1045 (quoting *Devereaux*, 263 F.3d at 1076). Such a claim is cognizable as a substantive due process claim under § 1983 for violation of the

Fourteenth Amendment, *Tobias v. Arteaga*, 996 F.3d 571, 584 (9th Cir.2021); *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir.2009), which requires Plaintiffs to show the Officers engaged in an "abuse of power [that] 'shocks the conscience' and 'violates the decencies of civilized conduct.'" *Stoot*, 582 F.3d at 928 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Under applicable case law and based on the evidence presented, the Officers' interview techniques did not meet *Devereaux's* stringent standard of being "so coercive and abusive that the [Officers] knew or should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076.

The evidence also does not support Plaintiffs' claim the Officers violated *Brady* by suppressing exculpatory and material evidence. It is undisputed that all of the City's investigative material was turned over to the OCDA, including all the audio and video recordings of the witness and suspect interviews, and that copies of the audios and videos were provided to Aaron's criminal defense attorney.

Further, because the evidence does not show Aaron's constitutional rights were violated and that the Officers' conduct shocked the conscience, the Fourteenth Amendment claim brought by his parents also necessarily fails. *See Schwarz v. Lassen Cty. ex rel. Lassen Cty. Jail*, 628 F.App'x 527, 528 (9th Cir.2016) (citing *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir.2004).

Finally, because Plaintiffs did not establish a constitutional violation by the

Officers, their supervisor liability claim also necessarily fails. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir.2001) ("Neither a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred.").

**Issue 2**:     If this Court finds that the Officers' conduct violated the Fourteenth Amendment, are the Officers entitled to qualified immunity? The answer to this question is yes. Qualified immunity was raised by the Officers in their motion; however, the district court never reached this issue since it found the Officers did not violate Plaintiffs' constitutional rights. Should this Court find that the Officers violated Plaintiffs' constitutional rights, the Officers still would be entitled to judgment in their favor under qualified immunity because the rights at issue were not clearly established in 2011, at the time of Nina's interviews. *City of Escondido, Cal. v. Emmons*, 586 U.S. 38, 42 (2019) (citing *Kisela v. Hughes*, 584 U.S. __, 138 S.Ct. 1148, 1152 (2018).) Importantly, "the clearly established right must be defined with specificity" and "not . . . at a high level of generality." *City of Escondido,* 586 U.S. at 42 (*citing Kisela*, 138 S.Ct. at 1152.) "The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). "Otherwise, the rule is not one that 'every reasonable official' would know." *Id*.

In *Tobias*, 996 F.3d 571, the Ninth Circuit had an opportunity to consider

4880-4110-4847, v. 1

whether coercion techniques used on a 13-year-old suspect for less than two hours were clearly established as "psychological torture" sufficient to establish a substantive due process violation and overcome qualified immunity. Unlike this case, *Tobias* involved the interrogation of a juvenile murder suspect, not a third-party witness, and the techniques used were much more egregious than here. After forcing the juvenile to confess to murder, he was convicted; however, the conviction was overturned. Tobias then brought a substantive due process claim under the Fourteenth Amendment. While the district court denied the officers' motion for summary judgment raising qualified immunity, the Ninth Circuit reversed. It held that the "extended, overbearing interrogation of a minor, who was isolated from family and his requested attorney, comes close to the level of 'psychological torture' that we have held is not tolerated by the Fourteenth Amendment" and it violated the plaintiff's substantive due process rights. However, it also held the officers were entitled to qualified immunity because the unconstitutionality of the use of such techniques on a 13-year-old for a two-hour period was not clearly established as of 2012. *Id*. at 585-586. In cases involving interviews of witnesses as opposed to criminal suspects, officers are given wide latitude in conducting the interviews. See, e.g., *Devereaux*, 263 F.3d at 1075; *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir.2009); *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir.2003). Accordingly, should this Court find the Officers violated Plaintiffs' constitutional

rights, it also should find they are entitled to qualified immunity because the rights were not clearly established in April 2011.

**Issue 3**:         Did the District Court correctly find that the City was entitled to summary judgment in its favor on Plaintiffs' *Monell* claim because there was no underlying constitutional violation by the Officers?

The answer to this question is yes. It has long been the law that a public entity can be held liable for causing a constitutional violation only when there is, in fact, a constitutional violation. *See Palmerin v. City of Riverside*, 794 F.2d 1409, 1414 (9th Cir.1986) ("[A]bsent any constitutional violations by the individual defendants, there can be no *Monell* liability."). There was no such violation here. But even if there were a constitutional violation (which there was not), the City would be entitled to judgment in its favor on the *Monell* claim because it established that any such violation was not caused by a custom, policy or practice of the City and the City had a constitutionally-sound training program. The City established that it's police department had in effect in 2011 General Order 6.2, which expressly prohibits "obtaining involuntary confessions or admissions through coercion or other illegal means." The City also established that it requires its police officers to be P.O.S.T certified, which requires over 650 hours of training at a P.O.S.T certified academy. The City also requires P.O.S.T compliant field training and continuing professional training for its officers, and provides almost continuous daily training through daily

briefings. The training includes procedures for interviewing suspects and minors under the age of 18. Thus, should this Court reverse the judgment in favor of the Officers, it should not reverse the judgment in favor of the City on the *Monell* claim.

### C.  <u>Statement of the Case</u>

The second amended complaint was filed on May 10, 2022, and alleges federal claims against Defendants. 19-ER-4341-4369. The City filed a motion for summary judgment challenging Plaintiffs' second claim brought under *Monell*. 2-ER-33-55. Plaintiffs filed an opposition and the City filed a reply. 2-ER-56-98. On September 22, 2023, Plaintiffs filed a motion for partial summary judgment against Lord. 2-ER-185-218. Lord opposed Plaintiffs' motion and Plaintiffs replied. 2-ER-219-275. The Officers moved for summary judgment on the Fourteenth Amendment Due Process and supervisory liability claims. 2-ER-99-128. Plaintiffs filed an opposition to which the Officers replied. 2-ER-129-184.

On December 19, 2023, the district court ruled on the motions for summary judgment and partial summary judgment[2], granting Defendants' and denying Plaintiffs' motions. 1-ER-2-29. Judgment was entered on January 4, 2024. 1-ER-30-31. This appeal followed.

---

[2] The parties' motions were supported by video and audio evidence relating to witness and suspect interviews, including the interviews of witness Nina. Plaintiffs have filed an unopposed motion to transmit this video evidence to the Court. Video evidence referenced in this brief will be identified by the exhibit numbers appearing in the motion to transmit.

### D. Summary of Facts

#### 1) The shooting and conviction

On March 20, 2011, a gang-related shooting occurred in the City of Garden Grove that resulted in the death of a gang member. 6-ER-960. The shooting investigation was a complex homicide investigation that involved many more individuals than just the Officers named in this litigation, including over 200 hundred personnel who were involved in the April 20, 2011 investigation/interviews. 6-ER-962,985; 20-ER-4639-4640; 21-ER-4727-4729.

As a result of the shooting, at least 15 individuals were charged with and convicted of various crimes, including Tien Phung (aka "CJ"), Elvis Doan, Tom Phung, Alexander Tran, Tony Ngo, and Anthony Nguyen, as well as Aaron, who was convicted by a jury of second degree murder, attempted murder, and shooting at an occupied motor vehicle. 6-ER-960-961. In May 2020, in a 2-1 decision, Aaron's conviction was reversed on direct appeal for insufficient evidence. 6-ER-960-961; 19-ER-4370-4425.

#### 2) The investigation

In the first couple of days after the shooting, interviews were conducted of multiple suspects and witnesses, including CJ, who was interviewed on March 20, 2011, the day of the shooting, and Leesa Huynh, who was interviewed by Detectives Vi and Reynolds on March 21, 2011. 6-ER-962-964,969-971; 20-ER-4643; 21-ER-

16

4721-4724,4743,4750.

CJ identified Aaron during his interview, placing him on Westminster near the Phi Hong, in the vicinity of the shooting. 6-ER-962-968; 21-ER-4721-4724,4743,4745-4748. Huynh also implicated Aaron. Huynh was a passenger in the shooter's car that was driven by her nephew Puffy and she told officers that when they got to the Phi Hong, she recalled that Aaron, his girlfriend Nina, Alex Tran and another girl, Julie, who were all passengers in Aaron's car, also were at the poolhall. 6-ER-971-985.

On April 20, 2011, over a dozen people were brought into the Garden Grove police station for questioning with over 200 City personnel involved in the April 20, 2011 operation. 6-ER-985-986. DDA Dan Feldman, the district attorney assigned to this case, also was present in the police department for part of the day on April 20th while interviews were being conducted. 6-ER-986; 20-ER-4698-4699.

Some of the information given to investigators during the April 20, 2011 interrogations/interviews included: Tom Phung identifying Puffy, Aaron, and CJ as being present at the poolhall on the night of the shooting; Alex Tran stating he was in Aaron's car on the night of the shooting along with Nina and Julie and that they were driving up and down Westminster; John Nguyen aka Ryder stating that Aaron's car was one of the ones that went to the poolhall the night of the shooting; and Anthony Nguyen identifying Aaron's car as being parked in the back at the poolhall

17

the night of the shooting. 6-ER-986-1013.

