Case No. 24-189

---

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

AARON NGUYEN, ET AL.
Plaintiffs-Appellants

vs.

CITY OF GARDEN GROVE, et al.,
Defendants-Appellees.

---

Appeal from the Judgement of the United States District Court
for the Central District of California
Case No. 8:21-cv-JVS-ADS

---

## APPELLANTS' REPLY BRIEF

---

BARRETT S. LITT, SBN 105322
DAVID S. McLANE, SBN 124952
LINDSAY BATTLES, SBN 262779
BEN SHAW, SBN 319194
RODRIGO PADILLA, SBN 339523
McLANE, BEDNARSKI & LITT LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670
E-mail: lbattles@mbllegal.com*

Attorneys for Plaintiffs-Appellants

# TABLE OF CONTENTS

Introduction ................................................................................6

Argument ....................................................................................9

    I.    Direct Fabrication .................................................9

        A.    This Is No Case of Mere Omissions ...............................9

            1.    "Carelessness" Cannot Excuse Lord's Affirmative Misrepresentations ................................9

            2.    Deliberate Fabrication Includes Material Omissions ...........................................15

            3.    The OCDA Relied on Lord's Report....................18

        B.    Nina's Fabricated Diagram.........................................19

    II.    Nina's Interrogation Satisfies the Shocks-the-Conscience (Deliberate Indifference) Standard......................................21

        A.    Qualified Immunity Is Unavailable.............................22

        B.    Defendants' Misconduct Exemplifies Deliberate Indifference ...............................................28

    III.    Defendants Should Have Known Aaron Was Innocent Yet Persisted in Coercing an Admission from Nina ..................32

    IV.    Brady ......................................................................34

    V.    Plaintiffs Relied on Admissible Expert Opinion .................37

    VI.    Plaintiffs Submitted Substantial Evidence Supporting Their Monell Claims .......................................................39

Certificate of Compliance for Briefs.......................................43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................ 13

*Caldwell v. City & County of San Francisco*,
  889 F.3d 1105 (9th Cir. 2018) ......................................... 12, 17

*City of Canton, Ohio v. Harris*,
  489 U.S. 378 (1989) ................................................................ 39

*Carillo v. County of Los Angeles*,
  798 F.3d 1210 (9th Cir. 2015) .............................................. 13

*Cooper v. Dupnik*,
  963 F.2d 1220 (9th Cir. 1992) ......................... 23, 24, 25, 31

*Costanich v. Dept. of Heath and Soc. Serv.*,
  627 F.3d 1101 (9th Cir. 2010) ....................... 9, 11, 13, 15, 40

*Cristini v. City of Warren*,
  2012 WL 5508369 (E.D. Mich. Nov. 14, 2012) ..................... 40

*Crowe v. County of San Diego*,
  608 F.3d 406 (9th Cir. 2010) ........................................ Passim

*Cunningham v. City of Wenatchee*,
  345 F.3d 802 (9th Cir. 2003) ................................................ 31

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) ........................................ 13, 31

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
  771 F.3d 1119 (9th Cir. 2014) ................................................ 6

*Gantt v. City of Los Angeles*,
  717 F.3d 702 (9th Cir. 2013) .......................................... 28, 32

*Gausvik v. Perez,*
345 F.3d 813 (9th Cir. 2003) .......................................................... 13, 31

*Gregory v. City of Louisville,*
444 F.3d 725 (6th Cir. 2006) .............................................................. 11

*Harris v. Bornhorst,*
2004 WL 7340519 (N.D. Ohio 2004) ................................................... 24

*Henry v. Kernan,*
177 F.3d 1152 (9th Cir. 1999) ............................................................ 26

*Hurt v. Wise,*
880 F.3d 831 (7th Cir. 2018) .............................................................. 32

*J.F. Feeser, Inc. v. Serv-A-Portion, Inc.,*
909 F.2d 1524 (3d Cir. 1990) ............................................................. 39

*Jackson v. City of Cleveland,*
925 F.3d 793 (6th Cir. 2019) ............................................................. 40

*Kirkpatrick v. County of Washoe,*
843 F.3d 784 (9th Cir. 2016) ............................................................. 39

*Liston v. Cnty. of Riverside,*
120 F.3d 965 (9th Cir. 1997) ............................................................. 36

*Lobato v. Las Vegas Metro. Police Dep't,*
2023 WL 6620306 (9th Cir. Oct. 11, 2023) ................................ 13, 16,17

*Lobato v. Las Vegas Metro Police Dep't,*
2022 WL 4017055 (D. Nev. Sept. 1, 2022) ...................................... 13, 19

*Masson v. New Yorker Magazine, Inc.,*
501 U.S. 496 (1991) ........................................................................... 6

*McSherry v. City of Long Beach,*
584 F.3d 1129 (9th Cir. 2009) ........................................................... 31

*Mellen v. Winn,*
900 F.3d 1085 (9th Cir. 2018) ........................................................... 38

*O'Doan v. Sanford,*
  991 F.3d 1027 (9th Cir. 2021) ........................................................ 15

*Richards v. Cnty. of San Bernardino,*
  39 F.4th 562 (9th Cir. 2022) ......................................................... 37

*Union No. 1936, United Bhd. of Carpenters & Joiners of Am.,*
  680 F.2d 594 (9th Cir. 1982) ........................................................ 29

*Spencer v. Peters,*
  857 F.3d 789 (9th Cir. 2017) .......................................... 13, 21, 28

*Stoot v. City of Everett,*
  582 F.3d 910 (9th Cir. 2009) ........................................................ 18

*Tekoh v. Cnty. of Los Angeles,*
  75 F.4th 1264 (9th Cir. 2023) ...................................................... 38

*Tennison v. City & Cnty. of San Francisco,*
  570 F.3d 1078 (9th Cir. 2009) ...................................................... 35

*Tobias v. Arteaga,*
  996 F.3d 571 (9th Cir. 2021) ................................................. Passim

*United States v. Pelullo,*
  399 F.3d 197 (3d Cir. 2005) ......................................................... 37

*United States v. Shaffer,*
  *789 F.2d 682* (9th Cir. 1986) ...................................................... 37

*Ward v. Crow Vote LLC,*
  634 F. Supp. 3d 800 (C.D. Cal. 2022) ........................................ 39

*Wilkins v. De Reyes,*
  2006 WL 8443775 (D.N.M. 2006) .............................................. 27

*Woods v. Clusen,*
  794 F.2d 293 (7th Cir. 1986) ................................................ 25, 27

## **Introduction**

This appeal involves significant disputes of fact and the inferences to be drawn from them. *Fresno Motors, LLC v. Mercedes Benz USA, LLC* 771 F.3d 1119, 1125 (9th Cir. 2014) (summary judgment improper "where divergent ultimate inferences may reasonably be drawn from undisputed facts"). Chief among these disputes is whether Lord's report created such a false impression of Nina's interrogation that it cannot be excused as mere carelessness. Where words or conduct may be interpreted in several ways, summary judgment must be denied. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 521-522 (1991).