### 3) Nina's first interview

On April 20, 2011, Lord interviewed both Nina and Aaron, interviewing Nina two times that day with both interviews being recorded. 6-ER-1017. Nina was Aaron's girlfriend and was 17 years old; Aaron was 26. 11-ER-2044; 22-ER-5013. In total, Nina was interviewed for about 2 hours and 51 minutes. 6-ER-1017-1018; VideoExs.-AA-2 and BB-2. Nina did not have a parent present at the interview. 11-ER-2251. Lord told Nina that she appeared for her interview voluntarily and that she could stop anytime. 6-ER-1020; 21-ER-4934-4935.

Throughout the first interview, Nina was told she was lying, she needed to stop lying and tell the truth, it was a crime to lie to the police, and the quicker she tells the truth the quicker she can go home. 6-ER-1023,1105-1106; 11-ER-2260-2261,2267,2277,2291-2292; 21-ER-4937,4948-4949,4983,4990-4991; 22-ER-4998,5012; VideoEx.-AA-2, 8:11:17-8:11:35, 8:22:40-8:23:45, 8:58:00-8:58:18, 9:06:17-9:06:23, 9:06:45-9:07:31; VideoEx.-BB-2, 12:41:43-12:43:09, 12:57:27-12:57:43;. The officers also told Nina she "is not the one in trouble." 11-ER-2263; 21-ER-4955. At various times, the officers told Nina they had video evidence, cell phone evidence, and witness statements that put Aaron and her at the Phi Hong. 6-ER-1028; 11-ER-2254-2255,2258-2259,2268-2269,2286-2288,2291; 21-ER-4938,4982. The cell phone evidence placed Aaron near Bolsa and Bushard. 12-ER-

18

2300. Lord told Nina that Aaron admitted being at the shooting even though he never did. 11-ER-2260; 12-ER-2301; 21-ER-4948.

When asked if she was at the poolhall, Nina referenced the 2000 on Garden Grove Boulevard. 11-ER-2256-2257,2276,22812288,2290. At times throughout the interview, Nina denied being at the Phi Hong and told the officers she did not remember being there. 6-ER-1040; 11-ER-2288-2290; 21-ER-4947-4948; VideoEx.-AA-2, 8:22:00-8:22:23. Nina told the officers that on the day of the shooting, she remembered being at a Vietnamese restaurant waiting for someone to call and that her friend, Julie, also was in the car. 6-ER-1036; 21-ER-4960,4945; VideoEx.-AA-2, 8:17:22-8:17:32, 8:19:00-8:19:19. Nina told officers she was at a party at Puffy's house before going to the restaurant. 6-ER-1040; 21-ER-4947; VideoEx.-AA-2, 8:22:00-8:22:23. Nina told officers they went to the park after the party, that Puffy was there too, that when they left the park they started following CJ but got lost and ended up going to a Vietnamese restaurant. 6-ER1044; 21-ER-4951,4953-4954; VideoEx.-AA-2, 8:24:13-8:25:28, 8:27:45-8:28:55.

Nina stated some people left the park to look for enemies to beat up. 6-ER-1045; 21-ER-4958-4960,4962,4991; VideoEx.-AA-2, 8:33:15-8:33:53, 8:34:12-8:34:56, 8:36:06-8:36:14, 9:04:47-9:05:02. Nina told the officers the plan to look for enemies was made at the park. 11-ER-2265. Nina told officers she thought they went to Tony's house after the restaurant but at other times she said they went to a donut

shop after the restaurant. 11-ER-2259,2268.

Later in the interview, Lord asked Nina what happened when they went to the poolhall and Nina then described being at the poolhall when Puffy's car was parked next to them. 11-ER-2271,2272. Nina also told the officers that Skyler and Leesa were in Puffy's car. 11-ER-2273. Nina also stated that on the night they were at the poolhall, Alex and Dice were in Aaron's car but Julie was not, and also said she thought she was getting "that day mixed up with another . . . the day of the shooting." 11-ER-2273-2275.

When the officers showed Nina a photo of the Phi Hong sign and asked her if that was the poolhall, she stated that she did not remember being there. 11-ER-2283. Later, Lord brought the conversation back to the day they were in the poolhall parking lot, and Nina stated that Puffy left after saying he had to do something. 11-ER-¶2285. Nina then stated they were not at the Phi Hong but at the 2000. Id. Nina told the officers that when she described Puffy's car at the poolhall, she was referring to a different day at the 2000 not the day of the shooting and not Phi Hong. 11-ER-2290. Nina then stated that on the night of the shooting, she and Aaron went to Puffy's party, went to the park, knew CJ's group was going to beat up POV, followed CJ leaving the park, lost CJ, and sat in the restaurant's parking lot. Id. When asked if she was at the poolhall on Harbor and Westminster, Nina responded that they were there but she could not remember exactly when. 21-ER-4966["UNKNOWN: So I'm

going to ask you straight out, were you at the billiard hall at Brook ... at Harbor and Westminster? NGUYEN: Yes we were."].

### 4)    Nina's conversation with Martin

Martin spoke with Nina between her first and second interviews. 6-ER-1104-1105. Martin did not record his conversation with Nina. 12-ER-2311-2312.

Nina described to Aaron her interaction with Martin. 6-ER-1107-1108; 22-ER-5054; VideoEx.-BB-2, 13:46:53-13:49:57. At her deposition, Nina testified Martin used profanity, calling her a "fucking liar." 6-ER-1109; 12-ER-2326-2327. At the criminal trial, Nina testified Martin was pointing in her face and told her to tell the truth and stop lying for about 30 minutes. 6-ER-1108; 12-ER-2322; 21-ER-4865. Martin was the only officer to point a finger in Nina's face, put a foot on her chair, and scream at her. 6-ER-1109-1110. There is no evidence or allegation that Nina made any substantive statements to Martin during this interaction.

### 5)    Nina's second interview

In the second interview, Nina is crying for several minutes. 6-ER-1105-1106; 12-ER-2313; 22-ER-4998,5012. When asked why she was upset, Nina stated "I'm not lying to you sir." 6-ER-1105-1106; 22-ER-4998. Nina later explained that she was crying because Martin was in her face and pointing at her. 6-ER-1105-1106; 12-ER-2314; 22-ER-5012.

Throughout the second interview, Nina was told she was lying and needed to

be honest. 6-ER-1061; 12-ER-2332,2339,2341,2343; 22-ER-5013-5014; VideoEx.-BB-2, 12:58:40-12:58:45, 13:00:32-13:00:49. The officers told Nina other people saw her and Aaron at the poolhall. 12-ER-2339. Martin told Nina that Aaron's phone pinged at Harbor and Westminster, and they had video surveillance of Aaron's car at Harbor and Westminster. 12-ER-2381,2383,2384.

Nina told the officers she was at the Phi Hong but didn't remember being there. 12-ER-2345-2346. At other points in the interview, Nina stated she did not remember being at the poolhall. 6-ER-1069; 12-ER-2340,2367-2368,2380,2382, 2384; 22-ER-5013,5015; VideoEx.-BB-2, 12:59:08-12:59:31, 13:01:29-13:02:16, 13:03:29-13:04:32. Nina admitted being at Puffy's party with Aaron, Julie, and Alex and that three or four cars went to the park after. 6-ER-1066; 22-ER-5000,5003. Nina stated that CJ yelled to Tony to follow him. 6-ER-1066-1067; 22-ER-5005-5006. Tony then got into Aaron's car with Nina, Alex, and Julie, and they followed CJ. Id. Nina told officers that they lost the group near Mile Square Park after which she said they went to the Vietnamese restaurant. 12-ER-2236-2237. Nina told officers that after waiting at the Vietnamese restaurant for less than an hour, they went to Tony's house or M&M's. 6-ER-1067-1068; 22-ER-5009,5011; VideoEx.-BB-2, 12:54:29-12:54:46, 12:56:20-12:57:01.

Lord asked Nina what happened after they got to the Phi Hong parking lot and Nina responded she did not remember but then said that while at the poolhall, Tony

got out and talked to CJ. 6-ER-1069; 12-ER-2347; 22-ER-5013,5015-5017; VideoEx.-BB-2, 12:59:08-12:59:31, 13:01:29-13:02:16, 13:03:29-13:04:32. Nina told the officers they did not follow any cars out of the parking lot, but they drove down Westminster to Tony's house. 6-ER1077; 22-ER-5019-5020; VideoEx.-BB-2, 13:05:38-13:06:32, 13:06:44-13:07:18. An officer asked Nina if they left the poolhall on Harbor Boulevard and Nina said "something like that," and when she was asked if she knew where Westminster was, she said "I am really bad at my streets . . . . But, yeah I think." 12-ER-2355-2356. Nina then told officers they were supposed to trap someone, but she did not hear any shooting. 6-ER-1081; 22-ER-5030,5033-5034; VideoEx.-BB-2, 13:15:42-13:15:56, 13:18:43-13:19:08. Nina said she thought they were trying to trap a white Honda. 12-ER-2358. When asked how she knew which car to follow, Nina said CJ told Aaron to follow the black car, the black car trapped the white car, and they went to the Vietnamese restaurant after they lost them, but denied they were part of the trapping. 12-ER-2358-2359.

Lord asked Nina to draw a picture of the way she saw the cars trapping the other car. 12-ER-235964. Lord told Nina "draw Westminster, just draw a street." 6-ER-1085; 22-ER-5034; VideoEx.-BB-2, 13:19:09-13:20:42. Nina wrote Westminster. 12-ER-2360. As she was drawing, Nina indicated where CJ's and Aaron's cars are. Id. Lord pointed to Nina's drawing and asked if those are the lanes and Nina said "yeah" and drew some lanes. 12-ER-2361. As she was drawing, Nina

23

stated "I think this . . . was Puffy" and "the white car was in front of us," and "CJ went further and then after we just lost them." Id. As Nina was drawing, she also stated "and then the restaurant is somewhere over here." Id.