What is undisputed, however, is that the District Court had the facts wrong when it concluded that Lord's false description of Nina's reaction to the Phi Hong photo was simply an error in timing. Defendants do not contest that, from 8:53 a.m., when the photo appears and the words "Phi Hong" first enter the conversation, through the end of the first interview, Nina unambiguously and repeatedly denied being present. From the time she is oriented to location with the photo, she made no admission, supporting the inference that she was in no way oriented to location when she earlier (8:41 a.m.) agreed that she had been to a

6

poolhall at Harbor/Westminster, but could not remember when.

This is no case of "mere omission." Lord not only falsified Nina's reaction to the photo, but entirely omitted her ten unambiguous denials during the first session and her eight references to being at a different poolhall on another day, which was indispensable to understanding her first interview session. Lord gave the false impression that Nina admitted to being at the Phi Hong during the morning and maintained her admission throughout the day, concealing that detectives failed to secure an admission during the first session despite using intense pressure, threats, and incessant lies.

Lord also concealed the brute intimidation that occurred between the two recorded sessions. In the face of her repeated denials – and despite an alibi consistent with Aaron's, and corroborated by GPS evidence, – Sgt. Martin pulled Nina into his private office, placed a foot on her chair, and screamed profanities and threats until Nina reached an emotional breaking point. The report never indicates that Nina's first admission of being at the Phi Hong first occurred at 1:02 p.m., after this confrontation, after she denied presence at least twelve times, and pleaded "can I just admit everything?" The report conceals that, despite

coaching and emotional manipulation, she fully recanted her admissions by the end of the second interview. Lord presented a materially false description of Nina's statements, while concealing facts necessary to assess their reliability.

A witness may not have the right to be interviewed in a particular way, but Defendants should have known that the deceptive, intimidating interview tactics they used would yield false information. Defendants' creation of false evidence through their deliberate indifference to the predictable consequences of such abusive techniques, combined with reckless disregard for the exculpatory GPS and video surveillance footage that was uncontestably in their possession shocks the conscience. The district court's failure to acknowledge the deliberate indifference standard constitutes reversible error, and given the coerciveness of the techniques, and duration of Nina's interrogation, qualified immunity is not available under *Tobias v. Arteaga*, 996 F.3d at 581-582 (9th Cir. 2021). The case should be remanded.

/ / /

/ / /

/ / /

## Argument

## I. Direct Fabrication

### A. This Is No Case of Mere Omissions

#### 1. *"Carelessness" Cannot Excuse Lord's Affirmative Misrepresentations*

Lord falsely reported that Nina admitted to being at the Phi Hong, including when shown a photo. Defendants do not dispute that, immediately upon viewing the photo (8:53 a.m.) – the *first time* the words Phi Hong enter the conversation (and the first time Nina is oriented to the location of interest) – Nina unambiguously denied being there. (10-ER-1881[UMF-166]). After being shown the photo, Nina consistently and repeatedly denied being present at the Phi Hong (10x) during the first interview (and maintained her denials 20 minutes into the second recorded interview). Instead, Lord's report gives the false impression that Nina admitted to being at the Phi Hong during the first interview and maintained her admission throughout the day, except when Aaron entered the room. Changing her 16 (total) denials ("No" I was not there), to "Yes," (I was), in the report, could not be more consequential. *See Costanich v. Dept. of Heath and Soc. Serv.*, 627 F.3d 1101, 1113 (9th Cir. 2010) ("[t]he substitution of 'consistent' for 'positive,' [] reasonably may

be characterized as a misstatement. Reporting that a witness said something she did not cannot be so characterized.").

It is also undisputed that the district court factually erred in characterizing Lord's false report as a mere timing inaccuracy. The Court erroneously concluded that, *after* being shown a photo at 8:53, Nina admitted to being at the Phi Hong. No such thing happened. Between 8:53 and 9:11, there is no statement that could be so characterized. At 8:41, before the words "Phi Hong" enter the conversation, and before Nina was oriented to location, Nina agreed she had been to a pool hall at Harbor/Westminster, but could not remember when. *See* 1-ER-5, 15 (district court citing to Nina interrogation transcript, p. 33). There was no indication whatsoever that she knew what poolhalls or other establishments were located at Harbor/Westminster, until shown a photo (at which point she repeatedly denied being present). Her disorientation to location is underscored by her repeated references to 2000 (a different poolhall from a different day) when she is asked about a poolhall.[1]

---

[1] For these reasons, Lord's statement, at the beginning of the same paragraph that Nina said she was "down at the Phi Hong" is equally false. Once the words "Phi Hong" entered the conversation, and Nina understood the relevant location, she consistently denied being present.

Appellees shamelessly excuse Lord's falsehood as a "drafting error." AAB, p. 40 ("At most, Lord's error was one of punctuation, using an 'and' rather than a period."). Defendants unreasonably speculate that Lord inadvertently connected two ideas by failing to use a period: that he *meant* that at some point he showed Nina a picture (of the Phi Hong), and, unrelatedly, at some point she admitted she was "there" (*i.e.* at the Phi Hong). The sentence reads: "I showed Nina a picture of the Phi Hong Billiards and she admitted she was there with Aaron." 13-ER-2789 (emphasis added). *Even if* Lord had placed a period between the sentences, as Defendants claim he meant to do, the phrase "she was there" would still connect back to "I showed Nina a picture of the Phi Hong, " and would accordingly convey that Nina admitted to being at the place depicted in the photograph. The only reasonable inference is that Lord intentionally sought to convey that he showed Nina the Phi Hong photo, and she responded at the time that she had been "**there**".