When Lord showed Nina a photo and asked if she saw the car get blocked in, Nina denied that she saw them blocking the car in the photo. 12-ER-2364. When the officers showed Nina a photo of the Phi Hong parking lot, she pointed out where they turned. 6-ER-1089-1090; 22-ER-5043-5044. Nina stated that they turned on Harbor. 12-ER-2369. An officer told Nina they know Alex was driving on Westminster the night of the shooting. 12-ER-2369-2370. When Nina is asked if they "could have" turned on Westminster, she said they could have. 12-ER-2370.

During the second interview, Nina and Aaron were put alone in the room together. 6-ER-1093; 22-ER-5048. While they were alone, Aaron told Nina to lie that they were "just friends" and that they did not do anything except watch movies at home. 6-ER-1098; 21-ER-4920,4924-4925. Lord then entered the room and said that Nina "drew that picture and said that you . . . and Puffy and CJ were over there by the poolhall." 12-ER-2373. Nina stated that the picture she drew was of Mile Square Park, not the Phi Hong. 6-ER-1093; 12-ER-2373; 22-ER-5051; VideoEx.-BB-2, 13:41:44-13:42:14.

During her interviews, Nina was told she could use the restroom, she could get something to eat, and she could stop talking and call her mom but Nina never

asked to call her mom or anyone else. 6-ER-1102; 23-ER-5458-5459.

### 6) Lord's report

Lord drafted a 29-page report with an 18-page summary of Nina's interviews. 12-ER-2409; 13-ER-2782-2811. Throughout his report, Lord stated Nina could not remember certain events, changed her story, and "may have gotten some of the incident jumbled or confused." 13-ER-2786,2788,2789,2795-2796. When Nina started to describe events at the poolhall, Lord's report stated, Nina "again started to seem very vague in her answers to [his] questions." 13-ER-2795-2796. In his report, Lord stated he explained to Nina he thought she was not telling the truth and needed to stop lying. 13-ER-2788,2789,2796,2798. Lord also wrote he told Nina he had evidence showing Aaron at the Phi Hong parking lot and other people saw them there. 13-ER-2789. Lord wrote, he "showed Nina a picture of the Phi Hong Billiards and she admitted she was there with Aaron." Id. Lord then stated that Nina "told [him] she did not know anything else about the incident." Id. Lord wrote Nina said she did not hear or see the shooting. Id.

At one point, Lord stated that he exited his interview with Aaron and had a conversation with other detectives, who informed him other people had identified Aaron as being in the Phi Hong parking lot. 13-ER-2793. Lord resumed the interview with Aaron, while Martin spoke with Nina. Id.

In the report, Lord stated he found Nina in a conference room and noticed that

25

she was crying. 13-ER-Id. In summarizing the second interview, Lord wrote that Nina initially told him they left the parking lot on Harbor Blvd., "but then changed her story and told [him] they had left on Westminster Ave." 13-ER-2796. Then, Lord's report stated that Nina "said they were following other cars out of the parking lot, and they drove west on Westminster Ave. away from Phi Hong Billiards." Id. Lord also wrote that Nina "told [him] she would draw a map, and [he] had her do this." 13-ER-2797.

Lord stated that when he placed Nina and Aaron in the same interview room alone, "[t]hey both were saying back and forth to each other they were not at the Phi Hong Billiards." Id. The report stated that when Lord entered the interview room, Nina said drawing the map "was a mistake and she was referring to being somewhere near Mile Square Park." 13-ER-2798. Lord wrote that he "explained to [Nina] that was impossible because she had written on the map Westminster Ave. and had indicated it was on Westminster Ave., nowhere near Mile Square Park." Id. Lord also noted that he "then confronted Nina with that lie, and she told [him] she had made a mistake." Id.

### 7) <u>Investigative materials</u>

All of the City's investigative material was turned over to the OCDA, including all audio and video recordings of the witness and suspect interviews. 6-ER-1133; 19-ER-4337. The video DVDs of the March 20, 2011 interview of CJ,

which consisted of pre- and post-Miranda interviews, were personally delivered to the OCDA by April 15, 2011. 6-ER-1135; 19-ER-4337. The video DVD of the March 21, 2011 interview of Leesa Huynh was personally delivered to the OCDA by April 15, 2011. 6-ER-1135; 19-ER-4337. By July 19, 2011, the OCDA had in its possession the following audio/video recordings of witness and suspect interviews conducted by Garden Grove Police Department ("GGPD"): Anthony Nguyen (audio); John Nguyen (video); Alexander Tran (two videos); Aaron Nguyen (video); Tien Phung (audio); Nina Nguyen (interview #1 video and interview #2 video). 6-ER-1137-1138; 19-ER-4339. Copies of these audios/videos were provided to Aaron's criminal defense attorney on July 19, 2011. 6-ER-1138; 19-ER-4339.

### 8) <u>Decision to Prosecute</u>

DDA Feldman was present at the Garden Grove police station on April 20, 2011, and he participated in conversations with various detectives on that day while the interviews of witnesses and suspects were ongoing. 12-ER-2305-2306. DDA Feldman learned the substance of what was being said in the interviews, and he suggested putting Aaron and Nina in a room together. 13-ER-2307-2308; 20-ER-4698-4702.

DDA Feldman explained that he did not rely on the completeness, accuracy, and truthfulness of the police report in making his decisions but realized they are summaries and not transcriptions. Throughout the case he would be looking to

verify who the people involved were and whether or not they were competent to testify and what evidence he could use. Ultimately, DDA Feldman made the decision as to who to prosecute. He also was the sole decisionmaker as to what evidence to present at the preliminary hearing and also regarding what evidence to present at Aaron's criminal trial, including deciding what witnesses to call. DDA Feldman made the decision to put into evidence the drawing made by Nina. 6-ER-986,1142-1162,1193; 20-ER-4690-4705,4712,4716-4717.

### 9) Nina's criminal trial testimony

Nina testified as a witness at Aaron's criminal trial and her testimony was consistent with what she told the Officers in her two interviews in that her criminal trial testimony was similarly inconsistent. 21-ER-4776-4919. Specifically, Nina testified at Aaron's criminal trial she made statements during her interview indicating she and Aaron had been to Phi Hong but also testified she had no memory of being there. 11-ER-2224; 21-ER-4824-4825. She also testified that Tony told Aaron to go to the poolhall after the restaurant. 21-ER-4824. Nina explicitly denied lying to the officers when she told them they had been to the poolhall, stating:

Q      … Ms. Nguyen, did you go to the pool hall in a car driven by your boyfriend at the time Aaron Nguyen?

A      No.

Q      Did you tell the officers that you did?

A    Yes.

Q    Were you lying to the officers?

A    No.

Q    Who did you see when you got to the pool hall?

A    I did not see any – it was dark. I couldn't see anyone.

21-ER-4826.

She also testified that the drawing she made, 21-ER-4931, accurately depicted a "trapping" of another car that had occurred that same evening as the shooting. 21-ER-4891-4892. And she testified that Aaron had been involved in the earlier trapping incident the same evening of the shooting. 21-ER-4829-4830. Finally, Nina testified at the criminal trial that Aaron had told her to lie to the police and tell them she had been at home watching a movie. 21-ER-4909,4924.

### 10)    The City's Policies

The City has a formal written policy on involuntary confessions denoted as General Order 6.2. 4-ER-470,631. General Order 6.2, which was in effect in 2011, prohibits "obtaining involuntary confessions or admissions through coercion or other illegal means." 4-ER-470.

The City only hires police officers who are certified by the California Commission on Peace Officer Standards and Training (P.O.S.T.). 4-ER-473. To obtain a basic P.O.S.T. certification, a person must attend a P.O.S.T. certified

training academy that provides over 650 hours of law enforcement training. 4-ER-475. Police academy training includes accurately documenting witness statements in written police reports. 4-ER-478. New Garden Grove police officers are required to successfully complete 14 weeks of P.O.S.T. certified field training. 4-ER-481. During field training, new Garden Grove police officers are assigned to work side-by-side with P.O.S.T. certified Field Training Officers. 4-ER-483. Field Training Officers prepare daily written evaluations of new Garden Grove police officers. 4-ER-485. The field training of new Garden Grove police officers includes training on writing police reports and interviewing suspects and witnesses. 4-ER-494. Garden Grove requires each police officer to complete at least 24 hours of continuing professional training every two years. 4-ER-497. The OCDA provides GGPD with monthly training videos for police officers. 4-ER-501. In the two years before 2011, several of the video titles provided by the OCDA related to interviews and exculpatory evidence. 4-ER-507. The City provides its police officers with training publications. 4-ER-511. Before each shift, Garden Grove police officers are required to attend a briefing session that is used to review topical information related to police work. 4-ER-514. The training provided to the City's officers included techniques for interviewing witnesses and suspects, including minors. 4-ER-521. Martin, Reynolds, and Lord each received training on homicide investigations before April 20, 2011. 4-ER-533.