Regardless, this is a question to be resolved by a jury. *See Costanich* 627 F.3d at 1111 (district court's description of "'recording errors and misstatements'" untenable; summary judgment requires that all factual inferences be drawn in nonmoving party's favor); *Gregory v. City of*

*Louisville*, 444 F.3d 725, 744 (6th Cir. 2006) (rejecting argument report's "'failure to disclose,' if any, amounts only to negligence" because "culpability is an issue of fact for a jury.").

Lord's report creates a fundamentally false impression of the first interview that goes beyond "mere carelessness." Beyond falsifying her reaction to the photo/falsely stating she said she "was down at the Phi Hong," he concealed ten subsequent first-session denials. Lord misleadingly reported that Nina admitted to being at "a poolhall," while concealing that she had repeatedly said she was at the 2000 (eight times), not the Phi Hong, and that she was remembering events from a different day than the day of the shooting, involving members of the victim group[2] (indicating a social relationship with the victims and thus a lack of motive to join any attack). Her description of events at 2000 was no minor detail, it was integral to understanding her first-interview statements. *See, e.g.*, *Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018) ( "[t]here is a wide gulf between telling someone you were…nearby when a shooting occurred and telling someone you were 'present' for a shooting and were 'with the suspects dealing drugs'").

---

[2] 4-ER-443-445[AMF-71-76]

12

Insofar as there is any debate as to Lord's intent, resolution of this factual dispute belongs to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (at summary judgment, the judge "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). [3]

Lord's false police report is no less egregious than the falsifications in *Spencer* and *Costanich.*[4] Lord did not merely distort statements; he concealed the facts necessary to assess the voluntariness and reliability of Nina's statements, including the timeline/duration of questioning and detectives' impermissibly coercive strategies. Lord's report contains no indication that Nina persistently denied being at the Phi Hong for the entire first recorded session (over an hour) until 1:02 p.m., in the face of overwhelming pressure, deception and intimidation. There is no

---

[3] Qualified immunity is unavailable for Lord's false report. *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001); *Carillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015); *see also, Lobato,* 2022 WL 4017055, at *7–10, *aff'd. Lobato*, 2023 WL 6620306.

[4] In *Gausvik*, a police officer incorrectly indicated 8 children accused the Defendant of sexual abuse (2 victims positively identified the Defendant); the number 8 came from a victim statement that the Defendant "abused at least eight other child victims." *Gausvik*, 345 F.3d at 817. In *Spencer*, a witness stated she was not abused, but was falsely quoted to have described abuse. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

description of Martin's confrontation before the second session, nor any indication of the coercion used to finally secure her admission 20 minutes into the second session. Between 12:57 -12:58, Lord called her a liar five times, despite Nina's inconsolable crying and pleas to be believed ("I promise you, just please believe me."). At 12:59, Nina asked, "can I just admit everything?" 10-ER-1972-1980[UMF-307-322]. By 1:02, she had denied being at the Phi Hong twelve times – all of which were omitted from Lord's report. 10-ER-1980-1981[UMF-323]; 11-ER-2107-2110[UMF-505]. By 1:02, detectives had falsely claimed, at least eight times, they had irrefutable video and GPS data placing Aaron/Nina at the scene. 10-ER-1985-1987[UMF-333]. Lord's report indicated he told Nina "she needed to be honest," but omits that detectives accused Nina of dishonesty more than 20 times during the course of the interviews. 12-ER-2389-2393[AMF-459].

Lord's failure to report that Nina only capitulated four hours after the first session began, and in response to overwhelming verbal and physical intimidation Sgt. Martin (and Lord) – is foundational to Plaintiffs' claims and fundamentally inappropriate for resolution at summary judgment.

Beyond Lord's false description of Nina's statements and diagram, Lord falsely reported that three other witnesses placed Aaron at the Phi Hong; this was not true.[5] The report is replete with additional mischaracterizations that cannot reasonably be construed as mistakes. *See* 4-ER-440-445[AMF-64-77]. Their numerosity makes unreasonable any inference that Lord's entire report was not an exercise in deliberate fabrication.

### 2. *Deliberate Fabrication Includes Material Omissions*

*O'Doan v. Sanford*, 991 F.3d 1027, 1045 (9th Cir. 2021) is inapposite. There is a vast distinction between concluding, as *O'Doan* panel did, that omitting a suspect's previous seizure was a "mere omission," and concluding the same of a report falsely stating that a witness admitted to being at a crime scene when she in fact emphatically denied remembering any such thing. *See Costanich*, *supra*, 627 F.3d 1101 at 1113. The instant appeal presents (1) an omission of the repeated

---

[5] Elvis Doan did not place Aaron at the poolhall. John Nguyen believed Aaron was there because he was at a house hangout later, but thought Aaron left the poolhall before the fatal chase because *he did not see Aaron following the other cars*. Anthony Nguyen misidentified Aaron's car and said Alex (a passenger in Aaron's car) was not at the scene. 4-ER-605-607[AMF-78]; 5-ER-940-942[AMF-506–517].

emphatic denials *plus* (2) an outright lie that the witness admitted being there. *O'Doan* does not hold that omitting a witness' repeated, material denials is constitutionally permissible. Changing Nina's statement from "No" (I was not there) (16 times total), to "Yes," (I was) entirely transforms the meaning of her statements.