### E.    Standard of Review

A trial court judgment is presumed correct, and the appellant has the burden of overcoming that presumption. *Parke v. Raley*, 506 U.S. 20, 29 (1992). The trial court's decision may be affirmed on any ground that is supported by the record, whether or not that ground was relied on by the trial court. *Sicor Limited v. Cetus Corp.*, 51 F.3d 848, 860, fn. 17 (9th Cir.1995). An appellant must demonstrate that any asserted error is prejudicial. 28 U.S.C. section 2111; *Shinseki v. Sanders*, 556 U.S. 396, 406-409 (2009); *Molina v. Astrue*, 674 F.3d 1104, 1118 (9th Cir.2012).

The grant of summary judgment is reviewed de novo. *Ah Quin v. County of Kauai Department of Transportation*, 733 F.3d 267, 270 (9th Cir.2013).

## 2.    THE DISTRICT COURT CORRECTLY FOUND IN THE OFFICERS' FAVOR AND AGAINST PLAINTIFFS ON THE FOURTEENTH AMENDMENT DUE PROCESS AND SUPERVISORY LIABILITY CLAIMS

Plaintiffs' first claim asserts a due process violation under the Fourteenth Amendment based on alleged fabrication of evidence. Specifically, Plaintiffs argue the Officers fabricated evidence in multiple ways, including by: (1) Lord falsifying his police report regarding the interview of witness Nina; (2) using coercive interview techniques, including using psychological coercion on Nina, lying about what evidence they had such as cell phone evidence, videos/photos of involved

31

vehicles and witness statements implicating Aaron; (3) hiding or suppressing *Brady* evidence in Lord's report; (4) Martin interviewing Nina and yelling at her, all without recording the encounter either via videotaping or in a police report; and (5) Lord forcing Nina to make and label a diagram that was used against Aaron at the criminal trial.

The Fourteenth Amendment right to due process can be violated where the government subjects a plaintiff to criminal charges based on deliberately fabricated evidence. *Devereaux*, 263 F.3d at 1074-75. The standard for showing a Fourteenth Amendment due process violation is *quite demanding*. *Stoot*, 582 F.3d at 928. "[O]nly the most egregious official conduct" is "arbitrary in the constitutional sense," and constitutes a violation of substantive due process. *County of Sacramento*, 523 U.S. at 846 (citation and quotations omitted). A Fourteenth Amendment claim is cognizable only if the abuse of power "shocks the conscience" and "violates the decencies of civilized conduct." *Id*.

To prevail on a claim based upon fabrication of evidence in violation of the Fourteenth Amendment, a plaintiff must first point to evidence he contends was deliberately fabricated. *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir.2015). Then, the plaintiff can prove intent (i.e., deliberateness) either by producing direct evidence, *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir.2017), or by producing circumstantial evidence showing that: "(1) [d]efendants continued their

investigation … despite the fact that they knew or should have known that [the plaintiff] was innocent;[3] or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known those techniques would yield false information. *Devereaux*, 263 F.3d at 1076; *see also Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir.2012). Thus, fabrication can be proved by a plaintiff producing direct evidence of deliberate fabrication or by producing circumstantial evidence regarding a defendant's motive. *Caldwell*, 889 F.3d at 1112.

The district court correctly determined that the evidence supported neither a direct evidence nor circumstantial evidence claim of fabrication of evidence.

A.    <u>There Is No Direct Evidence Lord Deliberately Falsified Evidence In His Report</u>

Plaintiffs argue Lord's alleged mischaracterization of Nina's statements in her interviews, and his failure to disclose that he directed her to write Westminster on the diagram she drew, constituted direct evidence of deliberate fabrication.

---

[3] Plaintiffs make this argument in their opening brief, AOB p.80; however, they did not make this argument in the lower court, 1-ER-17-18[Neither the Officers nor the Plaintiffs argue that a deliberate fabrication of evidence claim applies under *Devereaux's* first prong. Thus, the Court moves to *Devereaux's* second prong.] The evidence cited in Plaintiffs' AOB does not support their new argument that the Officers knew or should have known Aaron was innocent. A jury of his peers convicted him based on the evidence.

33

Regarding the alleged "mischaracterization" claim, Plaintiffs assert that this consisted of (1) reporting that when shown a photo of Phi Hong, she admitted to being there; (2) omitting her ten denials after being shown a photo; (3) concealing her explanation of being at the 2000 on a different day; and (4) omitting the use of coercive tactics. Plaintiffs' position is not well taken.

In *Devereaux*, the Ninth Circuit held a *Brady* violation, i.e., withholding exculpatory evidence, cannot in itself support a deliberate-fabrication-of-evidence claim. 263 F.3d at 1079. As the *O'Doan*[4] court explained, "[d]eliberate fabrication … must mean something more than a mere omission" and "[n]othing in clearly established law suggests that the officer[] w[as] required to provide more detail to

---

[4] Citing to *Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *1 (9th Cir. Oct. 11, 2023), Plaintiffs attempt to distinguish *O'Doan*. They argue *Lobato* held that material omissions can support a deliberate fabrication claim. AOB p.60. They are incorrect. In *Lobato*, the court noted that the case was different from *O'Doan* because it concerned *more* than mere omissions and that the district court had determined there was a genuine issue of material fact regarding whether the detectives deliberately fabricated evidence based on the totality of the many alleged mischaracterizations, discrepancies, and omissions between Lobato's statements and the detectives' reports. In addition, concerning causation, the district court determined there was a genuine dispute of material fact regarding whether the detectives' reports had a "substantial or controlling impact on" the prosecution of Lobato for killing Duran Bailey."

avoid violating the Constitution]." 991 F.3d at 1045. "Nothing in clearly established law suggests that the officer[] w[as] required to provide more detail to avoid violating the Constitution." *Id*. As *O'Doan* recognized, "[p]olice reports can be written quickly, at odd hours, and with other law enforcement matters pressing. . . . If there was an inaccuracy in [the report], it was a technical one at best. There is no basis to treat this as a deliberate fabrication of evidence." *Id*. at 1046.

Mere carelessness and mistakes of tone are insufficient, and errors concerning trivial matters cannot establish a violation. *Spencer*, 857 F.3d at 798 (citations omitted). Thus, for example, in *Gausvik*, 345 F.3d at 817, the Ninth Circuit found the plaintiff failed to meet the *Devereaux* test when he, inter alia, pointed to inaccurate statements in an affidavit, such as the assertion that eight children accused the plaintiff of sexual abuse when, in fact, only two children did, holding that misstatements and "carelessly handled" facts and investigations do not amount to fabrication of evidence.

Plaintiffs cite *Spencer*, 857 F.3d at 793, and *Costanich v. Dep't of Soc. & Health Services*, 627 F.3d 1101, 1111 (9th Cir.2010), to support their argument. AOB p.47. These cases are inapposite because, contrary to Plaintiffs' claims, the evidence clearly shows that there was no fabricated evidence, any omissions or discrepancies were not material, and Lord's report was not used as evidence.

In *Spencer*, Krause investigated reports of sexual abuse made by the plaintiff's

daughter and prepared reports of her interviews. 857 F.3d at 793-794. "The interviews took place almost entirely in Krause's motel room and her rental car, without anyone else present." *Id*. at 795. Krause prepared multiple reports describing in detail sexual abuse by the plaintiff of his two biological children and stepson. *Id*. at 796. The plaintiff pled guilty to statutory rape. In the civil action, the plaintiff alleged that were it not for the contents of Krause's reports, he never would have pled guilty and spent nearly 20 years in prison. *Id*. at 802.

At the civil trial, the plaintiff submitted evidence contradicting Krause's reports. Krause "attributed many quotations to Matthew," but at trial, Matthew testified that many of those quotations were fabricated. *Id*. at 795. Krause's report also "contain[ed] scores of specific, explicit quotations attributed to Kathryn," and again at trial, Kathryn testified that the substantive quotations were all fabrications and that she had denied to Krause that anyone had sexually abused her." *Id*. The court affirmed the jury's finding in plaintiff's favor, holding the plaintiff had introduced evidence of deliberate fabrication that the jury was permitted to credit. *Id*. at 799.

In *Costanich*, the state revoked the plaintiff's foster care license and initiated guardianship termination proceedings based on an investigation undertaken by Duron. Duron submitted a report and a declaration in support of the guardianship termination, both of which contained "deliberately falsified statements." 627 F.3d at

36

1111. The court listed the false evidence: "Duron's report indicated that she had interviewed thirty-four people. She later admitted that she had made only brief contact with eighteen of the individuals listed. …. The suggestion that she interviewed three of the therapists and received reports from a fourth lent credibility to her report, but, as Duron testified at the ALJ hearing, she did not actually speak to '[m]edical professionals.' … Other witnesses pointed out that the report contained evidence or statements they never made. … Duron purposely used quotation marks around many of the purported witness statements in her investigative report," including statements that were unequivocally refuted by those witnesses. *Id*. at 1112. Like in *Spencer*, Duron's declaration and report, containing what were represented as direct quotations or nearly so, were the evidence that was used by the state to terminate the plaintiff's guardianship. *Id*. at 1105-1106.