*Lobato* is far more analogous, and distinguished *O'Doan* on the requirement to consider the "the totality of the mischaracterizations, discrepancies, and omissions between" plaintiff's account and defendants' reports. *Lobato v. Las Vegas Metro. Police Dep't*, No. 22-16440, 2023 WL 6620306, at *1 (9th Cir. Oct. 11, 2023) (unpublished) aff'd in part, rev'd in part and remanded, No. 22-16440, 2023 WL 6620306 (9th Cir. Oct. 11, 2023). *Lobato* found police reports provided direct evidence and raised a genuine dispute regarding defendants' deliberate fabrication where they, among other things, (1) omitted plaintiff's statements regarding the location and timing of an unrelated incident, (2) mischaracterized plaintiff's reaction to a photograph, (3) falsely added details placing the unrelated incident near the crime's time and location and (4) embellished her statements to conform the unrelated incident details to details of the crime. *Id.* at *4 – 10

16

Lord's report similarly (1) omitted Nina's <u>eight</u> references to being at 2000, which she said was near Koreatown Plaza, not Phi Hong, on a different night, with victim group members; (2) inverted her reaction to the Phi Hong photo, excluding her <u>sixteen</u> denials, and fabricating that she said she was there; (3) thereby placing her at Phi Hong on the shooting night; and, (4) conformed her account of a "chase" near the restaurant, 3.6 miles away, to support the theory of a trapping of victims on Westminster that never occurred.[6]

These exclusions were "not obviously the product of carelessness," *Caldwell*, 889 F.3d 1105 at 1115, and alone are strong evidence of fabrication, requiring remand. Like *Lobato*, the Court should distinguish *O'Doan* because the "totality of [Lord's] mischaracterizations, discrepancies, and omissions between [Nina's] account of [the shooting night] and [Lord's] recounting of [Nina's] statements... provide[] direct evidence that [Lord] fabricated evidence to make it appear" Aaron was part of the Phi Hong shooting. *Lobato*, 2023 WL 6620306, at *1 (9th Cir. Oct. 11, 2023).

_____

[6] Lord's report also gave the false impression that Nina said Aaron participated in trapping a car when she twice clearly denied any role in trapping a car. 12-ER-2359[AMF-363].

It is untrue that the report sufficiently included exculpatory information. None of Lord's supposed disclosures alerted the reader to Nina's true reaction to the photo, unambiguous denials, or references to 2000. *See* AOB, pp. 58-59. Moreover, many of his "disclosures" actually obscured exculpatory information/evidence of coercion. For example, Lord disclosed Nina and Aaron's statements to each other that they were not at Phi Hong, but then immediately falsely framed them as lies: "They had told us they were there, but both were denying [to each other] they had told us…" Aaron uniformly denied being at the Phi Hong; Nina repeatedly denied being present before being manipulated and intimidated into making an admission.

### 3. The OCDA Relied on Lord's Report

Lord's misrepresentations unquestionably set in motion the chain of events that led to Aaron's deprivation of liberty. *E.g., Stoot,* 582 F.3d at 926–27 (police officer could "reasonably have foreseen that a coerced confession would be used against [the suspect] and would lead to [] detention.") (internal quotation omitted).

DDA Feldman unambiguously testified in deposition that he would have relied on officers' representations to determine if sufficient evidence

18

supported murder charges. He was asked if, in a case of this magnitude, he would have relied on detectives' representations to determine if sufficient evidence supported filing a complaint. He answered: "Precisely." Feldman would necessarily have relied on Lord's report regarding Martin's unrecorded 30-minute confrontation.[7] He also would have relied upon Lord's representations that three witnesses placed Aaron at the Phi Hong, which was untrue. 9-ER-1654-1662[AMF-525-527]; 15-ER-3286-3288; Ex. 7(a) 1:05:09 – 1:05:48; *Lobato*, 2022 WL 4017055, at *9.

## B. Nina's Fabricated Diagram

Appellants cannot deny that Lord told Nina to write "Westminster." Nina testified in deposition that she wrote "Westminster" to comply with Detective Lord's instruction. 11-ER-1999, 2001-2004[UMF-365, 371-373]. While drawing the circle on the diagram, Nina explained that her drawing pertained to the area near "the restaurant." 11-ER-2001[UMF-

---

[7] If, as defendants contend, Nina made no statements during Martin's 30-minute confrontation, it confirms that Lord lied (again) in reporting "Nina…admitted to him she had not told…the entire truth about what she knew about this incident during the first interview." 13-ER-2793. Feldman relied on the lie that Nina's sobbing resulted from consciousness of guilt, not Martin's confrontation.

370]. Nina's reference to the "restaurant" established a location 3.6 miles from the shooting—yet she was effectively instructed to label her depiction "Crime Scene."[8] Lord's report failed to disclose both Nina's placement of the diagram at "the restaurant" and Lord's instruction to write Westminster. The report falsely claimed Nina only backtracked about the location only after Aaron entered the room—creating the false impression that Aaron's presence was what caused her to backtrack (when in reality she always placed the diagram 3.6 miles away from the shooting).[9]

Defendants trivialize Lord's fabrication while ignoring the paramount importance of Nina's credibility. Nina's diagram was

---

[8] Defendants misrepresents Nina's testimony about the diagram (AAB p. 54); 24-ER-4830 ("I saw a car switching lanes pretty quickly and that's all I can remember"). Objective evidence shows no car "trapping" occurred near the shooting. 6-ER-1081-1084[UMF-73]. Nina consistently testified that the diagram and description of a chase related to cars leaving the park. 21-ER-4829-4831, 4879-4883, 4891-4892.

[9] The Vietnamese translation presented at trial was *false*. Aaron did not ask Nina to lie about the shooting night; when Aaron did talk to Nina about the shooting night, he repeatedly told her to "just tell them the truth." Plaintiffs' expert's unrebutted translation shows Aaron requested Nina to say they were just watching a movie with reference to their sexual/romantic involvement (Nina was underage), not, as the false translation conveys, the shooting night. 6-ER-1098-1099[UMF-79], 1132-1133[UMF-101].

indispensable to the prosecution's case. No eyewitness testified to seeing Aaron in the Phi Hong parking lot; indeed, two prosecution witnesses testified they did *not* see his car. Cell phone GPS evidence placed him 3.6 miles away (a 10-15 minute drive) less than 20 minutes before the shooting. Prosecution witnesses testified he was not a gang member. 8-ER-1318-1319[UMF-9-10]. The prosecutor's closing argument explicitly asked the jury to credit Nina's diagram over substantial evidence exonerating Aaron – including Nina's own inconsistencies and contradictions, the absence of eyewitness testimony and GPS evidence.