Similarly, Plaintiffs' reliance on *Kando v. City of Long Beach*, No. 21-56199, 2023 WL 3092304 (9th Cir. Apr. 26, 2023), is misplaced. There, the plaintiff sued, in part, for deliberate fabrication of evidence, alleging the defendant deliberately omitted exculpatory evidence from a 911 call report and that the omissions were material to charging her with making a criminal threat. In upholding summary judgment in defendant's favor, the Ninth Circuit rejected plaintiff's claim regarding the omission from the report of the fact that she later retracted the call, finding that the plaintiff did not show that the defendant acted deliberately in doing so. The Ninth

Circuit found it significant that the defendant verbally told the police officer about the retraction and in light of such ready disclosure of the retraction, her omission of it from the report "could not have been an attempt to frame [the plaintiff]." *Id*. at *2. Because the plaintiff had not demonstrated the defendant deliberately or recklessly omitted material evidence, she had not established a due process claim. *Id.*

Unlike in *Spencer* or *Costanich*, Plaintiffs do not and cannot contend that Lord misquoted witnesses or that he claimed to have interviewed witnesses that he did not. Plaintiffs argue Lord's report was falsified because it failed to report Nina's "denials" of being at Phi Hong and it incorrectly stated Nina admitted to being at Phi Hong, did not mention 2000, and did not mention that Lord told Nina to write Westminster.[5] But the evidence shows Lord's report did include much of the exculpatory evidence that Plaintiffs claim was omitted, including that "[Nina] seemed to be confused" and "[Nina] changed her story" and Nina "could not remember" or "did not know" and "[Nina] told [him] she thought she may have gotten some of the incident jumbled or confused" and "Nina again started to seem very vague in her answers to [Lord's] questions" and "[Nina and Aaron] both were saying back and forth to each other they were not at the Phi Hong Billiards" and Nina said drawing the map "was a mistake and she was referring to being somewhere

---

[5] Plaintiffs themselves omit the entirety of Lord's statement, which was that he told Nina "draw Westminster, *just draw a street*." 22-ER-5034 (emphasis added).

near Mile Square Park." 13-ER-2786,2788-2789,2795-2798. Thus, the evidence shows that most of the alleged false or fabricated evidence was included in Lord's report.

Also, unlike in *Spencer* and *Costanich*, there is no evidence that the OCDA relied on Lord's report in deciding to prosecute Aaron. To the contrary, DDA Feldman testified that he did not rely on the completeness, accuracy, and truthfulness of the police report in making his decisions. Indeed, the evidence shows that all of Nina's statements were provided to the OCDA via the audio/video recordings,[6] which were provided to DDA Feldman, who in turn provided them to Aaron's criminal defense attorney. Finally, according to Plaintiffs' own allegations in the AOB, during a break between his two interviews of Nina, Lord told DDA Feldman that Nina's story was similar to Aaron's that Aaron was following CJ, got lost, and

---

[6] While Plaintiffs point to the unrecorded interaction between Nina and Martin that occurred between the first and second interviews as being coercive, there is no evidence or claim made by Plaintiffs that Nina made any exculpatory or inculpatory statements to Martin but they allege that Martin yelled at Nina, accused her of lying and told her she needed to start telling the truth. Accusations of lying, reminders to tell the truth, and pointing in a witness's face are not "so coercive and abusive" as to rise to the level of fabrication of evidence. Further, there is no case law cited by Plaintiffs that shows that not recording the interaction was a constitutional violation.

then pulled over at some restaurant and stayed there for an hour while waiting for a phone call. DDA Feldman responded, in part, by saying they needed to flip someone. AOB, p.30. Thus, as in *Kando*, this shows a lack of deliberateness on Lord's part.

Much of Plaintiffs' ire seems to be focused on the statement in Lord's report that he "showed Nina a picture of Phi Hong Billiards and she admitted she was there with Aaron." AOB, pp.52-55. Plaintiffs argue this sentence means that when he showed Nina a picture of the Phi Hong, she responded by admitting to being at Phi Hong. Plaintiffs mischaracterize this single sentence in Lord's report. At most, Lord's error was one of punctuation, using an "and" rather than a period. "I showed Nina a picture," which is true. "Nina admitted she was at Phi Hong," which also is true. Plaintiffs have failed to cite any case law that holds poor draftsmanship equates to deliberately fabricated evidence. Case law does recognize, however, that police reports can be written quickly and at odd hours, *O'Doan*, 991 F.3d at 1046, and that misstatements and "carelessly handled" facts and investigations do not amount to fabrication of evidence. *Gausvik*, 345 F.3d at 817. Also, as stated by the *Spencer* court: "Errors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim." 857 F.3d at 798. The two phrases in the objected-to sentence that (2) Lord showed Nina a picture of Phi Hong, and (2) Nina admitted she had been to Phi Hong with Aaron, are both true statements. Therefore, while Lord's statement that he "showed Nina a picture of the Phi Hong Billiards and she

admitted she was there with Aaron" may be inaccurate and careless as to timing, it fails to rise to the level of a deliberate fabrication of evidence.

All Plaintiffs can point to here is their belief that Lord's report should have been more akin to a word-for-word transcription of everything Nina said. No case law holds officers to such a standard, or holds that failing to do so would rise to the level of a constitutional violation. Indeed, Plaintiffs do not cite to a single case that requires a police report to be a verbatim transcription of a witness interview.

At bottom, all materials – including the very video recordings that Plaintiffs rely on here to show that Lord's report was fabricated or false – were provided to DDA Feldman and to Aaron's criminal defense counsel. Nothing was fabricated. Nothing was falsified. Nothing was concealed. The evidence conclusively refutes Plaintiffs' claim of deliberateness and the district court correctly ruled that Plaintiffs did not have any direct evidence of fabrication.

B.     **There Is No Circumstantial Evidence The Officers Deliberately Fabricated Evidence**

Plaintiffs' circumstantial evidence claim is based on their assertion the Officers used coercive interview techniques when interviewing third-party witness Nina. Importantly, mere coercion alone is not sufficient to prove a violation of substantive due process. *Stoot*, 582 F.3d at 928-929; *Tekoh v. County of Los Angeles*, 2018 WL 9782523, *10 (C.D.Cal. Mar. 8, 2018). A claim that coercive interrogation

41

techniques violated a plaintiff's right to substantive due process "is cognizable only if the alleged abuse of power 'shocks the conscience' and 'violates the decencies of civilized conduct.'" *Stoot*, 582 F.3d at 928. This is a demanding standard. *Id.* In *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir.2003), the court noted that under the Fourteenth Amendment, an interrogation is coercive only when, in light of the totality of the circumstances, an officer's tactics are so extreme as to undermine a suspect's ability to exercise free will.

In *Devereaux*, 263 F.3d at 1076-77, the court held that "ample evidence" that an investigator "repeatedly" admonished a child to tell the truth and continued "aggressively" investigating after the child made multiple denials of sexual abuse did not support a deliberate fabrication of evidence claim. In *Caldwell*, 889 F.3d at 1120, the court held that directly paying a witness does not violate a defendant's due process rights, and that offering a witness protection in exchange for her testimony is not so coercive that it would lead to fabricated evidence. And in *Cunningham*, 345 F.3d at 810-11, the court held an interrogation did not undermine the plaintiff's free will even though the interrogation lasted eight hours, the officer's questions unsettled the plaintiff – "mere emotionalism and confusion do not invalidate confessions," the officer suggested that the plaintiff's cooperation could lead to treatment rather than prison, the officer denied the bi-polar plaintiff's request to call his therapist – plaintiff had "no constitutional right [to do so]," and the officer

42

continued to question the plaintiff after the suspect claimed he was innocent – doing so is "often necessary to achieve the truth," but did not yell at or threaten the witness with violence.

*Devereaux* and its progeny establish that police officers are not required to believe witnesses. They may constitutionally tell witnesses not to lie, that they do not believe them, that they must tell the truth, and that they can go home sooner if they tell the truth. *Devereuax*, 263 F.3d at 1076-77; *Amaya–Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir.1997); *Cunningham*, 345 F.3d at 812. As *Devereaux* establishes, police officers are not required to be nice to witnesses – they may be aggressive in their questioning. Also, case law has held that lying to a witness is not unconstitutional. *Frazier v. Cupp*, 394 U.S. 731, 739 (1969). Case law further holds that police are not required to stop an interview just because a witness becomes emotional, and failing to stop the interview does not make the interview coercive. *Cunningham*, 345 F.3d at 810.

In their brief, Plaintiffs make various claims to support their position Nina's interviews were coercive, including her age. Plaintiffs cite *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir.2010) and *Gallegos v. Colorado*, 370 U.S. 49 (1962), among others, to support their claim that juvenile interrogations are judged by a higher standard and that greater care is needed to make sure any admission is voluntary. These cases are inapposite.

*Crowe* discussed what would constitute "psychological torture" sufficient to support a Fourteenth Amendment claim. While the *Crowe* interrogation met the high threshold for a Fourteenth Amendment claim, its facts bear no resemblance to Nina's interviews.

In *Crowe*, three 14- and 15-year-old boys, Michael, Aaron and Joshua, were accused of murdering Michael's 12-year-old sister, who was stabbed to death in her bedroom while the family slept. Michael was interrogated four times. The third interview lasted more than three hours and took place at the police station. Michael asked to see his parents and expressed how stressful the days since his sister's murder had been. Michael repeatedly denied murdering his sister. The detective told Michael the police knew he killed her and that perhaps Michael doesn't remember doing it. Michael was interviewed a fourth time for more than six hours. 608 F.3d at 420. Throughout the six-hour interview, Michael repeatedly said he did not remember killing his sister. During that interview, the detectives offered to help him remember. *Id*. at 421. The detectives told Michael that if he confessed, he would get help rather than go to jail. Id*. at 422. Michael then told the officers he would be lying if he were to tell them he murdered his sister and his story would be wrong. The detectives latched onto Michael's statement as a confession. *Id*.