## II.  Nina's Interrogation Satisfies the Shocks-the-Conscience (Deliberate Indifference) Standard

In assessing the coerciveness of a third-party witness interrogation, the question is whether the interview techniques were so coercive and abusive that police knew or should have known they would yield false or unreliable information. *Spencer*, 857 F.3d at 799-800. The focus is on the totality of the circumstances, not any single technique. *See Tobias*, 996 F.3d at 581. It is well-established that youth is a consideration in assessing coerciveness. *Crowe*, 608 F3d at 431.

And while there may be no right to have a witness interviewed in a

particular way, whatever limits apply on the coercion of juvenile *suspects* must apply at least equally to juvenile *witnesses*. If anything, the coercion permissible in a juvenile *witness* interrogation is less than the coercion permissible in a juvenile *suspect* interrogation.

### A.    Qualified Immunity Is Unavailable

Qualified immunity is unavailable for coercion of juvenile confessions. *Crowe*, 608 F.3d at 432 (qualified immunity "manifestly inapplicable" where officers subjected juveniles to hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured; these techniques shocked the conscience under clearly established law in 1998).

Defendants' reliance on *Tobias*, 996 F.3d at 581-582 (9th Cir. 2021), is misplaced. *Tobias* held that police used improperly coercive interrogation techniques where detectives threatened that, if a juvenile murder suspect continued to "lie," he would be viewed as a "cold-blooded killer," and the court "might throw the book at [him]." The Ninth Circuit nonetheless applied qualified immunity on a 14th Amendment substantive due process claim because, although *Tobias* was pressured to confess, the interrogation lasted only 75-90 minutes. *Id.* at 576 (75

minutes), 590, 595 (concurrence noting 90-minute duration). The less than 90-minute duration is what distinguished *Tobias* from *Crowe* (6 hours) and *Cooper* (4 hours). *Crowe* at 418-423; *Cooper* at 1237. The Ninth Circuit was clear, however, that conscience-shocking behavior does not automatically require "hours and hours" of interrogation as in *Crowe*. The analysis depends on both the interview's duration and coerciveness. *Tobias* at 585-586.

*Tobias* does not entitle Defendants to qualified immunity. The interrogation here lasted far longer than in *Tobias,* and involved far more egregious coercion. Nina's interrogation began at 8:08 a.m. and ended at 3:01 p.m. (the tape ends at 3:25). The first recorded session was from 8:08 a.m. until 9:11 a.m.; Martin's confrontation lasted 30 minutes; Nina's second on-camera interrogation began at 12:39 p.m. and ended at 3:00 p.m. In total, Nina's interrogation lasted approximately seven hours. While the entire interrogation time must be counted, even the active interrogation time (~3 hours) is  twice the duration of *Tobias* (75-90 minutes). The active questioning time was 2 hours and 51-56 minutes (2:51 according to Defendants; 2:56 according to Plaintiff, counting the time Aaron/Nina were placed together for observation and excluding

several pauses in the second session as a team of 3 detectives took passes questioning Nina).

Beyond the duration, Nina endured coercion that easily rivals the unconstitutional coercion in *Tobias*, *Cooper*, and *Crowe*. As in *Cooper* (and *Tobias*), Nina was "hammered" with questions, "pressured to admit guilt," and manipulated by detectives. Detectives told Nina outrageous lies about the evidence, insisting 10 times they had cellphone-GPS evidence conclusively placing her and Aaron at the crime scene and 7 times they had video-surveillance showing their car among the cars on Westminster. 11-ER-2053-2054.

But beyond even *Crowe,* detectives did not merely reference inculpatory evidence (*Crowe* at 419), they further disoriented Nina with fake physical props including cell phone maps, video surveillance stills, and the "red book" purporting to contain "all the proof." Detectives even showed her a still-shot taken from video-surveillance of the Westminster chase, falsely claiming it was Aaron's car. They falsely told her Aaron, Alex, Tony and Julie had confessed. None of them had.[10] 10-ER-

---

[10] The Constitution does not permit deception that causes an innocent person to confess. *See Harris v. Bornhorst*, 2004 WL 7340519 (N.D. Ohio 2004) (§ 1983 case, police "took advantage of [minor suspect's] youth and

1845[UMF-87-88], 1883[UMF-171]; 11-ER-2007[UMF-379], 2016[UMF-400].

But what truly sets this case apart is the cocktail of outrageous deception and fierce bullying. After detectives relentlessly pressured and lied to Nina for more than an hour, Sergeant Martin resorted to brute intimidation, pulling Nina into his office, towering over her, planting his foot on her chair, pointing his finger within inches of her face, and screaming "at the top of his lungs" that she was a "goddamned liar" and a "fucking liar," while threatening "deep trouble" if she didn't give them their version of the truth. 10-ER-1935-1952[UMF 248-270] ("If you don't tell the fucking truth you will be in deep shit"). No similarly aggressive confrontation occurred in *Crowe*, *Tobias* or *Cooper*, and certainly not in conjunction with outrageous false evidence ploys.

By the time Martin ended the belligerent tirade, Nina was sobbing and had reached an obvious emotional breaking point, as in *Cooper* (and

---

inexperience by using deception to" convince him of the existence of inculpating evidence meaning "he had no option but to confess."); *Woods v. Clusen*, 794 F.2d 293, 295-296 (7th Cir. 1986) (finding a confession involuntary when detectives falsely claimed to have found suspect's fingerprints).

*Tobias)*.[11] *Cooper,* 963 F.2d 1220, 1240-1241 (9th Cir. 1992) (noting plaintiff was "…emotionally worn down, stressed, and infused with a sense of helplessness and fear," reducing him "to a state of agitation and anxiety marked by tears and sobbing"); *Tobias* at 585 (observing juvenile suspect was "panick[ed]," "crying," and "scared to shit."); *see also, Henry v. Kernan*, 177 F.3d 1152, 1027, 1157 (9th Cir. 1999) (describing involuntary confession as long, incoherent and confused statement after suspect became "shaken, confused and frightened, crying in parts and frequently asking for forgiveness"). Nina testified that Martin's confrontation left her "extremely fearful" and "afraid for her life." She believed she "wasn't going to be able to go home, so [she] had to tell them what they wanted [her] to say in order for me to go home." 10-ER-1951, 1952[UMF-268-269]).