The detectives employed similar tactics in their interviews of the other two boys, who they claimed supplied the knife. They interrogated Aaron three times: the

first time for 30-45 minutes, the second for about 2 hours, and the third for 9.5 hours at the police station. *Id*. at 423-424. Joshua was interrogated three times: the first lasted one hour; the second lasted 13.5 hours, during which they denied Joshua's requests for sleep; and the third lasted approximately 12 hours with a two-hour break. *Id*. at 424-425. After charging the boys with murder, DNA testing confirmed a transient had murdered the sister. *Id*. at 417.

The court held the detectives' conduct "shock[ed] the conscience" noting Michael and Aaron "were isolated and subjected to hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." *Id*. at 432. The court held the boys' interrogations were fairly described as "[p]sychological torture." *Id*.

Similarly, in *Gallegos*, youth was a factor in the court concluding the suspect had been subjected to psychological torture. But a myriad of other factors – including that the 14-year-old minor was essentially kept in isolation for five days – also played into that conclusion, Importantly, *Gallegos* did not involve a civil case brought under the Fourteenth Amendment but arose from a petition to overturn the minor's conviction for murder.

In *Gallegos*, the 14-year-old petitioner and another youth followed, assaulted and robbed an elderly man who eventually died from his injuries. The petitioner was arrested on January 1, at which time the victim was still alive. On January 2, the

45

petitioner's mother tried to see him but was denied. From January 1 through January 7, the petitioner was held in Juvenile Hall, where he was kept in security. He was examined by the police in Juvenile Hall January 2, and made a confession. 370 U.S. at 50. The petitioner eventually was convicted of murder. In overturning the conviction, the U.S. Supreme Court stated:

> There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested was obtained in violation of due process. *Id*. at 55 (internal citations omitted).

*Gallegos* did not involve a civil Fourteenth Amendment claim, so the Court did not assess whether the conduct shocked the conscience or constituted a civil due process violation.

While Plaintiffs focus on Nina's age to support their claim the Officers used coercive interview techniques, the U.S. Supreme Court has held that age is not the only factor to be used in determining how to question a minor. Officers should also consider "experience, education, background, and intelligence" to determine a

minor's capacity to understand the warnings and consequences. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

In *Stoot*, plaintiffs challenged the officer's interviewing techniques, arguing that his interview with the four-year-old child abuse victim was "riddled with leading and/or coercive questions that undermined the reliability of her answers." 582 F.3d at 919 n.9 (internal quotation marks omitted). But the Ninth Circuit held this argument was foreclosed by its decision in *Devereaux*, "in which [it] rejected a foster parent's claim that governmental officials acted unconstitutionally by 'failing . . . to conduct and monitor these interrogations [of a child] in a manner that would ensure the veracity of the information obtained.'" *Id.* (quoting *Devereaux*, 263 F.3d at 1076). *Stoot* further reiterated the holding in *Devereaux*, stating that "an official's mere 'failure to adhere to established guidelines and policies concerning the questioning of child witnesses' does not give rise to an independent claim under § 1983." *Id.* at 929 (quoting *Devereaux*, 263 F.3d at 1076).

In *Gausvik*, plaintiff alleged that the detective used "overbearing tactics" in interviewing the children, which he knew would yield false information. 345 F.3d at 817. The officer attempted to have one child admit to the abuse, but the child refused. *Id.* at 814. The officer interviewed another child who had cerebral palsy for two hours and allegedly refused to give him a break. *Id.* The officer then interviewed the first child again, who continued to deny any sexual abuse. *Id.* The Ninth Circuit held

that "such tactics do not establish a deliberate-fabrication-of-evidence claim." *Id*. The court also found that the plaintiff failed to show by independent evidence that the detective knew or should have known his interview tactics would yield false information. *Id*.

In *Gantt v. City of Los Angeles*, the Ninth Circuit found sufficient evidence on the fabrication of evidence claim to allow it to go to a jury. 717 F.3d 702 (9th Cir.2013). But the facts in *Gantt* are markedly different from the facts here. There, the detectives interrogated the eyewitness after "he had been awake for approximately two days straight on a crack binge and was still under the influence when he made his identifications," threatened to charge the eyewitness with murder if he did not provide information, interrogated the eyewitness on multiple days, and interrogated the eyewitness for 4 to 6 hours on at least one of the days. *Id*. at 704. Further, after the officers showed the eyewitness some materials, they told him to lie about being shown the materials. *Id*. at 708.

Here, Nina was only interviewed twice for a total of about 2 hours and 51 minutes. 6-ER-1018:25-27. During the interviews, Nina was told that she could stop anytime, get something to eat, use the restroom, stop talking and call her mother. 6-ER-1102; 23-ER-5458-5459. Nina never asked to call her mother or anyone else during her interviews. Id. Further, there is no evidence Nina was under the influence of any drugs or alcohol or that she was told to lie by the officers.

48

Plaintiffs' other arguments regarding coercion are equally meritless. Telling a witness to speak truthfully is not police coercion. *Devereaux*, 263 F.3d at 1076-1077; *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir.1997), *overruled on other grounds* in *United States v. Preston*, 751 F.3d 1008, 1019-1020 (9th Cir.2014). Nor are accusations that the witness is lying. *Cunningham*, 345 F.3d at 810; *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir.1987). Deception by the police is permitted and does not render a confession involuntary. *United States v. Miller*, 984 F.2d 1028, 1031 (1993). Police officers may constitutionally tell witnesses they do not believe them, that they must tell the truth, and that they can go home sooner if they tell the truth. *Devereaux*, 263 F.3d at 1076-77; *Amaya-Ruiz*, 121 F.3d at 494; *Cunningham*, 345 F.3d at 812. Police officers may promise police protection or even pay a witness for testifying. *Caldwell*, 889 F.3d at 1120. Police are not required to stop an interview when a witness becomes emotional, and failing to stop the interview does not make the interview coercive. *Cunningham*, 345 F.3d at 810.

Plaintiffs cite to a large number of cases to support their coercion argument but provide no details, simply pulling certain words out of the opinions without providing context. A deeper look into a few of Plaintiffs' cases shows their coercion argument is meritless.

Plaintiffs cited *Hyung Seok Koh v. Graf,* 307 F.Supp.3d 827, 851–59 (N.D. Ill.2018)*, a coerced confession case, for the proposition that coercion could include

deception regarding inculpatory evidence, rejection of denials, accusations of lying, and confusing questions. AOB p.68. Significantly, the *Koh* court dismissed the part of the claim for a due process violation under the Fourteenth Amendment, stating:

> The substantive due process claim is readily rejected. As the Seventh Circuit recently noted, the bar for 'conscience-shocking' conduct is *extraordinarily high*.

307 F.Supp.3d at 850 (emphasis added, citation omitted).

*Koh* noted: "Detective Graf used coercive ... physical tactics throughout the interviews. He ... approached Mr. Koh, and occasionally touched Mr. Koh on his arms and legs. ... It is also worth noting that Officer Kim's gun was visible throughout the entirety Mr. Koh's interviews." *Id.* at 853. The court succinctly summarized the interrogation tactics used in *Hyung Seok Koh* as including, "verbally and physically intimidating a suspect, as well as manipulating him, lying to him, and coaching him on the details of the confession, all while knowing he was not fluent in English and was operating without food, medications, or sleep." *Id.* at 855. This conduct was not conscious shocking.

*Henry v. Kernan*, 177 F.3d 1152, 1157 (9th Cir.1999) *opinion amended and superseded,* 197 F.3d 1021 (9th Cir.1999), cited at AOB p.78, was a habeas case not a civil Fourteenth Amendment case, and it involved a confession obtained in violation of *Miranda*. The *Henry* court looked at the totality of the circumstances,

noting Henry gave a "long, often incoherent, and confused statement which … included not only information about … divorce, his property, his automobile accident and head injury, his job, his guns, his children, deer hunting, an old vehicle his brother-in-law was fixing, his experiences in Vietnam, taking his trailer up in the woods, and his frustrated ambition to be a highway patrolman. As evidenced by the transcript, Henry's statements were rambling, disjointed, often unresponsive to the questions asked by the officers, occasionally inaudible, and sometimes virtually incoherent. Throughout his interrogation, petitioner was shaken, confused, and frightened, crying in parts and frequently asking for forgiveness." *Id.* at 1027. Nina did not display any of these signs of psychological confusion.

In *Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir.2018) (cited at AOB p.71), officers threatened to extend the two suspects' interrogations until they gave the "right" answer (meaning "inculpatory"). The officers "basically drafted the entire confession" by feeding the suspects "every critical fact" and refusing to accept their denials until they finally agreed to the version proposed by the interrogators. The officers applied interrogation tactics designed to increase psychological pressure to confess, such as minimizing moral guilt to prime them for a confession, and telling one suspect that the other had already implicated her. 880 F.3d at 847-48. One suspect was told her whole family was going to jail. *Id.* at 838. And even with all this, the court rejected the Fourteenth Amendment claim, stating:

We can be brief about the substantive due process argument: it should

have been winnowed from the case. The bar for "conscience-shocking"

is very high; these interviews may have been abusive, but nothing

extreme enough to invoke substantive due process occurred.