Finally, Detectives manipulated Nina with implicit threats and promises, repeatedly minimizing the consequences of an admission (e.g. "it's not a crime to be there"), while threatening worse trouble if Nina

---

[11] *See* 10-ER-1935[UMF-247-248], 10-ER-1936[UMF-249]; 10-ER-1938[UMF-250], 10-ER-1940[UMF-252], 10-ER-1958[UMF-283], 10-ER-1961[UMF-288-289], 10-ER-1974, 1975[UMF-313-314], 10-ER-1977[UMF-319], 10-ER-1982, 1983[UMF 325-326].

persisted in her denials ("but it is a crime to lie to us" and if you don't talk it "makes you look like...the hardcore one"). (10-ER-2618, 2634). During the first recorded interrogation, they told her five times, in response to her denials, that the faster she gave them the information they wanted, the faster she could leave, unmistakably communicating she was not free to leave until she provided the narrative they wanted. Contrary to Defendants' assertions, Martin later threatened Nina with conspiracy charges,[12] emphasizing that, while Aaron "made his decision," "all you have to do is say 'yeah' we were there," and noting Nina was "still young enough to have a life" (suggesting her life would be over if she didn't confess). 10-ER-1853[UMF-107], 1860[UMF-127], 1949[UMF-265]; 11-ER-2064-2066[UMF-484-486]. *See* *Tobias*, at 581-582 (emphasizing police promise to release suspect without a charge upon confession was coercive as matter of law); *see also Woods,* 794 F.2d at 295-296; *Wilkins* 2006 WL 8443775 (D.N.M. 2006), at *16 ("no question

---

[12] 13-ER-2737-2738 ("Do you know what conspiracy is? That is where a group of people...conspire to commit a crime together...we have...carloads of people... they all meet...and...say 'let's us go kick some ass over here... so they are conspiring to commit a crime. **You are in one of those cars young lady.** Okay, so twenty-six year old boyfriend driving you around putting you in a position you don't want to be in.")

… that a jury could find that threats of harm, as well as promises of help, leniency, and safety, are improperly coercive tactics, particularly when used against a young, uneducated defendant").

The abusive interview techniques here – especially the combination of trickery, browbeating, and implied promises to be released as soon as she told "the truth"– easily exceed the coercion in *Tobias* (with longer duration). Accordingly, qualified immunity here is, as in *Crowe*, "manifestly inapplicable." *Crowe*, 608 F.3d at 432.

## B. Defendants' Misconduct Exemplifies Deliberate Indifference

While coercive practices must "shock the conscience," the Ninth Circuit has repeatedly confirmed that, in the context of third-party witness interviews, conscience-shocking means, "[d]eliberate indifference," defined as "the conscious or reckless disregard of the consequences of one's acts or omissions." *Spencer v. Peters*, 857 F.3d 789, 802 (9th Cir. 2017); *Gantt v. City of Los Angeles*, 717 F.3d 702, 707-08 (9th Cir. 2013) (holding failure to instruct jury that deliberate indifference independently satisfies the shocks-the conscience standard is reversible error). State of mind is generally not appropriate for

resolution on summary judgment. See *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Loc. Union No. 1936, United Bhd. of Carpenters & Joiners of Am.*, 680 F.2d 594, 598 (9th Cir. 1982) (holding summary judgment generally not appropriate where motive and intent play a leading role in a determination of liability, and where the proof is largely in the hands of the defendants)

Detectives' choice to double down on aggressive techniques after Nina's first recorded session exemplifies conscious/reckless disregard for the truth. For over an hour, detectives failed to secure an admission from Nina despite intense pressure, accusations of lying, and outrageous lies about the evidence. As the first interview concluded, Detective Danielson openly lamented they had gotten nowhere, ("…we've wasted at least an hour and we don't know any more now than when we started this interview."). 13-ER-2662.

Detectives had every reason to take her denials seriously: they knew that Aaron was not a gang member, Aaron and Nina had consistent alibis, corroborated by cell phone GPS evidence showing them near Bolsa/Bushard, 3.6 miles from the Phi Hong. Because Aaron and Nina had no access to cell-GPS evidence, they could not have conformed their

alibi to this evidence. Their accounts were also corroborated by video surveillance footage showing that Aaron's car was not among the cars involved in the chase leaving the Phi Hong.

Instead of stopping the interrogation to consult objective cell phone and video surveillance footage, Martin chose to browbeat and intimidate and coerce Nina, pulling her into his office and screaming profanities and threats in her face (while standing on her chair and pointing his finger in her face). After Nina had broken down and was sobbing hysterically, Lord initiated the second recorded interrogation, where he extracted her brief, incoherent admission. Nina's request to "just admit everything" indicated she would say anything to escape an unbearable situation. As the interview progressed, more red flags presented irreconcilable discrepancies between Nina's short-lived admissions and the physical evidence.

Drawing inferences in favor of Plaintiffs, the choice of extreme coercive tactics was the product of a calculated plan as reflected by the inadvertently recorded hallway meeting in which they recognized the need to "flip" someone. *See Cooper*, 963 F.2d at 1224 (emphasizing calculated plan to, among other things, "pressure and interrogate [a

suspect] until he confessed").

Despite Defendants' contentions, the techniques here bear no resemblance to the techniques found insufficiently coercive in *Cunningham*, 345 F.3d 802 (9th Cir. 2003), *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003), *Devereaux*, and *McSherry v. City of Long Beach*, 584 F.3d 1129 (9th Cir. 2009). *Devereaux* involved interviewing a child in a police car and admonitions to tell the truth; there was no evidence of trickery, yelling or browbeating. *Deveraux*, 263 F.3d at 1077. *Gausvik* involved a two-hour child interview without breaks; there was no evidence whatsoever of coercive interview tactics (no pressure, intimidation, deception or threats). *Gausvik*, 345 F.3d 813, 815. *Cunningham* involved an eight-hour interview during which the subject became emotional and requested to call a therapist. *Cunningham*, 345 F.3d at 806. None of these cases involved repeated, elaborate witness deception. Nor did they involve screaming profanities and physical intimidation of juvenile witnesses. The techniques used here far more closely resemble the impermissible techniques of *Cooper* and *Crowe*.