880 F.3d at 844.

Plaintiffs cite *Brewster v. Shasta Cty.*, 27 F.App'x 908, 912-13 (9th Cir.2001) (cited at AOB p.72,fn.15), for the broad proposition that "'suggestive procedures with the intent of obtaining an identification' of a suspect, 'irrespective of whether he was in fact guilty,' qualifies as a coercive investigative technique.'" *Brewster* didn't involve a police interview but involved an unnecessarily suggestive photo identification and live lineup. *Id.* at 911. The plaintiff did not bring a Fourteenth Amendment due process claim against the detectives, so the *Brewster* court was not called on to determine if the conduct shocked the conscience.

Plaintiffs' efforts to loop this case into the coerced confessions cases fail. Most of the coerced confession cases cited by Plaintiffs relate to coerced confessions from suspects. Nina was not a suspect but was a third-party witness. Thus, none of her statements could be construed as "confessions." Most of the cases cited by Plaintiffs do not deal with a deliberate fabrication of evidence claim from a witness under § 1983. The coerced confession cases cited by Plaintiffs do not provide support for their deliberate fabrication of evidence claim.

The evidence shows the interview techniques relating to Nina do not reach the extraordinarily high bar for "conscience-shocking" conduct. Nina was questioned for 2 hours and 51 minutes. Nina understood if she needed to use the restroom or to get something to eat or drink, and if at any time she wanted to stop talking, she could, and was told if at any time she wanted to talk to her parents, she could and they would arrange it but Nina never asked to call her mother.

Additionally, Plaintiffs' claim that Martin threatened to charge Nina with conspiracy is false. Martin never threatened to charge Nina and she never thought she possibly could get arrested. 21-ER-4895["Q. Did you think there was a possibility that you could get arrested? A. Oh, no."]; 22-ER-5068.

The evidence also shows the diagram was not coerced. Plaintiffs assert Lord "directed" Nina to draw the picture and to write Westminster. The evidence, shows, however, that Nina was asked, not directed, to draw a picture. The following exchange occurred:

GGPD: I want you to do me a favor.

NGUYEN: Uh-huh.

GGPD: I want you to draw me a picture.

NGUYEN: Uh-huh.

GGPD: Of the way that you saw the cars

NGUYEN: Uh-huh.

GGPD: Trapping in the car.

NGUYEN: Uh-huh. Okay, so.

GGPD: Draw Westminster, just draw a street,

NGUYEN: Uh-huh. And then, ah, so this is CJ's car, and then, Aaron

car was over here. And then.

GGPD: Are these the lanes?

NGUYEN: Yeah, sorry.

22-ER-5034.

Nina admitted at deposition that no one made her draw anything specific. She

testified at the criminal trial that the drawing was an accurate depiction of a trapping

in of a car that had occurred that same evening and that Aaron had been involved in

the earlier trapping-in incident on the same evening as the shooting. 15-ER-3322;

21-ER-4829-4830,4891-4892,4931.

Finally, Plaintiffs argue that the district court applied the wrong standard of

"shocks the conscience" and that it should have applied a deliberate indifference or

reckless disregard for the consequences of their actions standard. Plaintiffs argue

that the district court's failure to mention deliberate indifference or reckless

disregard in its order requires reversal. AOB p.75. It does not.

First, case law is clear that for a plaintiff to succeed on a Fourteenth

Amendment due process violation claim, there must be evidence that the defendant

engaged in conduct that would "shock the conscience." Undisputedly, "due process violations under the Fourteenth Amendment occur *only* when official conduct 'shocks the conscience.'" *Gantt*, 717 F.3d at 707. Thus, it was not improper for the district court to consider whether the alleged conduct "shocked the conscience." It was the proper standard to apply and once it found that the Officers' conduct did not shock the conscience, the court did not then need to consider if they acted purposefully or with deliberate indifference or with reckless disregard.

Second, the cases Plaintiffs cite in support of this argument are inapposite. Both *Spencer*, 857 F.3d at 802 and *Gantt*, 717 F.3d at 707-708, arise in the context of jury instructions. In fact, in *Spencer*, the court, in upholding the "deliberate indifference" jury instruction noted, first, that the plaintiff had proved a direct evidence fabrication claim, and second, that the added language in the jury instruction there relating to the defendant's "deliberate indifference" did not prejudice the defendant because by including that in the jury instruction it required the plaintiff to prove an *additional* element, i.e., an added burden, which could not have prejudiced the defendants. 857 F.3d at 802-803. *Tatum v. Moody*, 768 F.3d 806, 820-821 (9th Cir.2014), also cited by Plaintiffs, arises in a *Brady* violation context, and is not relevant here because there was no *Brady* violation.

Third, there has been no showing that the district court judge in this case did not understand the correct standard to apply or that he did not apply the correct

standard. Citing *Devereaux*, the district court noted that in a "circumstantial evidence" case, there must be a showing that the Officers used techniques that they knew or should have known would yield false information. 1-ER-19. It found that the techniques complained of by Plaintiffs failed to meet *Devereaux's* stringent standard. *Id*.

The district court properly found in favor of Defendants on Plaintiffs' circumstantial evidence claim. Defendants' interview techniques did not violate Aaron's constitutional rights and their conduct did not shock the conscience.

### C.    Lord's Report Is Not A *Brady* Violation

Plaintiffs argue Lord's report concealed exculpatory/*Brady* evidence despite acknowledging that the OCDA was provided with all audio/video of the interviews. Plaintiffs apparently believe that all of the information contained in the audio/video evidence also should have been included in the written reports. Plaintiffs do not explain how putting exculpatory evidence in hundreds of pages of police reports would have been better than providing it in audio/video format. Plaintiffs cite to two cases: *United States v. Skilling*, 554 F.3d 529 (5th Cir.2009), aff'd in part, vacated in part, remanded, 561 U.S. 358 (2010), and *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078 (9th Cir.2009). Neither case is helpful.

*Skilling* is inapplicable. The Supreme Court's opinion does not address the suppression of *Brady* material, and the Fifth Circuit's opinion does not relate to

police officers' suppression of exculpatory evidence. Additionally, in *Skilling*, there were "several hundred million pages" of documents in an open file; yet, the Fifth Circuit found that giving a defense attorney open access to a file with hundreds of millions of pages of documents did not violate *Brady*. *Id*. at 577.

In *Tennison*, the exculpatory evidence was evidence that a person, known to the officers, had told them that they had arrested the wrong people, had identified the people involved, including the shooter, and had described the cars and chase in a manner consistent with the evidence. 570 F.3d at 1090. Based on this, the court stated the evidence "should not have been buried in a file, but should have been made known to the prosecutor." *Id*. But that is not the situation here.

Here, the evidence shows that the prosecutor was given Lord's police report – which clearly included exculpatory evidence (see, e.g., 13-ER-2782-2811) – and also was provided with the audio/video evidence of the interviews of suspects and witnesses, including the videos of Nina's two interviews, which also included Nina's description of her unrecorded, 30-minute interaction with Martin. All of this evidence, which had been provided to the OCDA, also, in turn, was provided to Aaron's criminal defense attorney. Thus Plaintiffs had access to all of Nina's contradictory statements and to the interview techniques used by the Officers via Nina's recorded interviews.

### D. The Officers Did Not Violate Ngoc's And Hoang's Right To Their

### Son's Society And Companionship

The claims of Ngoc and Hoang, Aaron's parents, also fail. Since Aaron has no evidence to support his constitutional claims, his parents cannot prevail on their Fourteenth Amendment claim, which is a derivative claim. *Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir.1987). The district court correctly found that the Officers' conduct did not shock the conscience and it correctly entered judgment in favor of the officers on Aaron's parents' claim.

### E. Because Plaintiffs' Constitutional Rights Were Not Violated, The Supervisor Liability Claim Fails

"A supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir.2001) (internal citations omitted). The finding that the Officers did not violate Plaintiffs' Fourteenth Amendment due process rights is determinative of Plaintiffs' supervisor liability claim. Since there was no constitutional violation, Reynolds and Martin cannot be held liable as supervisors under § 1983. *See Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir.2001). The district court's ruling on this issue was correct.

### 3. QUALIFIED IMMUNITY APPLIES

Even if this Court reverses the district court's judgment on the constitutional

violation issue, the Officers are entitled to qualified immunity. Qualified immunity was raised in the Officers motion, 2-ER-99, but was not decided by the district court since it found no constitutional violation.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido*, 586 U.S. at 42 (citing *Kisela*, 138 S.Ct. at 1152.) Qualified immunity is a question of law and not a question of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir.2008). The qualified immunity defense involves two questions: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts . . . show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established" at the time of the officer's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The Supreme Court has repeatedly held that "the clearly established right must be defined with specificity" and "not . . . at a high level of generality." *City of Escondido*, 586 U.S. at 42 (citing *Kisela*, 138 S.Ct. at 1152).

In *Tobias*, 996 F.3d 571, the Ninth Circuit had an opportunity to consider whether coercion techniques used on a 13-year-old suspect for less than two hours were clearly established as "psychological torture" sufficient to establish a substantive due process violation and overcome qualified immunity. The techniques used in *Tobias* were much more egregious than here and the juvenile was a suspect,

59

not a third-party witness. For example, early in the interrogation, detectives ignored Tobias's request for an attorney; lied to him, saying that someone had given him up as the murderer, cursed at him, and told him that failing to confess would make him appear a "cold-blooded killer;" told him his mom was there crying and had identified him in the video; and told him the court was going to think he was a big time gang killer who didn't want to tell the truth so they might throw the book at him. *Id*. at 577-578. Tobias eventually confessed. Still in the police station after his confession, Tobias told his mother he wasn't the person in the video, had no involvement in the murder and the detectives forced him to confess. His mother went to the detectives and reported what her son had told her and that Tobias was crying and "scared to shit." *Id*. at 578.