These techniques also exceed those in *Gantt*, 717 F.3d at 708. *Gantt*'s adult witness claimed to have been threatened with murder

charges and questioned for four to six hours (no estimate of active questioning) despite being sleep-deprived and high on crack. The *Gantt* officers did not disorient the witness with repeated lies about irrefutable cell GPS evidence and video surveillance footage, nor did they scream at or intimidate him until he was crying inconsolably. Even without deception, screaming, and physical intimidation, the Ninth Circuit held that the coercion of an adult in *Gantt* was sufficiently egregious to instruct the jury on fabrication of evidence. *See also Hurt v. Wise*, 880 F.3d 831, 848 (7th Cir. 2018), *overruled on other grounds by Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019) (triable issue of fact as to whether reasonable officer would have known that he was applying impermissible pressure to two suspects by accusing them of lying, rejecting denials, feeding facts and threating punishment).

## III. Defendants Should Have Known Aaron Was Innocent Yet Persisted in Coercing an Admission from Nina

Notwithstanding Defendants' representations, Plaintiffs have aways asserted that, during Nina's interrogation, Detectives had available abundant evidence that should have alerted them to the fact that Aaron/Nina were *not* present during the Phi Hong incident and were

entirely innocent. At oral argument, Plaintiffs argued that "we've presented evidence demonstrating that they [detectives] had information available that established that Aaron wasn't one of the cars present on Westminster." 24-ER-5483, (Oral Arg. Tr. p. 18:5-18:8).

As emphasized in Plaintiffs' briefing, detectives knew Aaron was not a gang member. 2-ER-80; 2-ER-192, 196, 254. During oral argument and in briefs, Plaintiffs explained that video surveillance footage available before Nina's interrogation, showed that Aaron's car was not among the caravan on cars on Westminster – he was not present during the deadly car chase, and therefore, Nina's diagram could not have pertained to the Westminster chase. 24-ER-5474, 5482 (Oral Arg. Tr. pp. 9:7-9:21, 17:1-17:13); 2-ER-270 (Affirmative MSJ Reply Brief, p. 18 "…defendants encountered significant red flags that Aaron was not at the Phi Hong: they knew his phone did not place him there, they knew Aaron, Alex and Nina provided the same alibi, and they could see his car was not captured on the video surveillance."); 2-ER-134 (Opp. to Indiv. Officers' MSJ, p. 1 (cell phone evidence placed Aaron 3.6 miles away, consistent with his alibi; Aaron's car did not appear on video surveillance footage, which captured the entire caravan of cars); 2-ER-149 (reckless

disregard for the truth underscored by "exonerating video surveillance"); 2-ER-195 (Aaron's car was absent from the caravan of cars involved in the incident), 1-ER-254 (MSJ Reply) (the video surveillance was "exonerating"); 2-ER-218 ("…an invalid conviction is a direct and foreseeable consequence of framing someone for murder despite an abundance of evidence demonstrating their innocence.")

Likewise, as emphasized at the hearing and in the briefs, both Nina and Aaron's denials were corroborated by cell phone location data showing that, consistent with their statements, they were near the Thanh My restaurant about 20 minutes before the shooting. 24-ER-5473, 5474 (Oral Arg. Tr., p. 8:22 – 9:6) (they could not have conformed their statements to cell phone data they had never seen); 2-ER-136 (MSJ Opposition, "already-analyzed GPS corroborated their alibi), 2-ER-149 ("reckless disregard demonstrated by cell GPS evidence corroborating his account"); 2-ER-195 (cell phone evidence placed Aaron's car 3.6 miles away).

## IV.   *Brady*

By submitting a false report, Defendants breached their *Brady* duty to make exculpatory and impeachment information known to the

34

prosecutor. *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1090, 1095 (9th Cir. 2009) ("Placing ... notes ... in the police file did not fulfill the Inspectors' duty to disclose exculpatory information to the prosecutor. [Exculpatory evidence indicating police identified the wrong person] ...should not have been buried in a file, but should have been made known to the prosecutor").

As Plaintiffs' prosecution expert explained, prosecutors necessarily rely on police officer representations as communicated in reports and verbal statements. Because reports are the primary means by which prosecutors access information required to initiate and pursue criminal prosecutions, prosecutors assume the information they contain is truthful, accurate and reasonably complete. 9-ER-1663-1676, 1700-1748[AMF-529-536, AMF-542-546, 547-555].

Here, Lord's false report omitted significant material, exculpatory information, deceiving DDA Feldman and undermining his ability to evaluate the evidence. In a complex homicide investigation, it is especially important for prosecutors to be able to rely on the accuracy and completeness of police reports. This investigation involved numerous witnesses and more than 15 co-defendants, generating over 60 taped

interviews totaling more than 90 hours of interview footage. Because prosecutors cannot be expected to sift through dozens of hours of videos to ensure they have made a correct charging decision, they rely on officers to flag exculpatory evidence generated in interviews. 9-ER-1664-1703[AMF-533-542].

It goes without saying that prosecutors rely exclusively on police reports for accurate descriptions of witness interviews that were not recorded at all – here, the unrecorded interview of Nina by Sgt. Martin. 9-ER-1696[AMF-541]. Lord's police report conceals Nina's description of a terrifying confrontation, depriving Feldman of meaningful access to information necessary to evaluate the reliability and voluntariness of her statements. 8-ER-1592-1599[AMF-495-497].

Finally, even if exclusion of exculpatory evidence from police reports (including about the diagram) were considered permissible because information is available elsewhere (i.e. a video), that is not the case when, by excluding exculpatory information, and including affirmative misrepresentations, the report and diagram communicate a false and misleading description of events. See, e.g., *Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) (noting "material omission"

is a form of false evidence). Prosecution access to information is nullified if the government obscures its exculpatory value. See, e.g., *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005) citing *United States v. Shaffer, 789 F.2d 682, 690* (9th Cir. 1986) (noting government statements that tapes would be of no defense value negated disclosure of their existence).