After Tobias's murder conviction was reversed, he brought a substantive due process claim under the Fourteenth Amendment. While the district court denied the officers' motion for summary judgment raising qualified immunity, the Ninth Circuit reversed. It held that the "extended, overbearing interrogation of a minor, who was isolated from family and his requested attorney, comes close to the level of 'psychological torture' that we have held is not tolerated by the Fourteenth Amendment" and it violated the plaintiff's substantive due process rights. However, it also held the officers were entitled to qualified immunity because the unconstitutionality of the use of such techniques on a 13-year-old for a two-hour

60

period was not clearly established as of 2012. *Id*. at 585-586.

Significantly, existing cases at the time of Nina's interviews have held that wide latitude is to be given to officers conducting interviews of third-party witnesses. See, e.g., *Devereaux*, 263 F.3d at 1075; ("[T]here is no constitutional due process right to have child witnesses in a child sexual abuse investigation interviewed in a particular manner, or to have the investigation carried out in a particular way."); *McSherry*, 584 F.3d at 1135 ("[P]olice officers 'must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law . . . that indicates precisely where the line must be drawn.'" (quoting *Devereaux*, 263 F.3d at 1075)); *Gausvik*, 345 F.3d at 817 ("Suggestive interview tactics alone do not amount to a constitutional violation.").

To the extent it is found that the Officers' interview of Nina rises to the level of a constitutional violation, they are entitled to qualified immunity. No case law in 2011 would have informed them that they were violating a witness's constitutional rights. Similarly, if this Court finds that Lord's report violated Plaintiffs' constitutional rights because it was not a verbatim account of his interviews of Nina, he is entitled to qualified immunity because no case law in 2011 would have told him that his police report was required to be a verbatim account of the witness's statements.

**4.** **THE DISTRICT COURT CORRECTLY FOUND THE CITY IS ENTITLED TO JUDGMENT ON THE *MONELL* CLAIM**

### A. There Was No Underlying Constitutional Violation

Liability attaches to a public entity under section 1983 only "when execution of [its] policy or custom, . . . inflicts the injury." *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978). The elements of a *Monell* claim require a plaintiff to make a showing that "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived …" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir.2011) (citation omitted).

A public entity cannot be liable under *Monell* unless the plaintiff establishes both a deprivation of an established constitutional right and that a policy, custom or practice was the cause in fact of that deprivation *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("our first inquiry in any case alleging municipal liability under §1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). *See also City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986), ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."). Accordingly, because there was no constitutional violation, there is no viable *Monell* claim.

**B.** **The City Established It Did Not Have An Unconstitutional Custom, Policy Or Practice And It Had A Constitutionally Sound Training Program**

The evidence establishes that the City has appropriate written policies and/or practices at issue here. General Order 6.2, in effect in 2011, expressly prohibits "obtaining involuntary confessions or admissions through coercion or other illegal means." The City also produced unrefuted evidence of its constitutionally sound training program. Even if a few police officers might be inadequately trained does not give rise to *Monell* liability. See *City of Canton*, 489 U.S. at 389 (holding the failure to train must reflect a "'deliberate' or 'conscious' choice by a municipality"). The City would be entitled to judgment on Plaintiffs' *Monell* claim.

**5.** **PLAINTIFFS RELY ON IMPROPER EVIDENCE**

In their underlying oppositions and motion, Plaintiffs relied on improper evidence consisting of various expert reports. Defendants specifically objected to Plaintiffs submission of and reliance on unverified expert reports of Kassin and Boan. SER-12-104,127-177,194-257. Importantly, Kassin's and Boan's reports are not signed under penalty of perjury and they express opinions contrary to the applicable case law. In their brief, Plaintiffs continue to rely on the improper expert opinions of Kassin and Boan. AOB pp.15,62,70,75,76,79.

In addressing the parties' evidentiary objections the district court stated:

As a preliminary matter, City, Officers, and Plaintiffs submit numerous objections to the admission of certain pieces of evidence. When resolving a motion for summary judgment, courts may only consider admissible evidence. Fed. R. Civ. P. 56. … [¶] The Court only considered admissible evidence in resolving the three motions for summary judgment. When this Order cites evidence to which the parties have objected, the objection is impliedly overruled. Additionally, the Court declines to rule on objections to evidence upon which it did not rely.

1-ER-12-13.

Regarding Plaintiffs' reliance on their experts' reports, the district court rejected that reliance, stating:

The Court finds that Plaintiffs evidence is insufficient to support a finding of deliberate fabrication here. Aside from the coerced confession cases, Plaintiffs only support for their deliberate fabrication of evidence claim consists of expert reports that criticize the Officers' interviewing techniques. (Id. at 8, 11, 14.) However, "[t]here is no constitutional right to have witnesses interviewed in a particular manner or to have the investigation carried on in a particular way." *Tennison v. City & Cty. of San Francisco*, No. C 4-574, 2006 U.S. Dist.

64

LEXIS 25664, at *74 (N.D. Cal. Feb. 2, 2006); see also *Devereaux*, 263

F.3d at 1075 ("[T]here is no constitutional due process right to have

child witnesses in a child sexual abuse investigation interviewed in a

particular manner, or to have the investigation carried out in a particular

way."); *McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir.2009)

("[P]olice officers 'must be given some latitude in determining when to

credit witnesses' denials and when to discount them, and we are not

aware of any federal law . . . that indicates precisely where the line must

be drawn.'" (quoting *Devereaux*, 263 F.3d at 1075)); *Gausvik*, 345 F.3d

at 817 ("Suggestive interview tactics alone do not amount to a

constitutional violation.").

1-ER-21.

In addition to objecting to specific portions of the reports, Defendants had

objected to both Kassin's and Boan's reports in their entirety on the grounds they

lacked foundation and were not properly authenticated (FRE 602, 901), that they

constituted hearsay (FRE 802), and that they purported to be declarations but neither

one was signed under penalty of perjury (FRCP 56(c)(4); 28 USC 1746). *See, e.g.,*

SER-12,41,95,127,128,176,194,214,250. Defendants' specific and general

objections were well taken. The district court did not consider these expert

opinions/reports when ruling on the parties' motions. Plaintiffs' experts' reports and

opinions should be disregarded for purposes of this appeal as well.

## 6. **CONCLUSION**

For all the foregoing reasons, judgment should be affirmed in favor of the City of Garden Grove, Sergeant Mark Lord, Detective Michael Reynolds and Sergeant Mike Martin.

DATED: October 7, 2024  Respectfully submitted,

WOODRUFF & SMART, APC


By:*s/ Roberta A. Kraus*
  CAROLINE A. BYRNE
  ROBERTA A. KRAUS
  MEREDITH D. STEWART
  Attorneys for Appellees

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-189

I am the attorney or self-represented party.

**This brief contains** 13,984 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  ☐ it is a joint brief submitted by separately represented parties.
  ☐ a party or parties are filing a single brief in response to multiple briefs.
  ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Roberta A. Kraus  **Date** October 7, 2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** 67 *Rev. 12/01/22*

## <u>STATEMENT OF RELATED CASES</u>

No other cases in this Court are deemed related to this case pursuant to Circuit

Rule 28-2.6.

DATED: October 7, 2024   Respectfully submitted,

        WOODRUFF & SMART, APC


By:*s/ Roberta A. Kraus*    
   CAROLINE A. BYRNE
   ROBERTA A. KRAUS
   MEREDITH D. STEWART
   Attorneys for Appellees

4880-4110-4847, v. 1

## CERTIFICATE OF SERVICE

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On October 7, 2024, I hereby certify that I electronically filed the foregoing **APPELLEES' ANSWERING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the non-CM/ECF participants:

| | |
|---|---|
| Barrett S. Litt, Esq.<br>David McLane, Esq.<br>Lindsay Battles, Esq.<br>Rodrigo Padilla, Esq.<br>Ben Shaw, Esq.<br>McLANE, BEDNARSKI & LITT, LLP<br>975 East Green Street<br>Pasadena, CA 91106<br>Telephone: (626) 844-7660<br>Facsimile: (626) 844-7670<br>Email: blitt@mbllegal.com<br>　　　dmclane@mbllegal.com<br>　　　lbattles@mbllegal.com<br>　　　rpadilla@mbllegal.com<br>　　　mbolanos@mbllegal.com<br>　　　bshaw@mbllegal.com | Plaintiffs/Appellants<br>**AARON NGUYEN, NGOC LE THI PHAN, AND HOANG MINH NGUYEN** |
| Susan E. Coleman<br>BURKE, WILLIAMS & SORENSEN<br>444 South Flower Street, Suite 2400<br>Los Angeles, CA 90071-2953<br>Telephone: (213) 236-0600<br>Facsimile: (213) 236-0700<br>Email: scoleman@bwslaw.com | Attorneys for Defendants/Appellees **CITY OF GARDEN GROVE, a public entity; SERGEANT MARK LORD, an employee of Defendant City of Garden Grove, a public entity; DETECTIVE MICHAEL REYNOLDS, a former employee of Defendant City of Garden Grove, a public entity; and SERGEANT MIKE MARTIN, a former employee of Defendant City of Garden Grove, a public entity** |

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

Executed on October 7, 2024, at Costa Mesa, California.

/s/ *Vilay Lee*　　　　　　　
VILAY LEE

4880-4110-4847, v. 1