## V.    Plaintiffs Relied on Admissible Expert Opinion

Because the District Court considered Plaintiffs' expert reports (1-ER-21), it necessarily determined they were admissible, overruling defendants' objections. 1-ER-12-13 (objections to considered evidence impliedly overruled); 1-ER-21 (considering expert report opinions insufficient to create genuine dispute of fact because "no constitutional right to have witnesses interviewed in a particular manner.")

The district court misunderstood that the reports did not merely criticize detectives' interrogation techniques. Plaintiffs' police practices expert supplied indispensable evidence that Nina's admissions and diagram were generated through interview techniques detectives knew or should have known would yield unreliable evidence. (11-ER-2125[UMF-519]; (14-ER-3098-3099). *See Richards v. Cnty. of San Bernardino*, 39 F.4th 562 at 571; ("Expert opinion evidence is itself

sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion"); *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018) (holding it is abuse of discretion to exclude police practices expert testimony regarding whether failure to disclose statement deviated from the norm of what would be expected of a reasonable police officer).

Plaintiffs' false confession expert supplied evidence addressing the known psychological effects of deception and other coercive interrogation techniques on juveniles. 11-ER-2044-2045[UMF 453] (youth as a risk factor for false confession); 11-ER-2053-2063[UMF-462-482, 2063-2064[UMF-482-484] (Kassin opinions re deception; promises of leniency). This Circuit recognizes that expert testimony on false confessions is admissible in § 1983 cases arising from allegedly coerced statements. *Tekoh v. Cnty. of Los Angeles*, 75 F.4th 1264, 1266 (9th Cir. 2023) (reversing exclusion of coerced confessions expert because "it is 'hard to imagine anything more difficult to explain to a lay jury' than the fact that the alleged perpetrator could have confessed to a crime he did not commit.'").

The district court impliedly overruled Defendants' authentication

and signature objections. These objections fail because (1) expert reports are not affidavits or declarations, and (2) evidence not presented in admissible form at summary judgment may be considered if it may be presented in admissible form at trial. *Ward v. Crow Vote LLC*, 634 F. Supp. 3d 800, 807 (C.D. Cal. 2022), *aff'd*, No. 22-56108, 2024 WL 2239010 (9th Cir. May 17, 2024); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (holding hearsay evidence can be considered at summary judgment if declarant could later present evidence by direct testimony); *Rutter Group Prac. Guide*, E. Matters Constituting Proof, Fed. Civ. Pro. Before Trial Ch. 14-E (discussing submission of expert reports at summary judgment and listing no signature requirement).

## VI. Plaintiffs Submitted Substantial Evidence Supporting Their Monell Claims

Conscious disregard under *Monell* exists where a rights violation was "a highly predictable consequence" of failures to equip officers with specific skills or training to handle recurrent situations. *Id.* at 63 – 64; *Canton,* 489 U.S. at 390; *Kirkpatrick v. County of Washoe,* 843 F.3d 784, 794, 796-797 (9th Cir. 2016); *Gregory,* 444 F.3d at 753 ("Widespread

officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations.").

GGPD had no policies or formal training addressing Defendants' *Brady* obligations, truthful and accurate reporting, or risk factors for involuntary confessions. Reliance on officers' academy training is insufficient. 4-ER-415-417, 455[AMF-12-17, 106]. *Cristini v. City of Warren*, No. 07-11141, 2012 WL 5508369, *13 (E.D. Mich. Nov. 14, 2012) ("'[t]here is no reason to assume that police academy applicants are familiar with the constitutional [*Brady* disclosure requirements]"); *Jackson v. City of Cleveland*, 925 F.3d 793, 835-836 (6th Cir. 2019).

GGPD had no policy or formal training to ensure compliance with Brady disclosure requirements. 4-ER-415, 416[AMF 12,13]. Deposition testimony demonstrated that GGPD officers were oblivious to their obligations to disclose exculpatory information and not fabricate evidence. GGPD detectives believed they could omit obviously exculpatory information that they subjectively disbelieved,[13] found unpersuasive or believed was outweighed by inculpatory information. 4-

---

[13] *Costanich*, 627 F.3d at 1113 (an officer's subjective belief in a suspect's guilt does not excuse deliberate fabrication of evidence).

ER-417-421, 455[AMF-19-37]; 4-ER-455[AMF-107-112] (Lord did not know or understand whether GGPD requires truthful and accurate reporting, permits dishonesty or outright falsification, or prohibits advancing evidence officers know or should know is false).

Despite General Order 6.2, GGPD provided no guidance on avoiding coercion or involuntary confessions, including coerced juvenile confessions. 4-ER-631—635, 639[AMF-125-138, 148]. As 30(b)(6), Lord could identify no training, policies or guidelines specific to juvenile interrogations, say whether youth or suggestive techniques can increase the risk of juvenile involuntary confessions, or remember being trained to handle juvenile and adult interrogations differently. Lord could not say whether overbearing psychological pressure was a form of coercion nor could he provide examples of factors that increase the risk of involuntary confessions. He could not say whether psychological pressure might include accusations of lying, promising they could go home if they told the truth, or deceiving them about evidence. 4-ER-459-461, 465-466[AMF-133-134, 139-147, 149-152, 181].

Defendants' *Brady* violations, deliberate fabrication and coercion of Nina's short-lived admissions were "a highly predictable consequence" of

Garden Grove's failure to apprise Defendants of their constitutional obligations. *See Gregory,* 444 F.3d at 753 (6th Cir. 2006) (officers' testimony demonstrated they generally received no training on *Brady*-disclosure coupled with expert testimony that training on exculpatory evidence was non-existent).

Given material factual disputes regarding Garden Grove's *Monell* liability, the summary judgment grant, without reaching the merits, should be reversed.

Dated: December 12, 2024          Respectfully submitted,

McLANE, BEDNARSKI & LITT, LLP

By:____/s/ Lindsay Battles_____
LINDSAY BATTLES
   Attorneys for Plaintiffs-Appellants

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:*
*http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-189

I am the attorney or self-represented party.

**This Reply Brief contains 6,992 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R 32-1.

**Signature** */s/ Lindsay Battles*       **Date** December 12, 2024

*(use "*s/[typed name]*" to sign electronically filed documents)*